```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA

AMMAR AL-BALUCHI,                 .
a/k/a                            .
Ali Abdul Aziz Ali,              .   CA No. 08-2083 (PLF)
                                 .
        Petitioner,              .
                                 .
   v.                            .   Washington, D.C.
                                 .   Wednesday, February 27, 2019
ROBERT M. GATES, et al.,         .   10:08 a.m.
                                 .
        Respondents.             .
. . . . . . . . . . . . . . . . .
```

```
                 TRANSCRIPT OF MOTIONS HEARING
            BEFORE THE HONORABLE PAUL L. FRIEDMAN
                 UNITED STATES DISTRICT JUDGE
```

<u>APPEARANCES</u>:

| | |
|---|---|
| For the Plaintiff: | DANIEL L. KAPLAN, ESQ.<br>JON M. SANDS, ESQ.<br>SARAH S. GANNETT, ESQ.<br>Federal Public Defender Office<br>District of Arizona<br>850 West Adams<br>Suite 201<br>Phoenix, AZ 85007 |
| For the Defendants: | KRISTINA A. WOLFE, ESQ.<br>U.S. Department of Justice<br>Federal Programs Branch<br>P.O. Box 883<br>Ben Franklin Station<br>Washington, DC 20044 |
| | TERRY M. HENRY, ESQ.<br>RONALD J. WILTSIE, ESQ.<br>U.S. Department of Justice<br>Federal Programs Branch<br>1100 L Street, NW<br>Washington, DC 20530 |
| Court Reporter: | BRYAN A. WAYNE, RPR, CRR<br>U.S. Courthouse, Room 4704-A<br>333 Constitution Avenue, NW<br>Washington, DC 20001<br>(202) 354-3186 |

1              P R O C E E D I N G S

2              THE DEPUTY CLERK:  This is civil action 08-2083,

3     Ammar Al-Baluchi versus Robert M. Gates, et al.  Will counsel

4     please stand and identify yourselves for the record.

5              MR. KAPLAN:  Good morning, Your Honor.  Daniel Kaplan

6     for the petitioner.  My co-counsel, Sarah Gannett and Jonathan

7     Sands, are at counsel table.

8              THE COURT:  Good morning.  Mr. Sands, how are you?

9              MR. SANDS:  Fine, Your Honor.

10             THE COURT:  It's been a couple of decades since we've

11    seen each other.

12             MR. SANDS:  It seems that way.

13             MS. WOLFE:  Good morning, Your Honor.  Kristina Wolfe

14    on behalf of the government, and I'm joined today by

15    Mr. Terry Henry and Mr. Ron Wiltsie.

16             THE COURT:  Good morning, everybody.

17        So, just to sort of set the stage where I think we are,

18    obviously, Mr. Al-Baluchi has had a habeas petition, one of

19    what were at the time many, many habeas petitions by Guantánamo

20    detainees filed in this court.  At one time or another, most of

21    the judges in the court had between eight to twelve of those

22    petitions.  This has been pending for a long period of time.

23        In the meantime, military commission proceedings were begun

24    against Mr. Al-Baluchi.  So there are a whole bunch of motions

25    that have been filed relating to habeas and discovery and a

1    variety of other things.  We've agreed, I think, counsel and

2    I, that the logical way to proceed is to deal with two motions

3    and leave the others aside for the moment.  Depending upon how

4    I rule on these two motions, I may not have to get to those

5    motions for a very long time, if ever.

6        So, Mr. Al-Baluchi has filed a motion for permanent

7    injunction or mandamus with respect to the capital military

8    commissions, arguing generally that they're unlawful for a whole

9    variety of reasons, and the government has filed a motion to

10   hold in abeyance the habeas petition before me pending

11   completion of the military commissions.

12       There were motions originally filed some years ago.  Then

13   I asked that the parties refile those motions and focus on, in

14   addition to the other things they focused on, in revising some

15   of their original arguments, the D.C. Circuit's opinion in *In re*

16   *Al-Nashiri,* 835 F.3d 110.  So those motions were refiled, there

17   have been oppositions, and there have been replies.

18       All of the government's filings have been on the public

19   record.  The filings for the petitioner, Mr. Al-Baluchi, have

20   been filed in a format where -- and they're labeled as Top

21   Secret, although reading the documents, probably 90 percent of

22   them could have been filed publicly.

23       Whether or not it makes sense at some point to try to work

24   to file a redacted version of the public record is up to you.

25   But to the extent there's a public interest in these issues, the

1    public only gets to see one side of the argument at this point.

2    I guess I will make my opinion public.  Therefore, they'll be

3    able to see everything, although it too may have to be in

4    redacted form.  My guess is that not very much will have to be

5    redacted.

6        So I think, again, we have agreed that this hearing and

7    these arguments can probably be held entirely in open court.

8    Should it develop that anybody says anything that either the

9    government or the court security officer believes is getting

10   us into areas that we shouldn't in public proceedings, somebody

11   will stand up and say so.

12       If the argument suggests to counsel for either side that we

13   may need to go into a classified session near the end of the

14   morning, then we can do that as well, but I think from what

15   you've told me through my law clerk, everybody's in agreement

16   that we can probably do most of this in open court, because most

17   of it's legal -- and interesting legal issues and not simple

18   legal issues.

19       Since there are two motions pending, I hope you've agreed

20   on who's going to go first and what's the logical way to

21   proceed.

22           MR. KAPLAN:  I had assumed I would go first.

23   I assume you're in agreement?

24           MS. WOLFE:  Yes.  I'm in agreement.

25           THE COURT:  All right.  Mr. Kaplan.

1          MR. KAPLAN:  Thank you, Your Honor.

2      Let me just say initially two quick things.  I certainly

3  agree with what the Court has said as far as classified

4  information.  My intention this morning is that the classified

5  materials, the materials that necessitated the Top Secret

6  filing, are really factual matters relating to Mr. Al-Baluchi's

7  treatment.  I intend this morning to just refer to those as I

8  just have, Mr. Al-Baluchi's treatment, and I may use the word

9  "torture," and that's as far as I intend to go.

10          THE COURT:  Okay.  And I've read the briefs, the

11  classified and the unclassified.  I will say that I have not

12  gone back and read in any detail the statement of facts which

13  was filed in connection with the habeas proceeding sometime ago.

14          MR. KAPLAN:  For purposes of today's arguments, I

15  think it's simply appropriate for the Court and everyone here

16  to understand that this is a question of very, very severely

17  harsh treatment and what I'm going to characterize as "torture,"

18  and that will enable us to have the discussion we need to have

19  this morning.  I don't think we would have any objection, as the

20  Court has suggested, to creating and clearing through court

21  security officers a redacted version of our filings so that they

22  can be on the public record.

23      With that being said, good morning again, Your Honor.

24  I am still Daniel Kaplan.  I'm representing the petitioner,

25  Mr. Al-Baluchi.  I intend to essentially attack the issues in

1    both the cross-motions and the order that seems to make sense,

2    but I would certainly welcome the Court to suggest a different

3    way of approaching it if it believes another way would be more

4    efficient.

5         When the government chose to subject Mr. Al-Baluchi to the

6    treatment that's outlined in his declaration, which is part of

7    that statement of facts, it placed a status upon him.  It gave

8    him the status of a victim of torture at the hands of the

9    United States government.

10        That is significant with respect to the legitimacy, the

11   legality of this capital military commission because of a

12   couple of legal principles which have emerged from Guantánamo

13   litigation.  In the Supreme Court's *Hamdan* opinion, in note 16,

14   the Court, summarizing existing law, said, "We do not apply

15   *Councilman* abstention where there is a substantial question

16   whether military tribunal has personal jurisdiction over the

17   defendant."

18        Tied into that is the principle from a long-established

19   doctrine of military law, *McClaughry v. Deming,* a Supreme Court

20   opinion which states that, "Unlike a court, such as this one,

21   which has a continuous legal existence regardless of flaws that

22   may occur in the course of individual cases, a military tribunal

23   is only legal and valid to the extent it's convened and

24   structured in compliance with the governing statute."

25             THE COURT:  So in this case, first there is a

1    governing statute; and secondly, this commission has -- as

2    I understand it, and tell me if it's the same -- people sitting

3    on the commission.  But don't they have sort of a continuing

4    status?  There are four or five, I guess you could still call

5    them codefendants, that are being tried before the same

6    commission for related acts.  Am I right?

7             MR. KAPLAN:  Yes.

8             THE COURT:  But that doesn't make it a continuing body?

9             MR. KAPLAN:  Not in the sense that a court is,

10   Your Honor.  It's still the case that, under the principle of

11   *McClaughry* and *Runkle* and those cases, the commission only has

12   legal existence to the extent it's in accordance with the

13   governing statute.  Our claim is that, with respect to

14   Mr. Al-Baluchi, it's not in compliance with the governing

15   statute.  Again, it only exists --

16            THE COURT:  How is it not in compliance with the

17   governing statute?

18            MR. KAPLAN:  Because it's specifically structured

19   and designed to impose a capital sentence.  Now, it doesn't have

20   to impose a capital sentence, but there are very significant

21   differences between a capital military commission -- how it's

22   structured, how it votes, how it decides -- and a noncapital

23   military commission.  This commission is specifically designed

24   to impose capital punishment, which we argued would be out of

25   compliance with the Military Commission Act.

1          THE COURT:  But the statute -- yes.  There's a

2     difference in the statute between the capital military

3     commission and a noncapital military commission, but as I've

4     read the statute, and I'm not an expert, all the differences

5     work in favor of the individual who's charged.  There are more

6     members on a capital commission than on a noncapital commission.

7     They have to decide unanimously.

8          And while there's a right to counsel in a capital rather

9     than a noncapital commission, you have additional counsel who's

10    death-penalty qualified, would be the term in an Article III

11    court.  There's several other things that the death penalty

12    commission has that are admittedly differences, but they're

13    differences that seem to me, from my reading, to favor the

14    person who's charged with a capital offense rather than disfavor

15    him or her.

16          MR. KAPLAN:  Well, I would say a couple of things in

17    response to that.  I understand the Court's point that a lot of

18    those procedural things seem to favor the defendant, but some of

19    those procedural things don't really favor the defendant.  There

20    is an ability to suspend the sentence in the noncapital context

21    which doesn't exist in the capital context, I think, by the

22    convening authority.

23          THE COURT:  But doesn't the convening authority have

24    the right to change the sentence in both?  Change or modify?

25          MR. KAPLAN:  I think the convening authority does have

1      that authority, but there is a difference, which I will try

2      to check during the break, in terms of suspending the sentence.

3      The other point I'd like to make is that even if it were

4      the case that you could say that some of these procedural

5      differences could be beneficial or protective of the defendant,

6      it wouldn't change the essential fact that it's subjecting that

7      defendant to all the mental strains and stress and what we argue

8      is part of the cruel and unusual punishment of facing the

9      prospect of execution.

10          And it wouldn't change the fact, even if that were not

11     on the table, even if that were not a factor, that being

12     structured to impose a sentence which is prohibited by the

13     Military Commissions Act, even if you could say it has some

14     benefits, would still be in violation of the Military

15     Commissions Act.

16          THE COURT:  Are you saying that the death penalty

17     is prohibited by the Military Commissions Act?

18          MR. KAPLAN:  Yes.

19          THE COURT:  Well, how can the Military Commissions Act

20     then have a whole structure for capital military commissions if

21     it also prohibits the death penalty?

22          MR. KAPLAN:  I don't mean it prohibits it across

23     the board, Your Honor.  I mean it prohibits it where it would

24     constitute cruel and unusual punishment, because the Military

25     Commissions Act has a provision banning cruel and unusual

punishment.  Our claim is that because of the torture to which

Mr. Al-Baluchi has been subjected, giving him capital punishment

would be cruel and unusual, and that process, built into the

military commission's capital trial, would also be part of the

cruel and unusual punishment because it involves layers of

largely non-waivable, post-sentencing reviews.

THE COURT:  Well, there are two separate points

you've made.  I think one is that all that's led up to the

commission -- the psychological, the torture, the inhumane

treatment -- in places where he's been confined previously and

continuing at Guantánamo, and then your other point, I think, is

that some of what I would view as procedural protections, layers

of review, you say also constitute cruel and unusual punishment

because an individual can't waive them?

MR. KAPLAN:  Well, the combination of the fact that

they're non-waivable and the fact that they involve a long

period of time under the shadow of death, the language that the

European Court of Human Rights used in *Soering*, which is

principles that were cited by Supreme Court justices with

respect to the *Lackey* series of cases.  So --

THE COURT:  But, you know, if you break your argument

down, there are certain things you're relying upon that are true

in civilian courts too.  Any defendant charged with a capital

offense is operating under that cloud throughout all of the

pretrial proceedings and concerned about the death penalty being

imposed.  Even though they are waivable in the civilian courts,
the psychological trauma on a person convicted of the death
penalty during what tends to be years -- you know this better
than I do -- years, decades, going through the state court
system, 2254 in the federal courts, Supreme Court, getting
stays.

And, admittedly, the individual himself, with the advice
of counsel, has chosen to take all of those steps, but I can't
imagine that there isn't a huge psychological trauma every time,
waiting for a decision to come out, losing in one court, going
to the next court, winning in that court, losing in the next
court.

I don't quite understand -- putting aside what happened --
the psychological, the torture, and inhumane treatment
beforehand -- the things that are attendant to any death penalty
proceeding, which really is "proceedings" because they multiply
throughout the life of the case, and in various courts it's true
of what civilian defendants face as well.

MR. KAPLAN:  Well, Your Honor, I think what I need to
stress in response to that is at one point you said, putting
aside the torture that occurred beforehand -- and I will accept
the idea that if you put aside the torture, then our claim
doesn't have a lot of legs to stand on.  It is integral to our
claim that this torture occurred.

So this is a type of claim which was really started by

Justice Stevens', separate memorandum in the *Lackey* case, picked

up by Justice Breyer in several separate opinions respecting

certiorari.  It's known in the death penalty circles as a *Lackey*

claim, essentially, more or less like what you've described, and

it has not been accepted so far.  There have not been any cases

that I have found in which the fact of precharging, even

precharging of the defendant, serious pattern of very egregious

torture preceded all of that.

So I certainly accept the idea that integral to this claim

is that it's not just the mental strains and stresses that would

normally affect a civilian defendant, but also the fact that

before any of that begins you have a serious pattern of torture

that's already been inflicted.

So I think it is important that in the *Lackey* context, when

judges and justices have specifically explained why that *Lackey*

theory is not accepted, it's primarily because they find that

the defendant brings it upon him or herself, that they choose to

file an appeal, they choose collateral attacks, and there is

often a non-waivable appeal process to some degree.  But what

really draws a death-row experience out to the tune of decades

is collateral attacks and that sort of thing which the defendant

chooses to undertake.

It's essentially that person's fault is the reason for

rejecting this *Lackey* theory.  It's not Mr. Al-Baluchi's fault

that he was tortured.  He didn't choose that.  He didn't bring

that upon himself.  That was inflicted upon him deliberately by the U.S. government.  So I think there is a significant distinction to be drawn between that normal sort of run-of-the-mill context and what we're dealing with here.

THE COURT:  But is there any United States case law that supports that notion?  Usually, cruel and unusual punishment applies -- correct me if I'm wrong -- applies to a sentence imposed after conviction, not what's happened to an individual beforehand.

MR. KAPLAN:  I did not find any United States case law that dealt with anything remotely similar to the type of treatment that we're dealing with here, with one small exception.  The *Toscanino* case in the Second Circuit, there were allegations of a very serious pattern of torture, allegedly overseen and even participated in, by agents of the U.S. Government.  The Second Circuit took the position that if those were substantiated, they could be grounds for refusing to accept jurisdiction over the defendant.

The government points out that, even in that case, when it was remanded, relief was not granted.  But if you look at the district court's opinion on remand, you will see that when it was remanded, the defendant, who had made all these allegations to the Second Circuit, apparently couldn't substantiate them in the least and couldn't show that the U.S. government agents really had any involvement or even that the treatment was nearly

1    as bad as what he had been claiming.

2         So the fact of the matter is the U.S. courts really --

3    except for the extent to which it was dealt with in *Toscanino,*

4    because this kind of torture was happily unheard of before this

5    Guantánamo experience -- the U.S. courts have not really had an

6    opportunity to establish Eighth Amendment principles to that

7    kind of situation.

8              THE COURT:  Let me ask you this question: If I were

9    to accept your argument in this case, could the same argument

10   also be made for a Guantánamo detainee prosecuted before a

11   military commission if it were a noncapital commission, or

12   is it only when you tie the torture -- you know, let's assume

13   the hypothetical of Guantánamo -- or maybe not hypothetical

14   Guantánamo detainee who's undergone exactly the same kind of

15   treatment that you say your client has; but they're charged in

16   a noncapital case, or they're charged in Article III civilian

17   court.

18             MR. KAPLAN:  If it's in the military commission

19   context, there has to be a decision made at the outset whether

20   it's going to be capital or noncapital.  So in that context,

21   if it's a noncapital commission, the answer is no.  This claim

22   would not have any application to that circumstance.  There may

23   be other claims, but not this claim.

24        In a civilian context, I suppose there also has to be

25   decisions made at the outset whether the case is going to be

1    treated as capital, but if it's a civilian case that is not

2    capital, then, again, the claim would not apply.

3              THE COURT:  All right.

4              MR. KAPLAN:  Now, obviously, a major factor for the

5    hearing today is discussing the *Al-Nashiri* opinion, the D.C.

6    Circuit's most recent *Al-Nashiri* opinion.  We don't believe

7    that the *Al-Nashiri* opinion precludes the argument we're making

8    except in specific respects, which we acknowledged in our motion.

9         We did make an argument initially, which we modified

10   to a preservation argument after *Al-Nashiri*, that *Councilman*

11   shouldn't apply at all outside of the context of service

12   members who are being subjected to court martial.  We certainly

13   acknowledge that that is now being governed by *Nashiri*.

14             THE COURT:  Now, before you get to your larger

15   *Al-Nashiri* argument -- by raising *Al-Nashiri*, you reminded me.

16   It's part of this.  It goes to the abstention argument.  But

17   in the course of their abstention discussion, beginning on page

18   128, I think, going on to page 131 of the opinion, they talk

19   about the fact that Al-Nashiri's allegations relate to his

20   treatment during detention.

21        The court of appeals said, "While deeply troubling, they do

22   not provide any reason to fear that he will not be given a fair

23   hearing in the military commission."  They say nothing about the

24   competence of the commission itself and therefore don't fall

25   within an exception to abstention.

1     Now, I recognize that some of these arguments are

2     interrelated, or when you discuss cruel and unusual punishment,

3     you are discussing it both in the context of jurisdiction vel

4     non and in ultra vires, you're discussing it in the context of

5     the status exception, and you're discussing it in its own merits

6     as well.  But at least with respect to the abstention argument

7     and exceptions to the abstention argument, I do think that

8     *Al-Nashiri* deals, without using the words "cruel and unusual

9     punishment," in part with the argument that you were just making.

10         MR. KAPLAN:  Your Honor, I would respectfully question

11    a part of what the Court is saying.  In the *Al-Nashiri* case,

12    certainly the discussion of the factual allegations in the

13    dissent indicates that there was very harsh treatment of

14    Mr. Al-Nashiri as well before the charges were brought against

15    him, but the way that that fact and those facts were integrated

16    into a legal argument was very different in *Al-Nashiri* from this

17    case.  One indicator of that is a passage that Your Honor quoted

18    that says it does not say anything about the competence of the

19    military commission itself.

20         Well, our claim actually does say something about the

21    competence of the military commission.  It is our claim that

22    because of Mr. Al-Baluchi's torture, because of the consequent

23    fact that subjecting him to a capital trial, sentencing, and

24    execution would constitute cruel and unusual punishment in

25    violation of the Military Commissions Act, and because of the

principle articulated in *McClaughry v. Deming,* that that does

say something about the competence of that military commission.

In *McClaughry*, the Supreme Court said that if a commission

is not convened and constituted in complete accordance with the

governing statute ultra vires, it has no legal legitimacy.

There is no personal jurisdiction.  That is the nature of the

claim we're making.  The claim in *Nashiri* was quite different,

and the court focused on that difference and basically said, in

*Nashiri,* his legal claim was in reference to the nature of the

charges against him, the alleged offenses --

THE COURT:  Right.

MR. KAPLAN:  -- and the fact that they allegedly

didn't occur during hostilities.  And the court said, well,

that's the same type of claim that was in *Councilman* itself

where the allegation was these are not service-connected

charges.  If *Councilman* itself found abstention appropriate

with that type of argument, then for Mr. Al-Nashiri, that type

of argument is no less appropriate for abstention.  They

specifically said we find this type of claim is governed by

*Councilman*.

Well, we raise a different type of claim.  It's a

fundamentally different type of claim, and Al-Nashiri's

reference to his harsh treatment was used as an argument for --

what they argued fell under the extraordinary circumstances

principle, as the court characterized it, as free-floating

1    exception to the principles of abstention for psychological

2    harms.  Our claim is quite different from that.  And it's a

3    claim that was not raised, and it was nothing in particular

4    about the capital nature of the commission in *Al-Nashiri* that

5    was integral to their legal claims either.

6         So that's the primary distinction that we see between

7    *Al-Nashiri* and this case.  That's why we believe, even though,

8    again, portions of -- as the Supreme Court noted in *Hamdan*,

9    there's an initial question of whether *Councilman* applies at

10   all.  And then there is a subsequent question, which you only

11   reach if it does apply, as to whether it should actually apply

12   in a particular circumstance.

13        We concede that that first threshold under *Al-Nashiri* is

14   passed, that it does apply.  But we believe, under the second

15   part of the second question of whether it should apply here,

16   that it should not because of the fact that it would be cruel

17   and unusual punishment, as well as the other claims, the double

18   jeopardy issue, also under the Military Commissions Act.

19        We've also raised a different type of claim that,

20   under the Due Process Clause, it would be outrageous, because

21   of the government's outrageous conduct in its treatment of

22   Mr. Al-Baluchi that the military commission should be enjoined.

23        We recognize that, unlike the other two claims which rest

24   on portions of the Military Commissions Act itself and therefore

25   tie into the *McClaughry* principle, the outrageous-conduct claim

1   does rely on the argument that the Due Process Clause applies

2   to Mr. Al-Baluchi, and as our recent supplemental filing

3   indicates, there is a bit of fuzziness about circuit law on that

4   question.

5           THE COURT:  According to Judge Tatel and Judge Pillard.

6           MR. KAPLAN:  According to Judge Tatel and Judge

7   Pillard, and according to a dispute between us and the

8   respondents on that question.

9           THE COURT:  While we're on the double-jeopardy point,

10  it seems to me the double-jeopardy concept that you're arguing

11  is multiple punishments, that if you take the cruel and unusual

12  punishment and inhumane treatment, the torture, etc., leading up

13  to this point, then to subject him to further punishment, and

14  certainly if it's the death penalty, would be double-jeopardy,

15  and therefore I should enjoin the commissions.

16      Now, as I read the Supreme Court's and the lower courts' --

17  I don't like the term "lower courts'" -- but the Supreme Court's

18  and our other courts' double-jeopardy concept, the only time

19  that the courts say that the trial should be halted is when

20  it's a second trial for the same offense, not when it's a second

21  punishment.

22      It seems to me -- and tell me why I'm wrong, putting your

23  other arguments aside for the moment -- if it were just focusing

24  on your double-jeopardy argument, it would be appropriate for me

25  to say this is not *Abney;* this is not putting somebody through a

second trial.  Your multiple-punishment, double-jeopardy

argument could easily be dealt with first in the Military

Commission; second, on appeal through the military commission

process; and certainly, when you get to the D.C. Circuit, then

there'd be no reason to halt the trial for this kind of

double-jeopardy claim.

MR. KAPLAN:  Your Honor, I understand your point,

and my response would be that part of what we claim would be

the unlawful second punishment would be that actual process.

So under the principle of *Soering*, again, integrated into

the *Lackey*-related opinions and opinions like *Soering* from other

countries that are cited in our motions, that what they call the

"death row phenomenon," that process of being under the shadow

of death before, and especially after, a death sentence is

imposed, while that review process stretches on, certainly, for

years in this circumstance, is part of the unlawful punishment

and part of what makes it a violation of the Military

Commissions Act to permit that to occur.

And the government has made the point, I think at least

similar to the point Your Honor is making that, well, normally,

if something that occurred before trial was punishment, you

could simply sort of charge it off against the later punishment

so it all balances out, like in *Pearce* was done, if there was a

prior trial and there was a sentence partially served and the

new sentence is imposed, you just deduct that first sentence

actually served from the later sentence.

Well, there's a bit of a problem here, because it's not
clear how you could deduct torture from execution.  I don't
think Mr. Al-Baluchi can be just 40 percent executed.  It's
not --

THE COURT:  No, but before he's ever executed, we
have to have a decision, a finding of guilt by the Military
Commission, an imposition of sentence by the Military
Commission, a review by the convening authority, and then
there's another review within the military, and then the D.C.
Circuit, each of which would be able to consider the very
argument you've just made before you were executed.

They might say, you know, you're right, this is cruel and
unusual punishment; it's wrong, and we're going to reduce the
sentence to life, or we're going to reduce the sentence to
something else.

MR. KAPLAN:  That's correct, Your Honor.
That's factually correct.  However, that would be years.

THE COURT:  I know.

MR. KAPLAN:  That would be years after the sentence
is imposed.  That would be years under the shadow of death.
There's quite a lot of case law --

THE COURT:  Okay.  We can talk about other things
because we've talked about this.  The problem with that argument
is the certain justices of the Supreme Court embrace that

1    argument, but it's not the law at the moment in the civilian

2    courts.

3           MR. KAPLAN:  Again, I don't disagree with Your Honor.

4    I would say that it's not the law because the courts simply

5    haven't addressed anything remotely approaching this type of

6    factual situation.

7           THE COURT:  It's also the reason you cite *Furman* v.

8    *Georgia*.  I haven't seen that citation in several decades.

9           MR. KAPLAN:  Those are principles that, of course,

10   tied into *Lackey*.  I would make one more comment about Your

11   Honor's point, which is that the nature of our claim is that

12   this military commission, as in *McClaughry* and the progeny of

13   *McClaughry,* is really void *ab initio*.

14        If that is the case, it's no answer to say, well, okay,

15   but the problem could be fixed down the road on the appeals by

16   the D.C. Circuit, etc., because, as in *Reid*, as in *Toth*, as in

17   *McElroy*, as in *Hamdan*, if a military commission is legally void,

18   the court doesn't wait for the appeal process to fix it.  It

19   simply shuts it down.  And that's what our claim indicates

20   should happen in this instance.

21          THE COURT:  I get that point.  Now, in *Hamdan*, is

22   the ultra vires void argument, does that flow from footnote 16,

23   or does it flow from other parts of *Hamdan*?

24          MR. KAPLAN:  Footnote 16, I think, refers to personal

25   jurisdiction, and footnote 20 refers to the ultra vires, if I

1    remember right.

2              THE COURT:  Right.  But am I right that *Hamdan* --

3    all right.  (Pause.)

4        *Hamdan* raises substantial argument that, because the

5    military commission has been convened, to try him is not a

6    regularly constituted court under the Geneva Convention; it is

7    ultra vires and thus lacks jurisdiction.  But since the 2009

8    Military Commissions Act, that would not be a viable argument.

9              MR. KAPLAN:  The argument raised in *Hamdan*, according

10   to case law in the D.C. Circuit, would not.  We're making,

11   obviously, a very --

12             THE COURT:  Right.  The concept of ultra vires and

13   no jurisdiction, I understand, flows from footnote 20, but the

14   precise argument doesn't work anymore.

15             MR. KAPLAN:  Correct.

16             THE COURT:  And the other footnote has to do with

17   the status of persons.  The Court says in *Hamdan* what it said in

18   *Councilman*, that abstention is not appropriate where individuals

19   raise "substantial arguments denying the right of the military

20   to try them at all and in which the legal challenge turns on the

21   status of the persons as to whom the military asserted its power."

22       In other words, we do not apply *Councilman* abstention when

23   there's a substantial question whether a military tribunal has

24   personal jurisdiction over the individual.  So there's a lot in

25   those three or four sentences.

1      But the status you're talking about is the status of

2   a person who's endured mistreatment and inhumane treatment.

3   There is no argument that Mr. Al-Baluchi is an enemy combatant,

4   and in *Hamdan*, the status question was the dispute about whether

5   he was an enemy combatant at all, which is an entirely different

6   status you're talking about.  In *Councilman*, the status question

7   was whether he was a member of the military or not.

8      So it seems to me that -- well, I won't say "it seems

9   to me."  I question whether or not you're reading the status

10  exception, which leads to a conclusion that there's no

11  jurisdiction, much broader than the Supreme Court meant it

12  in footnote 16.

13           MR. KAPLAN:  Your Honor, I would say that what we

14  are doing is applying the concept of the status exception to a

15  circumstance that simply wasn't discussed.  You could say it's

16  broader, but it's simply a situation where it's being applied in

17  a new context.  And I don't dispute that.

18      Specifically, as I understand, both *Hamdan* and *Councilman,*

19  when they refer to the status exception, they're both referring

20  to a little cluster of cases, *Reid v. Quarels, Ex rel. Toth,* and

21  *McElroy*, all of which dealt with civilians, people who had the

22  status of being civilians and were being subjected to trial in

23  military tribunals, and because of their status as civilians,

24  those military tribunals were not valid as to them.

25      We are transposing those principles to the context of a

1    person who has been the victim of U.S. government torture.

2    We don't see it necessarily as stretching them out, but simply

3    applying them to a new circumstance just as *Councilman* applied

4    *Younger* principles of abstention to a new circumstance.  We

5    think the equities are, if anything, stronger.

6        A person's status as a civilian is really a boon and a

7    benefit to them and something that generally people are born

8    with.  The status of a person who's been the victim of U.S.

9    government torture is quite a burden and nothing that

10   Mr. Al-Baluchi ever volunteered for or agreed to accept.  So

11   we don't see why the status exception referred to in *Hamdan* --

12           THE COURT:  There's a lot of status exceptions we

13   don't agree to or --

14           MR. KAPLAN:  Yes.

15           THE COURT:  -- choose for ourselves; right?

16           MR. KAPLAN:  Very true.  This particular one, we

17   believe, under the Military Commissions Act, invalidates that

18   the capital commission that has been convened as to him.

19       Would Your Honor like to hear more about the merits of the

20   claims or their particular subjects?

21           THE COURT:  Well, let's stick with abstention for

22   a minute, and let me see if I want to ask you anything else.

23   I guess I know the answer to the question, but why not raise

24   all of these questions with the Military Commission before you

25   come here?

1          MR. KAPLAN:  Your Honor, I don't dispute that.

2    As far as I know, they could be raised in the Military

3    Commission.  First off, we simply don't think it's required that

4    they first be raised in the military commission because of the

5    cases that I've been discussing, cases like *Reid*, like *Toth*.

6    Mrs. Covert in *Reid* was facing a retrial and presumably could

7    have raised her challenges in the military court convened to try

8    her, but she filed a habeas petition in district court, and the

9    Supreme Court held relief should be granted.

10         Mr. Toth had been brought to Korea to face trial.  It does

11   not appear that he had already been tried and presumably could

12   have raised his challenges in the military court.  The Supreme

13   Court said he was entitled to relief.  We think that same

14   principle should be applied here.

15         On top of that, there is the fact that the military

16   commission process itself, again, is part of the unlawful

17   punishment that we believe that Mr. Al-Baluchi has a right to

18   be spared because of, again, that process and the shadow of

19   death and the largely non-waivable aspect of that process.

20         THE COURT:  Okay.  So your motion is a motion for

21   permanent injunction or mandamus.  The government, among other

22   things, argues that I don't have any jurisdiction to consider

23   any of that because -- for a variety of reasons, but primarily,

24   among others, 2241(e)(2) -- this is not motion that sounds in

25   habeas.  2241(e)(1), in *Boumediene*, the Supreme Court said

didn't deprive us of jurisdiction to consider all these habeas

petitions.  If they had, we would have had a hundred or more of

these cases in our court and a hundred or more reversals by the

D.C. Circuit.

That's a hyperbole and facetious.  But 2241(e)(2) is not

necessarily alive and well.  What gives me jurisdiction to

consider your mandamus claim and your motion for a permanent

injunction of the commissions?

MR. KAPLAN:  Your Honor, we dispute the claim on the

part of the government that our claim does not sound in habeas.

Because of *Boumediene*, 2241(e)(1), which tried to shut down

habeas, as you mentioned, is null and void.  And to the extent

our claim sounds in habeas, this Court has complete jurisdiction

to address it, and I think the key authority that shows that is

-- well, two.  *Hamdan* itself found it appropriate to take

jurisdiction to stop a military commission trial as a matter of

habeas relief; and *Aamer*, which was the case about forced

feeding, the case that firmly established in the D.C. Circuit

that claims that do not affect the facts or duration of

confinement but also the circumstances and the conditions of

confinement do sound in habeas.

And it's notable to look at the types of claims that are

addressed in *Aamer* itself and addressed in cases that were

discussed in *Aamer* to reach that conclusion.  In *Aamer* itself,

the petitioners were not seeking to shorten or terminate their

custody or even change the location of their custody.  They were

seeking to be freed from having to undergo forced feeding while

in custody.  The court cited the case *Hudson v. Hardy*.

In *Hudson v. Hardy*, the D.C. Circuit noted that the

complaint of that litigants related to having been subjected

to improper discipline while in prison.  And one thing the D.C.

Circuit said would prevent that habeas claim from becoming moot

even though he had been transferred was that he had a

disciplinary record that could follow him and affect the nature

of his custody in the future that would be a live habeas claim,

the D.C. Circuit said.

The court referred to a case called *Wilson* in which the

claim was that, because the petitioner had a mental illness,

his imprisonment with a mental illness would be unlawful, and

the court said that, unquestionably, he had a right to file for

relief in habeas.

So we think our claim, which is based on the mental strain

of being under the shadow of death while subjected to execution

and the non-waivable reviews and eventually execution itself

after having undergone the torture as described in

Mr. Al-Baluchi's declaration, entitles him to seek habeas relief

to avoid all of that.

THE COURT:  Well, how would his conditions change if

I granted your permanent injunction request or your mandamus

request?

1          MR. KAPLAN:  The primary thing would be that he

2    would not be subject to being brought into a capital military

3    commission where he faces the prospect of being sentenced to

4    execution and being under that shadow during non-waivable

5    reviews.

6          There are also more concrete differences which would have

7    a very significant effect on his day-to-day life at Guantánamo.

8    The process of being shuttled back and forth to the military

9    commission is very burdensome.  It's possible that a noncapital

10   military commission could be convened, but it's not absolutely

11   established that that could happen.  And so he might be freed

12   from having to undergo all of that mental strain, and the strain

13   of having to deal with the litigation process would change for

14   him.  The government has represented that the location of his

15   confinement wouldn't change, and I suppose we'd have to --

16          THE COURT:  Would not change.

17          MR. KAPLAN:  Would not change.  Would not change.

18   I suppose we have to accept that the place would not change;

19   but the circumstances would change very significantly, and he

20   wouldn't be facing the prospect and eventually, perhaps, the

21   reality of that shadow of death and actual execution.

22          THE COURT:  But it could be in a noncapital

23   commission.  They could, but they would have the option --

24   although, to this point, unless Congress has prohibited it,

25   does the executive branch still have the authority to try people

1    in Article III courts if they want to, or did Congress tell

2    them they couldn't?  Because there was a time when they had

3    the option.

4         MR. KAPLAN:  Yeah.  I know for many years Congress

5    inserted into annual legislation a ban on bringing anyone from

6    Guantánamo to the United States.  As far as I know, that's still

7    in place.

8         THE COURT:  Well, I'll find out from the government.

9    Or the alternative that -- I mean, as I understand it, there

10   is a category of people who have very different constitutional

11   claims to raise, which are people that are not cleared for

12   release and people who are not going to be tried before

13   commissions, but they're going to be held without charges

14   because there's not sufficient evidence to convict them, but

15   they're just going to be held, presumably, for the rest of

16   their lives.

17        One would think there would be some constitutional

18   claims to be made there too.  If I granted the relief you're

19   requesting, it sounds like the alternatives are noncapital

20   commission, or he would be held and have the psychological

21   damage hanging over his head that he probably would be held

22   for the rest of his life with nobody deciding or adjudicating

23   whether he's done anything wrong.

24        MR. KAPLAN:  Well, I think how you've described the

25   possible consequences is accurate.  Whether he would have a

legal claim and whether that legal claim might generate relief

is an unknown.  Perhaps if he were to turn into a so-called

"forever prisoner," he could seek release or some kind of

improvement in his conditions on that ground.

      But the fact is, it's not a certainty, again, that if the

capital military commission went away, that a noncapital

military commission would be convened.  At least one detainee,

years back, was spared having a military commission convened

because the convening authority felt that because of that

individual's torture, it would not be appropriate.  So there

would be some precedent for that.  A convening authority has

very broad discretion to make a decision about convening a

military commission.

            THE COURT:  Okay.

            MR. KAPLAN:  Were there any other questions you'd like

me to address right now?

            THE COURT:  Not at the moment.

            MR. KAPLAN:  Okay.

            THE COURT:  So why don't we take a 10-minute break,

and I'll hear from the government.

      (Recess from 10:57 a.m. to 11:18 a.m.)

            THE COURT:  Okay.  Ms. Wolfe.

            MS. WOLFE:  Good morning again, Your Honor.

      Mr. Al-Baluchi is simply here too soon, Your Honor.

The D.C. Circuit made clear in *Al-Nashiri* that federal courts

must respect the political branch's instructions regarding

the timing of Article III involvement in military commissions

convened pursuant to the Military Commissions Act, an

instruction that was grounded in national security concerns.

The proper time for Mr. Al-Baluchi to present his claims to

this Court is, therefore:

After they have been addressed by his military commission

in the first instance; he has been convicted of some or all of

the charges against him; the convening authority has reviewed

his conviction and any sentence that may be imposed; the

United States Court of Military Commission review has affirmed

his conviction and sentence; and the D.C. Circuit has conducted

a review that encompasses all matters of law, including the

sufficiency of the evidence to support the verdict.

Only then may he bring his claims, if any remain, to this

Court.  So, accordingly, consistent with *Al-Nashiri*, this Court

must both abstain from considering the merits of Mr. Al-Baluchi's

motion to enjoin his military commission as well as hold

Mr. Al-Baluchi's habeas petition in abeyance pending resolution

of Mr. Al-Baluchi's military commission proceedings as well as

any subsequent appeals that would culminate in the D.C. Circuit.

THE COURT:  What's the status of the military

commission?  Has a trial begun?  Are they still in pretrial

proceedings?

MS. WOLFE:  They're still in pretrial proceedings,

1    Your Honor.  My understanding is that they're still in active

2    discovery.

3              THE COURT:  How long does this whole thing take?

4    Is there experience to tell us how long these things take?

5              MS. WOLFE:  I personally don't know how long this

6    will take, Your Honor.  The Military Commissions Act provides

7    Mr. Al-Baluchi and his codefendants with the opportunity to

8    raise any concerns and claims that they have pretrial.

9              THE COURT:  Can he raise all of the claims there that

10   he's raising here?

11             MS. WOLFE:  He can raise all of the claims that he

12   has raised here there, as I heard Mr. Kaplan acknowledge this

13   morning, and those claims will be subject to robust adversarial

14   proceedings as the over 500 pretrial motions that have been

15   filed by Mr. Al-Baluchi and his four codefendants have up until

16   this point.  Unfortunately, we can't predict how long the

17   military commission process will take, but it is actively

18   ongoing.

19        Mr. Kaplan's remarks this morning makes clear that all

20   of his claims are grounded in his allegations regarding his

21   treatment prior to arriving to Guantánamo, but his prior

22   treatment does not give him a status that is cognizable under

23   *Councilman* or *Al-Nashiri*.  And the D.C. Circuit in *Al-Nashiri*

24   made clear, when it was presented with similar allegations

25   regarding treatment prior to arrival at Guantánamo, that a

particular detainee-defendant's allegations of this type of

treatment, and therefore particular vulnerabilities to trial

before a military commission, does not warrant an exception to

abstention, because it says nothing about the competence of the

military commission itself.

I heard Mr. Kaplan this morning acknowledge that he could,

if he chooses to, bring all of the claims that he has currently

brought before this Court to his military commission proceedings

and he's chosen not to do so, and *Al-Nashiri* thus controls and

instructs you to abstain and to allow the military commission

process that Congress designed, with guidance from the Supreme

Court, to move forward and to conclude with final review in the

D.C. Circuit.

I can address some specific questions --

THE COURT:  Well, tell me how you read footnote 16 of

*Hamdan*.

MS. WOLFE:  Unfortunately, Your Honor, I don't have

footnote 16 in front of me.

THE COURT:  Well, it's the status question.  Is there

anything -- I mean, his argument, I believe, is the status

relates to a person subjected to this kind of cruel and unusual

punishment, and I was suggesting -- there you go.

(Opposing counsel hands copy to counsel.)

THE COURT:  I was suggesting that the Supreme Court

meant something different or narrower.  And I'm not sure,

whether historically they're pre-*Hamdan* or post-*Hamdan*,
anybody's sort of put more meat on the bones of what we mean
by "status" in this context.

MS. WOLFE:  Well, "status," as was discussed in
*Councilman,* means Congress's power to subject a class of persons
to trial by a non-Article III tribunal, and that is the status
that is discussed here in footnote 16 in *Hamdan*.

And the D.C. Circuit in *Al-Nashiri*, when discussing *Hamdan*
and *Hamdan*'s holding, as well as footnote 20, did not attempt to
broaden the definition of the status exception beyond that which
was discussed in *Councilman*, which is Congress's power to
subject a class of persons to trial by non-Article III tribunal.

In this instance, the class of persons that we are
discussing is alien, unprivileged, enemy belligerents, and I did
not hear today from Mr. Kaplan that Mr. Al-Baluchi is contesting,
at least for purposes of this habeas proceeding, his status as
an alien, unprivileged, enemy belligerent.

THE COURT:  I assume you accept the notion that habeas
corpus goes to the fact of confinement and the duration of
confinement, but, at least in the D.C. Circuit, it also goes to
the conditions of confinement.

MS. WOLFE:  That is correct.  That is what the D.C.
Circuit said in *Aamer*.

THE COURT:  So if I were to grant the relief that
Mr. Al-Baluchi seeks, would this have any impact on the duration

1    or conditions of his confinement?

2              MS. WOLFE:  No.

3              THE COURT:  If I were to grant his motion, what

4    would change on the ground in Guantánamo with respect to

5    Mr. Al-Baluchi?

6              MS. WOLFE:  Nothing would change with respect

7    to his confinement on the ground in Guantánamo, Your Honor.

8              THE COURT:  So he argues that -- I think -- that if

9    you were successful here, it would remove him from precommission

10   detention.  But is the kind of detention he faces -- if he were

11   no longer facing trial before a capital military commission,

12   would his detention look any different?  Would his day-to-day

13   life be different?

14             MS. WOLFE:  His day-to-day life would not be

15   different, Your Honor.  Mr. Al-Baluchi is currently detained

16   in Camp 7 with other high-value detainees.  Some of those

17   high-value detainees are currently facing charges in various

18   military commissions, including four of Mr. Al-Baluchi's

19   codefendants, but there are other detainees in Camp 7 who are

20   not currently facing charges in a military commission.

21             THE COURT:  So, in other words, from what you're

22   saying, and I've probably read this somewhere anyway, the fact

23   that he's detained in Camp 7 relates to his designation as a

24   high-value detainee rather than the fact that he's on trial

25   before a capital military commission.

1          MS. WOLFE:  Correct, Your Honor.

2          THE COURT:  And that wouldn't change.

3          MS. WOLFE:  And that would not change, no.

4     My understanding is that would not change.

5          THE COURT:  Okay.  I've got a couple of other

6     questions.  We tend to focus on the request that they made to

7     enjoin the commission from proceeding and your request that I

8     abstain.  What about mandamus?  Is there anything in the case

9     law in *Councilman* and *Hamdan* and *Al-Nashiri* or anything else

10    that says that even if his claim does not sound in habeas,

11    wouldn't I still have jurisdiction to consider a mandamus

12    petition?

13         MS. WOLFE:  The Court that would have jurisdiction

14    to consider a mandamus petition would be the D.C. Circuit,

15    Your Honor.  The D.C. Circuit is the Article III court that

16    Congress and the MCA has vested exclusive jurisdiction in to

17    consider military commission judgments and issues related to

18    those military commission judgments.  And as we have seen both

19    with activities in Mr. Al-Nashiri's case as well as here in

20    Mr. Al-Baluchi's case, the D.C. Circuit has, and I believe is

21    currently considering, mandamus petitions stemming from military

22    commission claims.

23         THE COURT:  I'll ask Mr. Kaplan to comment on that

24    when he gets up again, but I guess I'm just thinking this

25    through, that the argument would be, one, until *Boumediene*

1     we didn't have any jurisdiction to do anything with respect to

2     people at Guantánamo.  The Supreme Court in *Boumediene* said

3     that, despite 2241(e), we did have jurisdiction to consider

4     habeas claims.  And that's all they said.

5         Then, separately, under the Military Commissions Act,

6     the Congress has said that, unlike prior military commissions,

7     I guess, you don't have to go to the Armed Services Court,

8     appellate court, which is an Article I court, but you can go

9     to an Article III court.  That court is the D.C. Circuit.

10        So you're saying that what follows from those things is

11     that I probably don't have jurisdiction to deal with mandamus at

12     all, even though the Supreme Court has said I have jurisdiction

13     to deal with habeas if this were a legitimate habeas claim.

14        MS. WOLFE:  Correct.  The MCA's jurisdictional

15     channelling provision, with committing Article III review in

16     the D.C. Circuit, strongly suggests that it is the D.C. Circuit,

17     in exercising that exclusive jurisdiction, that can consider

18     claims arising out of military commission proceedings on

19     mandamus prior to the entire military commission proceeding

20     being reviewed in that court.

21        THE COURT:  I'm jumping all over the place here, but

22     I think you argue that the protection against cruel and inhumane

23     punishment is not protected by *Boumediene* and its progeny.

24     Isn't he entitled to bring a challenge somewhere in some time

25     to cruel and inhumane and degrading punishment under the

Detainee Treatment Act?

MS. WOLFE:  That claim, just like all his other claims here, Your Honor, can be heard in the first instance in the military commission process.

THE COURT:  So the Detainee Treatment Act provides constitutional protection under the Fifth and Eighth Amendment and also statutory protection.  Is that fair to say?  What's the provision here that I'm thinking of?  There's a provision in the Military Commissions Act that says that a military commission may not inflict cruel and inhumane punishment.

MS. WOLFE:  Yes, Your Honor, there is.

THE COURT:  The Detainee Treatment Act also says that no individual in the custody or under the physical control of the United States government shall be subjected to cruel, inhumane, or degrading treatment or punishment.

MS. WOLFE:  Yes.

THE COURT:  Well, is your position that all the things he's complaining about, the cruel and inhumane punishment, occurred before he got to Guantánamo, or is there agreement on that?

MS. WOLFE:  I don't think it's relevant for purposes of resolving the present motions --

THE COURT:  Okay.

MS. WOLFE:  -- the scope of his allegations regarding treatment.  Just that, you know, he has made allegations

1    regarding his treatment.

2           THE COURT:  But to the extent that the Detainee

3    Treatment Act says that no individual in the custody or under

4    the physical control of the United States shall be subject to

5    cruel, inhumane, or degrading treatment or punishment -- and

6    then they define it, and they say that that's the kind of

7    punishment that's prohibited by the Fifth, Eighth, and

8    Fourteenth amendments as defined by a certain treaty back in

9    1984 -- how does one raise those kind of issues?

10          MS. WOLFE:  Mr. Al-Baluchi could raise that issue in

11   his military commission proceedings, Your Honor.  2241(c)(2)

12   would bar him raising that claim here if it does not sound in

13   habeas.

14          THE COURT:  How do you understand his ultra vires

15   argument?

16          MS. WOLFE:  His ultra vires argument is grounded

17   in his unique circumstances, which are predicated on his

18   allegations of treatment while in detention.  His allegations

19   regarding treatment, his treatment in detention, do not confer

20   a status within the meaning of *Councilman* and within the meaning

21   of *Al-Nashiri*.  They, again, address his particular

22   vulnerabilities to trial by military commission, and that, the

23   D.C. Circuit has said, does not warrant an exception to

24   abstention because it says nothing about the competency of the

25   military commission itself.

1     And as I understand from Mr. Kaplan's comments this

2     morning, they are not alleging that the military commission is

3     not competent to consider his claims.  They're just simply

4     alleging that, in their view, they're not required to bring

5     those claims there before bringing them here.

6              THE COURT:  All right.  Anything else you want to say?

7              MS. WOLFE:  No.

8              THE COURT:  I've read all the briefs and most of the

9     cases.  Do you have any questions?

10             MS. WOLFE:  No.

11             THE COURT:  Okay.  Mr. Kaplan.

12             MR. KAPLAN:  Thank you, Your Honor.  I'd like to

13    make a few points, following up on Your Honor's questions and

14    Respondent's comments.  I did make a reference earlier to a

15    difference between capital and noncapital commissions with

16    respect to the power to suspend the sentence.

17        The citation is 10 U.S.C. § 950t -- sorry -- 10 U.S.C.

18    § 950i, subsection (d): "The Secretary of the Defense, or the

19    convening authority acting on the case (if other than the

20    Secretary), may suspend the execution of any sentence or part

21    thereof in the case, except a sentence of death."

22        With respect to Respondent's comments about the "particular

23    vulnerabilities" passage from *Al-Nashiri* and whether that applies

24    here, we disagree with the proposition that that applies here.

25    As I said earlier, we do in fact make a claim based partly upon

Mr. *Al-Nashiri*'s torture prior to his being charged, that that
goes to the competence of the military commission, because
pursuant to the principle of *McClaughry v. Deming*, it
invalidates the illegality of that capital military commission.

I would note that the progeny of *McClaughry*, as we cited in
our motion, a number of military cases, the sorts of things that
have been found to be sufficient inconsistencies with the
governing statute to invalidate a commission are very, very
stringent.

In *Dean*, the defendant orally consented to a bench trial;
but he didn't put it in writing, and the statute required it to
be in writing.  That invalidated that commission under
*McClaughry*.  In another case, the authority to appoint members
of a commission was improperly delegated, and it was a bench
trial in the end, so it didn't have members.  But, nevertheless,
that inconsistency with the governing statute invalidated the
commission.

So that is very strictly applied.  That kind of technical
inconsistency with the governing statute is enough to invalidate
a commission under *McClaughry* for certiorari, we would suggest.
The fact that the entire commission is specifically structured
to impose a punishment that violates the governing statute is
enough, as well, to invalidate the commission.

THE COURT:  You say "violates the government's
statute."  The statute that says you can't impose cruel and

1    inhumane punishment?

2            MR. KAPLAN:  That's correct.

3            THE COURT:  So what you're saying, then, is that

4    the death penalty is always cruel and inhumane punishment.

5            MR. KAPLAN:  No.  Again, Your Honor, it's because of

6    the torture Mr. Al-Baluchi sustained that, as to him, to the

7    extent this is convened to try and punish him, it is invalid.

8    It is the case -- as Your Honor pointed out, this is a

9    multidefendant case.  But there's no indication that in

10   *McClaughry* and its progeny that if it were a multidefendant case

11   the principle would go away.  I think the same principles would

12   apply.  If an individual out of multiple defendants had not, in

13   writing, consented to a bench trial, there's no reason *Dean*

14   would be any different with respect to an individual defendant.

15       There was a discussion of the status exception.  The

16   respondent's position is that the status exception is firmly

17   stuck forever in the exact category in which it was previously

18   applied.  That is quite inconsistent with the D.C. Circuit's

19   *Nashiri* opinion.  That is essentially how the D.C. Circuit

20   characterized the argument that Mr. Nashiri was making about

21   whether *Councilman* abstention applies.

22       They argued, as we argue as a preservation matter, that

23   because *Councilman* specifically dealt with the equitable

24   abstention principles as they applied to a member of a military

25   service and the particular concerns that arise in that context,

it does not apply to a Guantánamo detainee who's not a member
of the U.S. military.  The D.C. Circuit said that's not how
equitable doctrines work.  The same principles would apply in
a different context as long as there are "equally compelling
reasons to apply it."

Well, the same principle that the D.C. Circuit recognized
with respect to *Councilman* abstention should certainly apply to
the status exception to *Councilman* abstention.  They're equally
compelling, if not more compelling, reasons to apply the status
exception in Mr. Al-Baluchi's circumstance.

The respondents have asserted nothing would change, that
nothing would change if Mr. Al-Baluchi no longer faced the
prospect of being put to trial in a capital military commission,
face the prospect of being sentenced to execution, face the
prospect of layers of non-waivable review under the shadow of
a death sentence, and face the prospect of eventually being put
to death, we respectfully submit a fairly insensitive and
extreme, as well as illogical statement, to say nothing would
change when someone no longer faces the prospect of being
sentenced to be put to death.

We simply don't see the logic or the rationality of that
assertion.  And in less and less significant and compelling
fashions, there are circumstances that would change, as I
mentioned earlier: the burdens of the litigation process, the
burdens of preparing for the trial, and all of the extra burdens

1    involved in a capital as opposed to a noncapital trial.

2         Certainly, there's jury selection.  It would be much more

3    complicated in terms of a capital versus a noncapital trial.

4    Every time Mr. Al-Baluchi has to be extracted and brought to

5    these shipping containers and await appearing in front of the

6    military commission, it's a great burden upon him, especially

7    given the consequences of the treatment that he was subjected to.

8         THE COURT:  Does the nonmilitary commission convene in

9    the same location?

10        MR. KAPLAN:  I believe it would be in the same

11   location.  However, as I indicated, if the current military

12   commission were invalidated as to him, it is not a certainty

13   that he would be subjected to trial in a new military

14   commission.  The detainee I was referring to before, his name is

15   al-Qahtani.  And the convening authority, Susan Crawford,

16   because of his torture, did not refer charges against him in a

17   military commission.  And there's no reason that couldn't happen

18   if there were to be an invalidation of the capital military

19   commission here.

20        Again, the burdens of litigation, the mental strain that

21   the Supreme Court discussed in *Medley*, cases such as *Furman* and

22   *Medley*, and the comments that Justice Frankfurter made about how

23   suicide is not an uncommon thing for a detainee to attempt while

24   awaiting execution of a death sentence, well, all of those

25   mental burdens are certainly the sorts of things that the D.C.

1    Circuit in *Aamer* discussed as falling within the contours of

2    habeas and sounding in habeas.

3         With respect to the prospect of mandamus, this Court

4    certainly has mandamus directly under the mandamus statute,

5    and the government has taken the position that mandamus really

6    should be in the D.C. Circuit.  Now, I don't intend to dispute

7    the idea that the D.C. Circuit could have mandamus jurisdiction.

8    However, I think it's important to recognize that -- a couple of

9    things.

10        In the earlier *Al-Nashiri* opinion, before the one we've

11   been primarily discussing, the D.C. Circuit addressed a petition

12   for a mandamus by Mr. Al-Nashiri and found that they could not

13   accept jurisdiction over that, that they had jurisdiction, but

14   they did not find it appropriate to exercise that jurisdiction

15   because they saw his claims in that petition as claims that

16   could be vindicated by the normal appeal process.  That suggests

17   that the scope of mandamus relief may be quite narrow.

18             THE COURT:  Well, it's the same regardless of which

19   court you're in.  Mandamus relief is narrow.

20             MR. KAPLAN:  Correct.  On top of that is the fact that

21   after the *Al-Nashiri I* opinion, the Court of Military Commission

22   Review drafted and implemented a new rule which gives that court

23   mandamus jurisdiction.  So that really changes the calculus in

24   terms of whether the D.C. Circuit would accept mandamus

25   jurisdiction.  It is possible -- and I'm expressing no position

1   myself one way or another, but it's possible that they could

2   say that, because mandamus is available in a court of military

3   commission review, it wouldn't be appropriate in the D.C.

4   Circuit.

5       One last thing I'd like to touch upon.  Your Honor referred

6   to the Detainee Treatment Act and how it can be raised and how

7   a claim under the Detainee Treatment Act could be vindicated.

8   The respondents answered that by stating that that claim could

9   be raised in the military commission.

10      I would just note that in respondents' response and

11  cross-motion, Document 203, on page 28 at footnote 16,

12  respondents asserted that petitioner's DTA, Detainee Treatment

13  Act claim, is also foreclosed because it does not provide an

14  express private right of action.

15      I suspect, on the basis of that assertion, that despite

16  what counsel for respondents have said this morning in this

17  court, if Mr. Al-Baluchi were to try to vindicate a Detainee

18  Treatment Act claim in a military commission, the argument and

19  response could well be this: that he can't because there's no

20  private right of action.

21      So, to the extent habeas is a necessary mechanism for

22  Mr. Al-Baluchi to actually vindicate rights under the Detainee

23  Treatment Act, it is no answer to say that he has a clear

24  alternative method by arguing it in the military commission.

25      Those things being said, I would invite any questions that

1    the Court may have.

2              THE COURT:  Well, your last couple of comments raise

3    a couple of points.  First of all, when you said that I have

4    mandamus jurisdiction, generally it's true.  But in this case,

5    this kind of a case involving mandamus of the military

6    commissions, or the government with respect to the military

7    commissions, why wouldn't 2241(e)(2) bar a mandamus claim just

8    like it bars "other non-habeas corpus claims?"

9              MR. KAPLAN:  I think that question is settled by what

10   I'm calling the *Al-Nashiri I* opinion.  That was the *Al-Nashiri*

11   opinion -- I'm sorry, I can find you the citation.

12             THE COURT:  In the circuit or in the district court?

13             MR. KAPLAN:  In the circuit court.  This is -- excuse

14   me -- 791 F.3d 71, issued in 2015.  And in that case --

15             THE COURT:  Did you give me a cite?  What's the cite?

16             MR. KAPLAN:  The cite is 791 F.3d 71.

17             THE COURT:  Okay.

18             MR. KAPLAN:  That was a mandamus petition to the D.C.

19   Circuit.  And before deciding that it would not exercise its

20   mandamus jurisdiction, the D.C. Circuit first addressed whether

21   it had mandamus jurisdiction, concluded that it did, and they

22   specifically said -- well, the government believed -- this is

23   a quotation from page 76:  "The government believes that

24   § 2241(e)(2) revokes our power to issue writs of mandamus.  We

25   disagree."  And they go on in the following paragraph to explain

that "revocation of mandamus must be very express, and it must make express reference to mandamus in order to function to revoke mandamus."

So proceeding on to page 77, they discuss the clear statement rule, and they say that 2241(e)(2) makes no mention of mandamus.  That's an important omission under our case law. A little further down, toward the end of 77, the text of § 2241(e)(2) bears little resemblance to statutes that expressly strip mandamus jurisdiction.

THE COURT:  The other thing I wanted to ask you about was Ms. Wolfe said all of Mr. Al-Baluchi's claims are grounded in his treatment prior to arriving in Guantánamo.  Is there any argument that the cruel and inhumane treatment is continuing in his current detention at Gitmo?

MR. KAPLAN:  Yes.  First off, because part of that mental strain of being under the shadow of death, we submit, exists even before the sentence is imposed because he is literally, right now, facing the prospect of being sentenced to death.  Certainly, it is intensified after the sentence is actually imposed, but we believe it exists even now as of this time.

Furthermore, Mr. Al-Baluchi suffers daily triggers and reminders of his treatment from being in the context he's in, from hearing the shuttling of metal doors and the rattling of chains, and the circumstances that are triggers of the trauma

1   that he underwent.  And that is something that we may be

2   addressing in a future motion in terms of the conditions of

3   his confinement.  That is part of the --

4           THE COURT:  The motion before the commission?

5           MR. KAPLAN:  Before Your Honor.  We had a previous one

6   that we withdrew --

7           THE COURT:  Oh, yes.

8           MR. KAPLAN:  -- and there may be another one that is

9   filed.

10          THE COURT:  Well, there's none of the pending motions

11  that are before me that need to be resolved before I resolve

12  these two motions?

13          MR. KAPLAN:  Well, there is one procedural matter

14  in terms of the format in which Your Honor issues the opinion,

15  because we suggested that --

16          THE COURT:  Issue the opinion based on from today?

17          MR. KAPLAN:  Yes, because we had suggested that it

18  would be easier if the opinion were not pre-issued in a

19  classified form.  Then we'd have to physically come here,

20  because we're based in Arizona.  We'd have to physically come

21  here to see it in the SCIF, which starts a deadline for filing

22  a notice of appeal before the redacted version comes out.  So

23  that was a small matter that would --

24          THE COURT:  So, basically, what you would like me to

25  do is to submit the opinion for classification review as it will

1    be issued, but not wait until -- not issue it first.

2            MR. KAPLAN:  Right.

3            THE COURT:  So that the classification review can

4    look at not a signed, file-stamped, "docketed opinion" and then

5    suggest redactions, but rather look at it before it's docketed

6    and file-stamped.

7            MR. KAPLAN:  As long as it's not docketed, starting

8    the notice of appeal deadline, until we're able to at least look

9    at a redacted form.

10           THE COURT:  Yes.

11           MR. KAPLAN:  That's the theory behind that motion.

12   So that one makes sense to decide first.

13           THE COURT:  All right.  Well, we'll look at that

14   motion, I guess, because I had assumed that all of the motions

15   would be held in abeyance or mooted or whatever -- first of all,

16   held in abeyance until I decided these two motions, and

17   secondly, possibly mooted or further held in abeyance depending

18   on what I do with the two motions today.

19           MR. KAPLAN:  And our position is that none of them

20   would actually be mooted.  They don't need -- except for that

21   one, there's no reason to decide them before these.

22           THE COURT:  They just stay on the docket until --

23           MR. KAPLAN:  They could stay on the docket until these

24   are decided.  But we do believe that -- I think that respondents

25   believe some or all of them would be mooted -- could be mooted

1    by the decision on these two motions.  We believe they all

2    remain live, and that's something we certainly could address.

3    We addressed that at a hearing that was held long ago in this

4    case, and we filed a joint statement with our positions on the

5    order.  But we don't think any of those other motions would be

6    mooted even if this Court were to hold this case in abeyance.

7             THE COURT:  Do you have a sense of how long the

8    proceedings are going to take before the commission if they go

9    forward?

10            MR. KAPLAN:  I can only say that my sense is long.

11   And when I say "long," I can say with certainty that I'm

12   confident we're talking about years and not months.  How many

13   years?  I can tell you, people who are integrally involved in

14   that trial don't know; and if they don't know, I certainly

15   don't.  But I can tell you it's not months.

16            THE COURT:  Why has it taken us so long to get to

17   this day?

18            MR. KAPLAN:  That's been a whole concatenation

19   of factors, Your Honor, with the government shutdowns and

20   sequestration and funding issues, and the fact that we are

21   geographically challenged --

22            THE COURT:  Yes.

23            MR. KAPLAN:  -- in this case and other things.

24            THE COURT:  Well, I know you're geographically

25   challenged, but I appreciate all the time and effort and

1    thought and work that you've put into this, because they're

2    hard issues, and they're important issues.

3                  MR. KAPLAN:  Thank you, Your Honor.

4                  THE COURT:  You guys have done a lot.

5          Ms. Wolfe, is there anything else you want to say in

6    response to anything?

7                  MS. WOLFE:  No, Your Honor.  Unless you have further

8    questions for the government, we rest on our papers.

9                  THE COURT:  And does either side think we have to have

10   any discussion in a classified setting today?

11                 MR. KAPLAN:  We do not.

12                 MS. WOLFE:  Neither does the government.

13                 THE COURT:  Okay.  Then I think we're done for today,

14   and I will work on an opinion.

15                 MR. KAPLAN:  Thank you, Your Honor.

16                 THE COURT:  Thank you.

17                 (Proceedings adjourned at 11:57 a.m.)

18

19

20

21

22

23

24

25

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify
that the foregoing pages are a correct transcript from the
record of proceedings in the above-entitled matter.


*Bryan A. Wayne*
BRYAN A. WAYNE