UNCLASSIFIED//FOR PUBLIC RELEASE

~~TOP SECRET//CODEWORD~~

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Filed with Classified
Information Security Officer

CISO _____

Date _____

| | |
|---|---|
| AMMAR AL-BALUCHI, | |
| Petitioner, | |
| v. | Civil Action No. 08-2083 (PLF) |
| JAMES N. MATTIS[2], *et al.*, | **(Oral Argument Requested)** |
| Respondents. | |

## UPDATED MOTION FOR PERMANENT INJUNCTION OR MANDAMUS WITH RESPECT TO UNLAWFUL TRIAL BY CAPITAL MILITARY COMMISSION

## I.    Introduction

This motion presents the Court with the following question: May the same government that deliberately subjected Petitioner Ammar al-Baluchi to a years-long ordeal of brutal tortures, on suspicion that he committed the offense for which it seeks to try him, now subject him to a capital trial, prolonged non-waivable review process, and eventual execution for that same offense?

The answer to that question, as explained below, is "no." Mr. al-Baluchi's trial by Capital Military Commission would violate provisions relating to cruel and unusual punishment, due process, and double jeopardy that are enshrined in multiple federal statutes as well as the Constitution of the United States. Accordingly, pursuant to LCvR 7 and this Court's Order entered on March 5, 2018 (Doc. 199) (Scheduling Order), Mr. al-Baluchi moves this Court to permanently enjoin, or grant a writ of mandamus barring, his trial by Capital Military Commission.

---

[2] Pursuant to Fed. R. Civ. P. 25(d), James N. Mattis is automatically substituted for the prior holders of the position of United States Secretary of Defense as a Respondent in this action.

~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~TOP SECRET//CODEWORD~~

## A.   Procedural Background

Mr. al-Baluchi notes that an earlier version of this motion was filed on August 14, 2014 (Doc. 154), and withdrawn pursuant to the Scheduling Order (Doc. 199 at 1). The Scheduling Order directs Mr. al-Baluchi to submit an updated Motion for Permanent Injunction or Mandamus with Respect to his Unlawful Capital Military Commission "that addresses the decision of the Court of Appeals in *In re Al-Nashiri*, 835 F.3d 110 (D.C. Cir. 2016)[, *cert. denied*, 138 S. Ct. 354 (2017)]." (Doc. 199 at 1.) Mr. al-Baluchi addresses the *Al-Nashiri* opinion where pertinent below, and anticipates that the opinion will be addressed in greater depth in connection with the government's forthcoming response to this motion, and its updated Cross-Motion to Hold Petition in Abeyance Pending Completion of Military Commission Proceedings. (Doc. 199 at 1.)

## B.   Factual Background

In 2003 the United States government took Ammar al-Baluchi, who was then 25 years old, into custody.[3] Over the next three years, the government subjected Mr. al-Baluchi to an ordeal of barbaric tortures, the consequences of which still plague him today.

The government shackled Mr. al-Baluchi in painful stress positions and refused to let him relieve himself as it shuttled him between at least seven or eight different secret prisons on flights that lasted as long as 24 hours.[4] At these "dark sites," groups of three of four agents would relieve one another as they tired themselves out beating and abusing Mr. al-Baluchi.[5] The agents repeatedly subjected Mr. al-Baluchi to a variety of tortures, often using several in combination.[6] They stripped him naked, shackled him, submerged him in ice-cold water, and poured more icy water on him when he came up for air.[7] They

---

[3] Statement of Facts (SOF) ¶ 1.
[4] *Id.* ¶ 3.
[5] *Id.* ¶ 14.
[6] SOF ¶ 6.
[7] *Id.* ¶¶ 10, 11.

~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~TOP SECRET//CODEWORD~~

subjected him to "walling" sessions during which they would count while they slammed his head against a wall up to nearly 100 times, then punished him for failing to remind them of the count by starting again from zero.[8] They bashed his head against the wall so many times that he perceived "electricity," and his vision became "shimmery."[9] They surreptitiously fed him hallucinatory drugs.[10] They hung him from the ceiling by his arms for up to a day or more at a time, only taking him down to subject him to different forms of torture.[11] They bolted his handcuffs to a low spot on the wall, forcing him to squat on a small mat, and kept him in that position for weeks at a time, giving him only the minimal slack necessary to eat and relieve himself.[12] They forced him to sit with his legs and arms extended in front of him and hold that position, kicking or hitting him if he let his arms drop.[13] They deprived him of sleep for months at a stretch, banging loudly on his door to wake him whenever his eyes closed.[14] They punished him by refusing him food.[15] They subjected him to extremely hot and extremely cold temperatures.[16] They beat, grabbed, slapped, and screamed at him.[17] They threatened to bring the worst criminals from American jails and have them rape him.[18] They inserted devices in his teeth that generated an electrical current that knocked him unconscious.[19] They crammed him into a box so small that he could not move, and left him there for long periods of time.[20] They

---

[8] *Id.* ¶ 12.
[9] *Id.*
[10] *Id.* ¶¶ 18, 34.
[11] *Id.* ¶ 16.
[12] *Id.* ¶ 17.
[13] *Id.*
[14] *Id.* ¶ 16.
[15] *Id.* ¶ 19.
[16] *Id.*
[17] *Id.* Ex. 3 (Declaration of Ammar al-Baluchi (Baluchi Dec.)) ¶ 18.
[18] *Id.*
[19] *Id.* ¶ 21.
[20] SOF Ex. 3 (Baluchi Dec.) ¶ 18.

~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE

chained him to the wall in dark rooms and blasted loud, harsh music at him around the clock for months at a time, until he experienced hallucinations and paranoia.[21]

This is only a "small portion" of the tortures to which the United States government subjected Mr. al-Baluchi.[22] Unsurprisingly, he still suffers the physical and mental consequences of this years-long course of cruel abuse. While Mr. al-Baluchi was being tortured, if he identified anything as particularly painful, the government would do it more.[23] Now he represses his emotions, pain, and needs.[24] During the torture, government agents alternated between abusing him and being friendly to him.[25] Now he severely mistrusts everyone.[26] Agents brought out details of Mr. al-Baluchi's childhood while interrogating him.[27] Now, thinking of his childhood triggers memories of his torture.[28] After repeatedly being deprived of the ability to relieve himself for long periods of time, ███████████████████████████████████████████████

███████████████████[29]

Sounds, sights, and experiences that are common in Mr. al-Baluchi's current environment ███████████████████████████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

---

[21] *Id.* ¶ 14.
[22] *Id.* ¶ 1.
[23] *Id.* ¶ 21.
[24] *Id.*; SOF Ex. 6 (Letter Report of Dr. Stephen N. Xenakis, August 14, 2014 (Xenakis Rpt.)) at 10.
[25] SOF Ex. 3 (Baluchi Dec.) ¶ 5.
[26] SOF ¶ 22; *Id.* Ex. 6 (Xenakis Rpt.) at 13.
[27] SOF Ex. 3 (Baluchi Dec.) ¶ 22.
[28] *Id.*; SOF Ex. 6 (Xenakis Rpt.) at 10.
[29] SOF Ex. 3 (Baluchi Dec.) ¶¶ 27-28.
[30] *Id.* ¶ 23; SOF Ex. 6 (Xenakis Rpt.) at 7-8.

UNCLASSIFIED//FOR PUBLIC RELEASE
~~TOP SECRET//CODEWORD~~

█████████████████████████████████████ Even sleep offers him little escape from his suffering. Although he is always exhausted, he is unable to achieve restful, sustained, or deep sleep, █████████████████████████████████[32] Although Mr. al-Baluchi is well-educated and speaks several languages, simple tasks such as writing a letter or tracking a conversation now can prove difficult for him.[33] Before the government spent years torturing him, Mr. al-Baluchi did not have sleep problems or other significant health issues.[34] Now, he feels his body and mind deteriorating.[35]

Now that it is finished torturing Mr. al-Baluchi, the government wishes to execute him. To accomplish this, the government has convened a Capital Military Commission to try him. But as demonstrated below, Mr. al-Baluchi's execution would be patently unlawful, and it follows that the Capital Military Commission is ultra vires and has no jurisdiction over him. This Court should accordingly enter a permanent injunction barring Respondents from subjecting Mr. al-Baluchi to a trial before a Capital Military Commission, or otherwise exposing him to the possibility of execution.

████████████████████████████████████

[32] SOF Ex. 3 (Baluchi Dec.) ¶ 25; SOF Ex. 6 (Xenakis Rpt.) at 12.
[33] SOF Ex. 3 (Baluchi Dec.) ¶ 31; SOF Ex. 6 (Xenakis Rpt.) at 9.
[34] SOF Ex. 3 (Baluchi Dec.) ¶ 25.
[35] Id. ¶ 31.

~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~TOP SECRET//CODEWORD~~

II.   **The Capital Military Commission that has been convened to try Mr. al-Baluchi and potentially sentence him to death is unlawful, unconstitutional, and thus without jurisdiction over him.**

       **A.**   **Pursuant to the Military Commissions Act and Rules for Military Commissions, Capital and Non-Capital Military Commissions are fundamentally different entities.**

As reflected in Rule 201(d) of the Rules for Military Commissions (2016 ed.) ("R.M.C.")[36], commissions convened pursuant to the Military Commissions Act of 2009, Pub. L. No. 111-84, tit. XVIII (2009), *codified at* 10 U.S.C. §§ 948a-950t ("Military Commissions Act"). come in two types – Non-capital and Capital:

    (d) *Types of military commissions.*

        (1) *Non-Capital Military Commissions.* All cases not referred capital by the convening authority are non-capital cases, even if they contemplate trial of one or more offenses for which the sentence of death is specifically authorized under chapter 47A of title 10, United States Code, or the law of war.

        (2) *Capital Military Commission.* Any commission in which:

            (A) The case has been referred with a special instruction that the case be tried as capital; and

            (B) A sentence of death is specifically authorized under chapter 47A of title 10, United States Code, or the law of war for one or more offenses referred to trial.

R.M.C. 201(d). The essential distinctions between these two types of commission permeate the pretrial, trial, sentencing, and appeal process.

    Where the government seeks to have a person tried by a Capital Military Commission, it must make a recommendation "as to whether the convening authority

---

[36] http://www.mc.mil/Portals/0/pdfs/2016_Manual_for_Military_Commissions.pdf.

7

~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~TOP SECRET//CODEWORD~~

should refer the case to a capital military commission," identifying the aggravating factor or factors it intends to prove to support the imposition of a death sentence. R.M.C. 307(d). Regardless of whether the charges brought are punishable by death, a commission qualifies as a Capital Military Commission only if it is "referred capital" by the convening authority – *i.e.*, only if it is referred "with a special instruction that the case be tried as capital." R.M.C. 201(d); *see also* R.M.C. 103(a)(4) ("Capital case" defined as "a military commission to which a capital offense has been referred with an instruction that the case be treated as capital"); R.M.C. 1107(e)(3) (convening authority on sentencing rehearing may refer case originally tried before Capital Military Commission to Non-Capital Military Commission). The Rule requires defense counsel to "explain to the accused[] the type of the military commission, capital or non-capital." R.M.C. 502(d)(7) Discussion part (B).

Capital Military Commissions are constituted differently from Non-Capital Military Commissions. *See* 10 U.S.C. § 948m(a)(2), 949m(c); R.M.C. 501(a) (Capital Military Commissions generally composed of at least 12 members; Non-Capital Military Commissions composed of at least 5 members). They involve different rights to counsel. *See* 10 U.S.C. § 949a(b)(2)(C); R.M.C. 506(b) (Capital Military Commissions include right to at least one additional counsel who is learned in applicable law relating to capital cases); *see also* R.M.C. 601(d) (convening authority may not refer charge as capital unless special requirements relating to counsel in Capital Military Commissions have been met); R.M.C. 901(d)(4)(B) (judge in Capital Military Commission must inform defendant in open session of right to additional counsel). They have different voting requirements. *See* 10 U.S.C. § 949m(b); R.M.C. 921 Discussion, 1006(d)(4)(A) (death sentence requires unanimous votes, as compared to two-thirds or three-quarter majorities in non-death cases); *see also* R.M.C. 1009(e)(3)(B) (reconsideration requires only one member's vote in death cases, as opposed to vote of more than a quarter of members in

~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE

non-death cases). And they involve different rights with respect to review and commutation. *See* 10 U.S.C. § 950c(b), (c); R.M.C. 1110(a) (defendant subject to capital sentence may not waive or withdraw appellate review by United States Court of Military Commission Review); R.M.C. 1108(b) (Secretary of Defense or convening authority may not suspend execution of death sentence); 10 U.S.C. § 950i(b), (c), (d); R.M.C. 1207 (death sentence must be approved by President).

In sum, Capital and Non-Capital Military Commissions convened pursuant to the Military Commissions Act are fundamentally different entities, constituted and governed by fundamentally different rules.

**B.   A military commission that is not in strict accordance with the governing statute is ultra vires and lacks jurisdiction.**

A military commission, unlike an Article III court, is "a court of special and limited jurisdiction" that "is called into existence for a special purpose, and to perform a particular duty." *Runkle v. United States*, 122 U.S. 543, 555 (1887). The Capital Military Commission that has been convened to try Mr. al-Baluchi and his codefendants is no exception: It was created for the sole purpose of subjecting these defendants to a capital trial and sentencing, will be dissolved when that purpose has been achieved, and has legitimate existence only insofar as that purpose is lawful. As the Supreme Court observed in *McClaughry v. Deming*, 186 U.S. 49 (1902), "[a] court-martial is the creature of statute, and, as a body or tribunal, it must be convened and constituted in entire conformity with the provisions of the statute, or else it is without jurisdiction." *Id.* at 62; *see also id.* (noting that military commission convened in violation of governing statute "would have jurisdiction over neither the subject-matter nor the person"); *accord Keyes v. United States*, 109 U.S. 336, 340 (1883) ("where the statutory conditions as to the constitution or jurisdiction of the [court-martial] are not observed, there is no tribunal authorized by law to render the judgment"); *Dynes v. Hoover*, 61 U.S. 65, 81 (1857)

UNCLASSIFIED//FOR PUBLIC RELEASE
TOP SECRET//CODEWORD

("Persons, then, belonging to the army and the navy are not subject to illegal or irresponsible courts martial, when the law for convening them and directing their proceedings of organization and for trial have been disregarded. In such cases, everything which may be done is void – not voidable, but void[.]").

The civilian and military appellate courts have closely observed these principles, refusing to validate the jurisdiction of military courts that lacked personal jurisdiction over the defendant or were convened in a manner that did not comply with the governing law. *See, e.g., Hamdan v. Rumsfeld*, 548 U.S. 557, 589 n.20 (2006) (noting that petitioner had raised a "substantial argument" that, because the military commission convened to try him did not comply with the UCMJ, "it is ultra vires and thus lacks jurisdiction over him"); *In re Al-Nashiri*, 835 F.3d at 133 (*discussing Hamdan*, 548 U.S. at 133-34); *United States v. Ryan*, 5 M.J. 97 (C.M.A. 1978) (court-martial lacked jurisdiction where convening authority improperly delegated power to appoint court-martial's members); *United States v. Dean*, 43 C.M.R. 52 (C.M.A. 1970) (court-martial lacked jurisdiction where, although defendant orally consented to trial before military judge alone, defendant did not file statutorily-required written request for trial before judge alone); *United States v. White*, 45 C.M.R. 357 (C.M.A. 1972) (court-martial lacked jurisdiction where four enlisted men served without defendant's statutorily-required written request); *United States v. Robinson*, 33 C.M.R. 206 (C.M.A. 1963) (voiding findings and sentence of court-martial where defendant's guilty plea had been accepted by law officer before court-martial was formally convened); *United States v. Harnish*, 31 C.M.R. 29 (C.M.A. 1961) (court-martial lacked jurisdiction where two members had been formally appointed to prior court-martial from which charges were withdrawn, but not to court-martial that convicted defendant); *United States v. Sullivan*, 2014 WL 2434710 (N-M. Ct. Crim. App. 2014) (court-martial lacked jurisdiction where convening order was signed by official subordinate to official who referred charges); *cf. United States v. Gaspard*, 35 M.J. 678

TOP SECRET//CODEWORD

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~TOP SECRET//CODEWORD~~

(A.C.M.R. 1992) (returning trial record to Judge Advocate General for hearing out of concern that "if the convening authority . . . did not personally select the individual members, the convening of this court-martial is fatally flawed").

It follows from the principles set forth in the preceding two sections that, if Mr. al-Baluchi may not lawfully be subjected to the death penalty, the Capital Military Commission that has been convened to try him is ultra vires and lacks personal jurisdiction over him. In fact, Mr. al-Baluchi's Capital Military Commission does lack jurisdiction over him because, as he demonstrates below, subjecting him to the death penalty would violate the Military Commissions Act, as well as the Fifth and Eighth Amendments to the United States Constitution.

**C. The Capital Military Commission that has been convened to try Mr. al-Baluchi is ultra vires and lacks personal jurisdiction over him because he may not lawfully or constitutionally be executed.**

**(1) Executing Mr. al-Baluchi would constitute cruel and unusual punishment.**

**(a) The Detainee Treatment Act, Military Commissions Act, and Constitution bar the infliction of cruel and unusual punishment upon Mr. al-Baluchi.**

**(i) Detainee Treatment Act, 42 U.S.C. § 2000dd**

The Detainee Treatment Act of 2005, 42 U.S.C. § 2000dd, provides as follows:

**§ 2000dd. Prohibition on cruel, inhuman, or degrading treatment or punishment of persons under custody or control of the United States Government**

~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~TOP SECRET//CODEWORD~~

**(a) In general**

No individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment.

**(b) Construction**

Nothing in this section shall be construed to impose any geographical limitation on the applicability of the prohibition against cruel, inhuman, or degrading treatment or punishment under this section.

**(c) Limitation on supersedure**

The provisions of this section shall not be superseded, except by a provision of law enacted after December 30, 2005, which specifically repeals, modifies, or supersedes the provisions of this section.

**(d) Cruel, inhuman, or degrading treatment or punishment defined**

In this section, the term "cruel, inhuman, or degrading treatment or punishment" means the cruel, unusual, and inhumane treatment or punishment prohibited by the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States, as defined in the United States Reservations, Declarations and Understandings to the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment done at New York, December 10, 1984.

42 U.S.C. § 2000dd (West, Westlaw through Pub. L. No. 115-132) (boldface added). Because the Act by its plain terms bans the infliction of cruel and unusual punishment on any individual under the "physical control of the United States government" (*id.* at § 2000dd(a)), regardless of his nationality or geographical location (*id.* at § 2000dd(a), (b)), it clearly applies to Mr. al-Baluchi.

~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~TOP SECRET//CODEWORD~~

### (ii)    Military Commissions Act, 10 U.S.C. § 949s

The Military Commissions Act contains the following prohibition of "cruel or unusual punishment":

**§ 949s. Cruel or unusual punishments prohibited**

Punishment by flogging, or by branding, marking, or tattooing on the body, or any other cruel or unusual punishment, may not be adjudged by a military commission under this chapter or inflicted under this chapter upon any person subject to this chapter. The use of irons, single or double, except for the purpose of safe custody, is prohibited under this chapter.

10 U.S.C. § 949s (West, Westlaw through Pub. L. No. 115-132). This provision, minus the iterations of the phrase "under this chapter," was contained in the document entitled "Proposed Legislation: Military Commissions Act of 2006" that President Bush transmitted to Congress on September 6, 2006. H.R. Doc. 109-133 (2006)[37] at 62. As the summary accompanying that proposed legislation noted (*id.* at 10), this provision tracks Article 55 of the Uniform Code of Military Justice ("UCMJ"), which is codified at 10 U.S.C. § 855. Article 55's prohibition of "cruel or unusual punishment" originated in the 1920 revisions to the UCMJ's predecessor, the Articles of War. *See* Articles of War Approved June 4, 1920 at 12 (G.P.O. 1920)[38] (comparing revised Article 41 with 1916 version).

The legislative history of the 1920 revisions to the Articles of War confirms that Congress's purpose in inserting this language was just what its plain language and common sense suggest: to import the constitutional prohibition of cruel and unusual punishment into the context of military justice. *See Establishment of Military Justice – Proposed Amendment of the Articles of War: Hearing Before the S. Subcomm. on*

---

[37] http://www.loc.gov/rr/frd/Military_Law/pdf/Hdoc_109-133.pdf.
[38] http://www.loc.gov/rr/frd/Military_Law/pdf/RAW-vol2.pdf#page=39.

~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

TOP SECRET//CODEWORD

*Military Affairs*, 66th Cong. 1170 (Oct. 24, 1919)[39] ("If any good can come from the provision of the pending bill . . . in enacting the general language of the Constitution prohibiting cruel and unusual punishments by courts-martial, let it be done") (Statement of Maj. Gen. Enoch H. Crowder, Judge Advocate General, United States Army); Edmund M. Morgan, *The Existing Court-Martial System and the Ansell Army Articles*, 29 Yale L.J. 52, 73 n.80 (1919) (noting that General Samuel T. Ansell, who championed the 1920 revisions, declared that their purposes included "provid[ing] that military punitive action be buttressed in enlightened concepts of justice, be regulated by the principles of justice, and that it give results that can fairly be accepted as justice").

Consistent with this provision's plain language and legislative history, the military appellate courts have held that Article 55's application is guided by federal Eighth Amendment caselaw (*United States v. Smith*, 56 M.J. 290, 292 (C.A.A.F. 2002)), and that Article 55 provides protections at least equal to – and possibly greater than – the protections of the Eighth Amendment. *United States v. Avila*, 53 M.J. 99, 101 (C.A.A.F. 2000); *see also United States v. Martinez*, 19 M.J. 744, 747-48 (A.C.M.R. 1984) ("the statutory safeguards of Article 55, UCMJ, encompass all constitutional safeguards of the [E]ighth [A]mendment, as the former parallels the latter.").

### (ii)   Fifth and Eighth Amendments

The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Fifth Amendment's Due Process Clause provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." *Id.* amend. V. These two provisions overlap, insofar as the principles underlying the Cruel and Unusual Punishments Clause are also

---

[39] http://www.loc.gov/rr/frd/Military_Law/pdf/10_24.pdf.

TOP SECRET//CODEWORD

UNCLASSIFIED//FOR PUBLIC RELEASE

applied as a matter of constitutional due process. *See Furman v. Georgia*, 408 U.S. 238, 241 (1972) ("That the requirements of due process ban cruel and unusual punishment is now settled.") (Douglas, J., concurring); *accord Spencer v. Bouchard*, 449 F.3d 721, 727 (6th Cir. 2006); *Surprenant v. Rivas*, 424 F.3d 5, 18 (1st Cir. 2005); *Board v. Farnham*, 394 F.3d 469, 477-78 (7th Cir. 2005); *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998).

While panels of the D.C. Circuit have stated that aliens without property or presence in the United States lack constitutional rights beyond the Suspension Clause right recognized by the Supreme Court in *Boumediene v. Bush*, 553 U.S. 723 (2008) (*see, e.g., Ali v. Rumsfeld*, 649 F.3d 762, 770-72 (D.C. Cir. 2011)), these statements do not represent the current position of the en banc court majority. The D.C. Circuit's recent decision in *Al Bahlul v. United States*, 767 F.3d 1 (D.C. Cir. 2014) (en banc), confirms that a majority of the judges on the en banc court believe that the *Boumediene* Court's analysis of the Suspension Clause's applicability to alien Guantanamo detainees also applies to other constitutional rights, and that pursuant to this analysis, alien Guantanamo detainees have rights under the Ex Post Facto Clause. *See id.* at 18 n.9 (majority opinion) (noting that Chief Judge Garland and Judges Tatel and Griffith would find the Ex Post Facto Clause applicable to aliens detained at Guantanamo "for the reasons stated in the first two paragraphs of Part II.B of Judge Rogers's opinion and in Note 3 of Judge Kavanaugh's opinion"); *id.* at 49 (Rogers, J., concurring in the judgment in part and dissenting (first paragraph of Part II.B)) (noting that *Boumediene* Court's "analysis of the extraterritorial reach of the Suspension Clause applies to the Ex Post Facto Clause because the detainees' status and location at Guantanamo Bay are the same, and the government has pointed to no distinguishing 'practical obstacles' to its application") (*citing Boumediene*, 553 U.S. at 766); *id.* at 65-66 n.3 (Kavanaugh, J., concurring in the judgment in part and dissenting in part) (noting that "the *Boumediene* analysis leads

UNCLASSIFIED//FOR PUBLIC RELEASE
~~TOP SECRET//CODEWORD~~

inexorably to the conclusion that the ex post facto right applies at Guantanamo" because "[i]t would be no more impracticable or anomalous to apply the Article I, Section 9 ex post facto right at Guantanamo than it is to apply the Article I, Section 9 habeas corpus right at Guantanamo").

This analysis is sound, and applies with the same force to the Constitution's Cruel and Unusual Punishments, Due Process, and Double Jeopardy Clauses. The *Boumediene* Court explicitly rejected a "formalistic, sovereignty-based test for determining" whether a particular constitutional provision applies to aliens detained at Guantanamo (553 U.S. at 762), instead adopting a "functional approach" (*id.* at 764) that asks "whether judicial enforcement of the provision would be 'impracticable and anomalous.'" *Id.* at 759 (*quoting Reid v. Covert*, 354 U.S. 1, 74-75 (1957) (Harlan, J., concurring)). Ultimately, the Court found nothing impracticable or anomalous about extending the privilege of habeas corpus to aliens detained at Guantanamo Bay, "a territory that, while technically not part of the United States, is under the complete and total control of our Government." *Id.* at 771. As there is likewise nothing impracticable or anomalous about extending the protections of the Cruel and Unusual Punishments, Due Process, and Double Jeopardy Clauses to such aliens, *Boumediene*'s reasoning should apply to those clauses as well.

    **(b)**    **Executing Mr. al-Baluchi after having subjected him to years of brutal torture would constitute cruel and unusual punishment.**

The purpose of the Eighth Amendment's Cruel and Unusual Punishments Clause is to erect a bulwark against "coercive cruelty" – *i.e.*, cruelty employed as "an instrument of tyranny; of zeal for a purpose, either honest or sinister." *Weems v. United States*, 217 U.S. 349, 373 (1910). The Clause's underlying "basic concept" is "nothing less than the dignity of man." *Trop v. Dulles*, 356 U.S. 86, 100 (1958). And as Justice Brennan observed in his concurring opinion in *Furman*, the Clause effectuates the Framers' belief

~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~TOP SECRET//CODEWORD~~

that "even the vilest criminal remains a human being possessed of common human dignity." *Furman*, 408 U.S. at 273 (Brennan, J., concurring); *accord Gregg v. Georgia*, 428 U.S. 153, 182 (1976) ("The Court must ask whether [a challenged punishment] comports with the basic concept of human dignity at the core of the [Eighth] Amendment.") (Op. of Stewart, Powell, and Stevens, JJ.). The Clause thus bars certain punishments not merely because they are painful, but because "they treat members of the human race as nonhumans, as objects to be toyed with and discarded." *Furman*, 408 U.S. at 272-73 (Brennan, J., concurring).

The facts recounted above and in the Statement of Facts filed with the original version of this motion (Doc. 159 (SOF)) demonstrate that the government subjected Mr. al-Baluchi to an ordeal of "coercive cruelty" that continued for years. *Weems*, 217 U.S. at 373. On suspicion that he had participated in a plot to attack the United States, the government spent years "toy[ing] with" Mr. al-Baluchi, and now seeks to "discard[]" *i.e.*, execute – him. *Furman*, 408 U.S. at 273 (Brennan, J., concurring). But putting Mr. al-Baluchi to death would be cruel and unusual in two independently-sufficient respects.

### (i)    Needless extinction of human life

A punishment qualifies as cruel and unusual when it amounts to "the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes." *Id.* at 312 (White, J., concurring); *see also id.* at 279 (Brennan, J., concurring) ("The infliction of a severe punishment by the State cannot comport with human dignity when it is nothing more than the pointless infliction of suffering."); *id.* at 331 (Marshall, J., concurring) ("a penalty may be cruel and unusual because it is excessive and serves no valid legislative purpose"); *accord Ford v. Wainwright*, 477 U.S. 399, 410 (1986) (Eighth Amendment "protect[s] the dignity of society itself from the

17
~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~TOP SECRET//CODEWORD~~

barbarity of exacting mindless vengeance"); *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) ("Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'") (*quoting Gregg*, 428 U.S. at 183).

This principle precludes Mr. al-Baluchi's execution here. After having subjected him to a years-long ordeal of hellish tortures, the government cannot identify any sufficiently compelling "social or public purposes" to justify taking Mr. al-Baluchi's life. *Furman*, 408 U.S. at 312 (White, J., concurring). Having chosen to subject him to this treatment, the government cannot plausibly assert that the marginal value of executing him would make a sufficient contribution to retribution and deterrence to render the death penalty anything other than cruel and unusual. *Gregg*, 428 U.S. at 183 (Op. of Stewart, Powell, and Stevens, JJ.) ("The death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders."); *accord Kennedy v. Louisiana*, 554 U.S. 407, 441 (2008) (noting that capital punishment is excessive when "it does not fulfill the two distinct social purposes served by the death penalty: retribution and deterrence of capital crimes."). Thus, in the wake of the abuses to which the government has already subjected him, Mr. al-Baluchi's execution would amount to the "pointless and needless extinction of life." *Furman*, 408 U.S. at 312 (White, J., concurring); *cf. Valle v. Florida*, 132 S. Ct. 1, 1-2 (2011) (Breyer, J., dissenting from denial of stay) ("It is difficult to imagine how an execution following so long a period of incarceration [over 33 years on death row] could add significantly to that punishment's deterrent value."); *Lackey v. Texas*, 514 U.S. 1045, 115 S. Ct. 1421, 1421-22 (1995) (Mem. of Stevens, J., respecting denial of certiorari) (noting that after a petitioner has spent 17 years on death row, "the acceptable state interest in retribution has arguably been satisfied by the severe punishment already inflicted" and "the additional deterrent effect from an actual execution now, on the one hand, as compared to 17 years on death row followed by the prisoner's continued incarceration for life, on the other,

18
~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~TOP SECRET//CODEWORD~~

seems minimal"); *McKenzie v. Day*, 57 F.3d 1461, 1486 (9th Cir. 1995), *adopted on reh'g en banc*, 57 F.3d 1493 (9th Cir. 1995) (Norris, C.J., dissenting) (habeas petitioner's twenty years on death row, "coupled with the allegedly harsh and punitive confinement conditions on death row, arguably satisfies the State's interest in exacting retribution") (footnote omitted).

On-point decisions of foreign courts bolster this conclusion. The Supreme Court "has long considered as relevant and informative the way in which foreign courts have applied standards roughly comparable to our own constitutional standards in roughly comparable circumstances," and has viewed the opinions of former Commonwealth nations as "particularly instructive" in the Eighth Amendment context because "those opinions reflect a legal tradition that also underlies our own Eighth Amendment." *Knight v. Florida*, 528 U.S. 990, 120 S. Ct. 459, 463-64 (1999) (Breyer, J., dissenting from denial of certiorari) (citing cases). It is thus notable that the high courts of former Commonwealth nations have disapproved of executions under circumstances similar to – but far less egregious than – those presented here.

In *Pratt v. Attorney-General for Jamaica*, [1994] 2 A.C. 1, 1993 WL 963003 (P.C. Nov. 2, 1993) (appeal taken from the Ct. of App. of Jamaica) (en banc), for example, the Privy Council of the British House of Lords recommended that the death sentences of prisoners who had been kept on death row for fourteen years be commuted to life imprisonment. The Privy Council is the highest court in England, the highest court of appeal for many former Commonwealth countries, and the "most authoritative interpreter of British common law." *McKenzie*, 57 F.3d at 1487 (Norris, J., dissenting) (citing cases); *see also Chambers v. Bowersox*, 157 F.3d 560, 569 (8th Cir. 1998). Accordingly, American courts "have long been guided" by its decisions. *McKenzie*, 57 F.3d at 1487 & n.17 (Norris, J., dissenting) (citing cases). The Privy Council reasoned that "[t]here is an instinctive revulsion against the prospect of hanging a man after he has been held under

~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~TOP SECRET//CODEWORD~~

sentence of death for many years," and that the source of that revulsion is "our humanity; we regard it as an inhuman act to keep a man facing the agony of execution over a long extended period of time." *Pratt*, 2 A.C. at 29. The Privy Council added that in any case in which execution is to take place more than five years after sentencing, there would be "strong grounds" for believing that the delay is sufficient to render the execution inhuman or degrading. *Id.* at 35; *see also Sher Singh v. Punjab*, (Mar. 24, 1983) 2 S.C.R. 582 (India) ("the jurisprudence of the civilized world has recognized and acknowledged that prolonged delay in executing a sentence of death can make the punishment when it comes inhuman and degrading").

In *Soering v. United Kingdom*, 161 Eur. Ct. H.R. (ser. A) (July 7, 1989), the European Court of Human Rights found that permitting a prisoner's extradition to the United States to face a Virginia capital trial would violate Article 3 of the Convention for the Protection of Human Rights and Fundamental Freedoms, which specifies that "[n]o one shall be subjected to torture or to inhuman or degrading treatment or punishment." The Court stressed that the average time on death row in Virginia is six to eight years, and that "the condemned prisoner has to endure for many years the conditions on death row and the anguish and mounting tension of living in the ever-present shadow of death." *Id.* ¶ 106; *see also United States v. Burns*, 2001 SCC 7, [2001] 1 S.C.R. 283 (Can.); *Catholic Comm'n for Justice and Peace in Zimbabwe v. Attorney-Gen.*, [1993] 1 Zimb. L.R. 239 (S. Ct. of Zimbabwe).

While some American jurists have rejected the notion that these opinions should guide United States courts in the application of Eighth Amendment principles, they have done so for reasons that have no relevance here. Their objection has been that a death-sentenced prisoner should not be permitted to "avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed." *Knight*, 120 S. Ct. at 459 (Thomas, J., concurring in the denial of certiorari); *see also Turner v. Jabe*,

20

~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE

~~TOP SECRET//CODEWORD~~

58 F.3d 924, 933 (4th Cir. 1995) (Luttig, J., concurring in the judgment). No such bootstrapping is at play here. Mr. al-Baluchi did not torture himself. He was entirely at the mercy of the government, which chose to subject him to "coercive cruelty" for as long as it saw fit. *Weems*, 217 U.S. at 373; *cf. McKenzie*, 57 F.3d at 1466 ("We are not confronted with a situation where the State of Montana has set up a scheme to prolong the period of incarceration, or rescheduled the execution repeatedly in order to torture [the petitioner]."). This Court is thus free to – and should – recognize the pertinence of decisions such as *Pratt* and *Soering* here. If several years spent waiting on death row are presumptively sufficient to render subsequent execution inhuman, it follows *a fortiori* that years of brutal torture must have the same effect.

### (ii)    Cumulative treatment qualifying as "manifestly cruel and unusual" punishment

When viewed in combination with what would precede it, Mr. al-Baluchi's execution would constitute a manifestly cruel and unusual form of punishment. The Eighth Amendment has always been understood to ban "manifestly cruel and unusual" punishments such as "burning at the stake, crucifixion, breaking on the wheel, or the like." *In re Kemmler*, 136 U.S. 436, 446 (1890); *accord Estelle v. Gamble*, 429 U.S. 97, 102 (1976) ("the primary concern of the [Eighth Amendment's] drafters was to proscribe 'torture(s)' and other 'barbar(ous)' methods of punishment.") (*quoting* Anthony F. Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning*, 57 Calif. L. Rev. 839, 841 (1969)). While a variety of mechanisms have historically been employed to administer such penalties, they share the essential characteristic of inflicting a period of extreme mental and physical suffering, culminating in death. And while the Supreme Court has made plain that the Cruel and Unusual Punishments Clause bans these historically-familiar methods of administering "torture or a lingering death" (*Kemmler*, 136 U.S. at 447), it has also stressed that the Clause was not intended "to

21

~~TOP SECRET//CODEWORD~~

~~TOP SECRET//CODEWORD~~

prohibit only practices like the Stuarts', or to prevent only an exact repetition of history."
*Weems*, 217 U.S. at 373; *accord Gregg*, 428 U.S. at 171 (Op. of Stewart, Powell, and
Stevens, JJ.) ("the Court has not confined the prohibition embodied in the Eighth
Amendment to 'barbarous' methods that were generally outlawed in the 18th century").
The Supreme Court has made plain that "the existence of the death penalty is not a
license to the Government to devise any punishment short of death within the limit of its
imagination." *Trop*, 356 U.S. at 99. The Cruel and Unusual Punishments Clause applies
fully to historically-unknown methods by which the government might inflict "torture or
a lingering death" upon a prisoner. *Kemmler*, 136 U.S. at 447.

It is thus significant that if the government were permitted to execute Mr. al-
Baluchi, his cumulative punishment would in effect consist of the years-long ordeal of
torture described above and in the Statement of Facts filed with the original version of
this motion, followed by years in custody during pretrial and trial proceedings (to which
no end is currently in sight), followed by post-conviction custody during a review and
appeal process that he is not permitted to waive (10 U.S.C. § 950c(b), (c) (Westlaw
2014)), followed by his execution. Along the way, the government will have subjected
him to a protracted game of jurisdictional ping-pong, as it first filed capital charges
against him in a military commission in 2008, then dismissed those charges in 2009, then
filed capital charges against him in federal district court in 2009, then dismissed those
charges in 2011, before finally filing the charges underlying the present Capital Military
Commission proceeding in 2012.[40]

Such a punishment plainly would qualify as "unusual." Neither the federal
government nor any state has ever imposed such a penalty. *Cf. Smith v. Arizona*, 552 U.S.
985, 128 S. Ct. 2997, 2997 (2007) (Breyer, J., dissenting from the denial of certiorari)
("In my view, Smith can reasonably claim that his execution at this late date would be

---

[40] SOF ¶ 54.

~~TOP SECRET//CODEWORD~~

'unusual.' I am unaware of other executions that have taken place after so long a [30-year] delay[.]"); *Foster v. Florida*, 537 U.S. 990, 123 S. Ct. 470, 472 (2002) (Breyer, J., dissenting from the denial of certiorari) ("If executed, Foster, now 55, will have been punished both by death and also by more than a generation spent in death row's twilight. It is fairly asked whether such punishment is both unusual and cruel."); *Ceja v. Stewart*, 134 F.3d 1368, 1369 (9th Cir. 1998) (B. Fletcher, J., dissenting from denial of stay) ("If Ceja is executed, his de facto sentence will be 23 years of solitary confinement in the most horrible portion of the prison – death row – followed by execution. There has never been such a sentence imposed in this country – or any other, to my knowledge. Neither Arizona nor any other state would ever enact a law calling for such a punishment.").

Nor can it reasonably be doubted that such a punishment would be "cruel." Not only has Mr. al-Baluchi's punishment already included years of torture, and not only would his sufferings culminate in the "ultimate sanction" of death (*Furman*, 408 U.S. at 286 (Brennan, J., concurring)), but the intervening time would include both years in pretrial and trial custody, and additional post-conviction custody during the non-waivable review and appeal processes. *See* 10 U.S.C. § 950b (review by convening authority); *id.* § 950f (review by United States Court of Military Commission Review); 10 U.S.C. § 950c(b), (c); R.M.C. 1110(a) (death-sentenced prisoner barred from waiving review by United States Court of Military Commission Review). Mr. al-Baluchi would spend this latter period continuously subject to the "anguish and mounting tension of living in the ever-present shadow of death." *Soering, supra*, at ¶ 106; *see also In re Medley*, 134 U.S. 160, 172 (1890) (noting that a death-sentenced prisoner's uncertainty as to when his execution will take place "must be accompanied by an immense mental anxiety amounting to a great increase of the offender's punishment"); *Furman*, 408 U.S. at 288 (Brennan, J., concurring) ("the prospect of pending execution exacts a frightful toll during the inevitable long wait between the imposition of sentence and the actual

~~TOP SECRET//CODEWORD~~

infliction of death"); *Solesbee v. Balkcom*, 339 U.S. 9, 14 (1950) (Frankfurter, J., dissenting) ("the onset of insanity while awaiting execution of a death sentence is not a rare phenomenon"); *People v. Anderson*, 493 P.2d 880, 894 (Cal. 1972) ("the process of carrying out a verdict of death is often so degrading and brutalizing to the human spirit as to constitute psychological torture"). This "psychological torture" (*id.*) would be exacerbated for Mr. al-Baluchi, because common circumstances of his confinement would continue to trigger traumatic memories of his years of torture.[41] The aggregate suffering inflicted by this many-layered sequence of ordeals would rival – and likely exceed – the historical mechanisms against which the Eighth Amendment has always been understood to operate. *Kemmler*, 136 U.S. at 446.

In short, because the cumulative punishment that the government's convening of a Capital Military Commission contemplates inflicting upon Mr. al-Baluchi would be "manifestly cruel and unusual" (*id.*), it cannot be reconciled with the ban on such punishments imposed by the Detainee Treatment Act, Military Commissions Act, and the Fifth and Eighth Amendments to the United States Constitution.

> **(2)   This Court should enjoin Mr. al-Baluchi's trial by Capital Military Commission as a remedy for the government's outrageous and shocking conduct violating the Fifth Amendment's Due Process Clause.**

The Supreme Court has observed that the government's pre-indictment conduct with respect to a defendant may be "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-32 (1973) (*citing Rochin v. California*, 342 U.S. 165 (1952)); *Hampton v. United States*, 425 U.S. 484, 491-95 (1976) (Powell, J., with Blackmun, J., concurring); *id.* at 495–500 (Brennan, J., with Stewart & Marshall,

---

[41] SOF Ex. 3 (Baluchi Dec.) ¶¶ 23-24.

~~TOP SECRET//CODEWORD~~

JJ., dissenting); *accord United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978); *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971). Federal courts have similarly relied upon due process principles in refusing to permit the government to prosecute and punish an individual after it has engaged in a "deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights" – as when it has been complicit in the accused's pre-indictment torture. *United States v. Toscanino*, 500 F.2d 267, 275 (2d Cir. 1974); *see also United States v. Cordero*, 668 F.2d 32, 36-37 (1st Cir. 1981). The essential constitutional principles underlying these decisions are that governmental conduct that "shocks the conscience" (*Rochin*, 342 U.S. at 172) violates due process, and that "a court which would ordinarily stay its hand will intervene when government conduct becomes so outrageous that conscience and justice demand a remedy." *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 66 n.5 (2d Cir. 1975).

Conscience and justice demand a remedy for the government's shocking mistreatment of Mr. al-Baluchi. Indeed, if this Court were to place at one end of a spectrum cases in which the government's actions "d[id] no more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically" (*Rochin*, 342 U.S. at 172), the government's years of barbaric torture of Mr. al-Baluchi would lie at the other end of that spectrum. Moreover, in view of the extreme outrageousness of the government's conduct, and the fact that the Military Commissions Act already bars the admission of evidence directly extracted through torture (10 U.S.C. § 948r (West, Westlaw through Pub. L. No. 115-132)), merely barring the admission of such evidence in Mr. al-Baluchi's trial would not be an effective remedy for the government's outrageous misconduct.

In light of these circumstances, the only adequate remedy is to deny the government "the right to exploit its own illegal conduct" by enjoining Mr. al-Baluchi's trial by Capital Military Commission. *Toscanino*, 500 F.2d at 275.

~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE
~~TOP SECRET//CODEWORD~~

(3)     **Mr. al-Baluchi's execution would constitute unlawful multiple punishment for the same offense.**

(a)     **Subjecting Mr. al-Baluchi to multiple punishments for the same offense would violate the Fifth Amendment's Due Process Clause, the Military Commissions Act, and Article 13 of the UCMJ.**

(i)     **Fifth Amendment Double Jeopardy Clause**

The Fifth Amendment's Double Jeopardy Clause specifies that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Clause contains "three separate constitutional protections": (1) "[i]t protects against a second prosecution for the same offense after acquittal"; (2) "[i]t protects against a second prosecution for the same offense after conviction"; and (3) "it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled in part on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989). The third category constituted an essential purpose underlying the Clause's inclusion in the Bill of Rights. Indeed, James Madison's original proposed language for the Clause was: "'No person shall be subject, except in cases of impeachment, to more than one punishment or one trial for the same offense.'" Carissa B. Hessick and F. Andrew Hessick, *Double Jeopardy as a Limit on Punishment*, 97 Cornell L. Rev. 45, 51 (2011) (*quoting* 1 Annals of Cong. 451-52 (1789) (Joseph Gales ed., 1834)). While several members of the House of Representatives objected to the inclusion of the words "one trial," "no one objected to the restriction on multiple punishments[; t]o the contrary, the only statement on that language was by Representative Egbert Benson, who noted that the 'humane' reason for a prohibition on double jeopardy was to prevent more than one punishment for a single offense." *Id.* at 51-52. The Supreme Court expressed early and emphatic confirmation of the Clause's ban on multiple punishments

~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE

in *Ex parte Lange*, 85 U.S. 163 (1873), noting that "[i]f there is anything settled in the jurisprudence of England and America, it is that no man can be twice lawfully punished for the same offence." *Id.* at 168; *see also id.* at 173 ("we do not doubt that the Constitution was designed as much to prevent the criminal from being twice punished for the same offence as from being twice tried for it").

### (ii)    Military Commissions Act, 10 U.S.C. § 949h(a)

The Military Commissions Act contains a "[f]ormer jeopardy" provision specifying that "[n]o person may, without the person's consent, be tried by a military commission under this chapter a second time for the same offense." 10 U.S.C. § 949h(a) (West, Westlaw through Pub. L. No. 115-132). This provision is patterned on Article 44 of the UCMJ (H.R. Doc. 109-133 (2006) at 8), which is codified at 10 U.S.C. § 844. Article 44, together with companion Articles that prohibit rehearing on acquitted counts and restore rights, privileges, and property affected by a sentence that has been set aside (and related rules), "provide[] each of the three components of the constitutional prohibition against former jeopardy," such that "[i]n the military, as in civilian life, the following are prohibited: (1) trial for the same offense after acquittal; (2) trial for the same offense after conviction; and (3) multiple punishments for the same offense." *United States v. Rosendahl*, 53 M.J. 344, 347 (C.A.A.F. 2000).

### (iii)    UCMJ Article 13

The UCMJ also contains a provision, Article 13, specifying that "[n]o person, while being held for trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, nor shall the arrest or confinement

UNCLASSIFIED//FOR PUBLIC RELEASE

~~TOP SECRET//CODEWORD~~

imposed upon him be any more rigorous than the circumstances require to insure his presence[.]" 10 U.S.C. § 813 (West, Westlaw through Pub. L. No. 115-132). Because Article 13 is written in sufficiently broad language to cover Mr. al-Baluchi's trial by Capital Military Commission, and because it is not among the UCMJ provisions that the Military Commissions Act expressly declares inapplicable (10 U.S.C. § 948b(d) (West, Westlaw through Pub. L. No. 115-132)), it is applicable here. *Cf. Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."). And while confinement credit has been the primary relief afforded for violations of Article 13 (*United States v. Zarbatany*, 70 M.J. 169, 174 (C.A.A.F. 2011)), "courts must consider other relief for violations of Article 13, UCMJ, where the context warrants." *Id.* at 175.

These provisions, both individually and in combination, bar the government from punishing Mr. al-Baluchi twice for the same offense.

> **(b)   Executing Mr. al-Baluchi would amount to punishing him twice for the same offense.**

As shown above and in the Statement of Facts filed with the original version of this motion, the government has already subjected Mr. al-Baluchi to a years-long ordeal of torture, on suspicion that he participated in a conspiracy to attack the United States. It is evident, for four reasons, that this treatment was the functional equivalent of prior punishment for the same offense for which the government now seeks to put him to death. First, the treatment was "remarkably" harsh. *Dep't of Revenue v. Kurth Ranch*, 511 U.S. 767, 780 (1994) (noting that tax on possession of illegal drugs was "remarkably high"). Second, the treatment would tend to deter others from committing the offense with which Mr. al-Baluchi is charged. *Id.* Third, the government subjected Mr. al-Baluchi to this treatment because it suspected that he had committed the offense for which he now

28

~~TOP SECRET//CODEWORD~~

faces trial before a Capital Military Commission. *Id.* at 781-82. Finally, the Military

Commissions Act specifies that the crimes with which Mr. al-Baluchi is charged are

punishable by terms of imprisonment or the death penalty – *not* by years of torture

followed by execution. 10 U.S.C. § 950t (West, Westlaw through Pub. L. No. 115-132).

Thus, even if Mr. al-Baluchi's years of trial and post-trial custody could be treated as

constituting part of Congress's intended punishment, the tortures to which the

government subjected him before formally charging him cannot. *See* Anne B. Poulin,

*Double Jeopardy and Multiple Punishment: Cutting the Gordian Knot*, 77 U. Colo. L.

Rev. 595, 604 (2006) ("the [Supreme] Court has repeatedly found that legislative intent

governs whether crimes are multiply punished . . .").

In short, the government's brutal abuses of Mr. al-Baluchi are "too far-removed in

crucial respects" from standard pretrial custody to "escape characterization as punishment

for the purpose of double jeopardy analysis." *Kurth Ranch*, 511 U.S. at 783. Executing

Mr. al-Baluchi would accordingly violate the prohibitions of multiple punishment

enshrined in the Fifth Amendment's Due Process Clause, the Military Commissions Act,

and Article 13 of the UCMJ.

### III.    The Court may exercise its habeas corpus or mandamus power to bar Mr. al-Baluchi's unlawful trial by Capital Military Commission.

#### A.    Injunction

A federal habeas corpus court has the power to enjoin an unlawful trial, including

an unlawful trial by military commission, in appropriate circumstances. *See, e.g., Strate*

*v. A-1 Contractors*, 520 U.S. 438 (1997) (affirming circuit court decision reversing

district court refusal to enjoin trial in ultra vires tribal court); *Reid v. Covert*, 354 U.S. 1

(1957) (holding that petitioner facing retrial by military commission "could not

constitutionally be tried by military authorities" and affirming district court's order

granting writ of habeas corpus); *United States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955) (finding statute authorizing court-martial unconstitutional and reversing circuit court decision that reversed district court's grant of habeas corpus with respect to petitioner facing trial by court-martial); *Ex parte Quirin*, 317 U.S. 1 (1942) (addressing applications for leave to file petitions for habeas corpus filed by individuals facing trial by military commission). The fact that such relief does not necessarily affect the petitioner's continued custody is no bar to this form of relief in a habeas corpus case. *See Hamdan*, 548 U.S. at 635 ("Hamdan does not challenge, and we do not today address, the Government's power to detain him for the duration of active hostilities.").

In *Al-Nashiri*, the D.C. Circuit addressed the question of whether an Article III court should abstain from exercising this power in respect to a prospective military commission trial. (No suggestion that this Court should abstain from addressing Mr. al-Baluchi's claims is currently before the Court, but it is anticipated that the government will soon file a motion for abstention in accordance with the Scheduling Order. (Doc. 199 at 1.)) The *Al-Nashiri* Court suggested that in this context, abstention may be appropriate outside of circumstances in which the petitioner claims that his status renders his military commission unlawful, or that the commission is "wholly ultra vires." *In re Al-Nashiri*, 835 F.3d at 132-34. While Mr. al-Baluchi respectfully disagrees with these propositions, he notes that they do not impede this Court from granting the relief requested here. The claims raised in *Al-Nashiri* rested on "the nature of [the petitioner's] alleged offenses," rather than on "his status" as a person subject to trial by military commission. *Id.* at 134. Mr. al-Baluchi's claims, by contrast, rest on the proposition that, for the multiple reasons outlined above, his status as a person who was savagely tortured by Respondents renders the Capital Military Commission convened to try him ultra vires. It follows that Mr. al-Baluchi's claims fit neatly within the categories that *Al-Nashiri* identifies as fully subject

~~TOP SECRET//CODEWORD~~

to an Article III court's power to intervene before trial, notwithstanding any possible request for abstention.

To the extent that the traditional four-factor analysis applies to Mr. al-Baluchi's request for an injunction (*eBay Inc. v. MercExchange*, 547 U.S. 388, 391 (2006)), those factors are clearly present: (1) the cruel and unusual punishment and double jeopardy inherent in subjecting him to a Capital Military Commission trial and subsequent, largely non-waivable, reviews constitutes irreparable injury that cannot be remedied after the fact; (2) post hoc remedies such as monetary damages are unavailable because the government would undoubtedly claim sovereign immunity if Mr. al-Baluchi were to seek them; (3) the balance of hardships favors the entry of an injunction, which would deprive Respondents only of the ability to subject Mr. al-Baluchi to years of litigation pursuant to an ultra vires military commission, while sparing him from an extended course of cruel and unusual punishment; and (4) the public interest favors avoiding the waste of time and resources involved in subjecting Mr. al-Baluchi to prosecution in a legally void tribunal. *See id.* In view of these factors, a permanent injunction is entirely appropriate.

## B.   Mandamus

If the Court were to find that no other remedy is available to provide the relief Mr. al-Baluchi seeks here, the Court could exercise its mandamus power to grant that relief. *See* 28 U.S.C. § 1361 (West, Westlaw through Pub. L. No. 115-132) ("The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."). Assuming that no other adequate remedy were available, mandamus could be granted provided that (1) Mr. al-Baluchi has a clear right to relief, and (2) the Respondents have a clear duty to act. *Thomas v. Holder*, 750 F.3d 899, 903 (D.C. Cir. 2014). Mr. al-Baluchi respectfully submits that for the reasons set forth above, both of these requirements are satisfied with regard to Respondents' obligation to abandon their

31

~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE
~~TOP SECRET//CODEWORD~~

effort to try Mr. al-Baluchi by Capital Military Commission and execute him. Indeed, there is ample precedent for the use of mandamus to compel such relief in these circumstances. *See, e.g.*, *United States ex rel. Sledjeski v. Commanding Officer, Armed Forces*, 478 F.2d 1147, 1150 (2d Cir. 1973); *Colson v. Bradley*, 477 F.2d 639, 641-42 (8th Cir. 1973); *Schatten v. United States*, 419 F.2d 187, 191 (6th Cir. 1969); *Smith v. Resor*, 406 F.2d 141, 147 (2d Cir. 1969); *United States ex rel. Schonbrun v. Commanding Officer, Armed Forces*, 403 F.2d 371, 374 (2d Cir. 1968).

~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~TOP SECRET//CODEWORD~~

## IV.   Conclusion and Request for Oral Argument

In sum, for the reasons set forth above, Mr. al-Baluchi's trial by Capital Military Commission would violate provisions relating to cruel and unusual punishment, due process, and double jeopardy enshrined in the Detainee Treatment Act, Military Commissions Act, United States Constitution, and UCMJ. This Court should accordingly enter an injunction or writ of mandamus permanently barring Respondents from subjecting Mr. al-Baluchi to trial by Capital Military Commission.

In view of the importance and complexity of the issues raised, Mr. al-Baluchi respectfully requests that the Court hear oral argument on this motion. *See* LCvR 7(f). Per LCvR 7(m), undersigned counsel conferred with counsel for Respondents, who indicated that Respondents object to the relief requested herein. A proposed Order is being filed herewith for the Court's convenience.

March 27, 2018

*s/ Daniel L. Kaplan*
JON M. SANDS (LCvR 83.2(e), (g))
Federal Public Defender
DANIEL L. KAPLAN (LCvR 83.2(e), (g))
SARAH S. GANNETT (LCvR 83.2(e), (g))
Assistant Federal Public Defenders
Office of the Federal Public Defender,
   District of Arizona
850 West Adams, Suite 201
Phoenix, Arizona 85007-2730
Telephone: (602) 382-2700
Fax: (602) 382-2800
Email:  jon_sands@fd.org
        dan_kaplan@fd.org
        sarah_gannett@fd.org

Counsel for Petitioner Ammar al-Baluchi

~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~TOP SECRET//CODEWORD~~

## CERTIFICATE OF FILING AND SERVICE

On March 27, 2018, pursuant to this Court's Procedures for Use of Sensitive Compartmented Information Facility (SCIF) and HVD Classified Material, Petitioner filed this Updated Motion for Permanent Injunction or Mandamus with Respect to Unlawful Trial by Capital Military Commission by delivering one original and four copies to a Court Security Officer for filing with the Court and service on Respondents.


By /s *Daniel L. Kaplan*

DANIEL L. KAPLAN (LCvR 83.2(e), (g))
Assistant Federal Public Defender

~~TOP SECRET//CODEWORD~~


UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

# ATTACHMENT

UNCLASSIFIED//FOR PUBLIC RELEASE

~~TOP SECRET//CODEWORD~~

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMMAR AL-BALUCHI,

Petitioner,

v.

JAMES N. MATTIS, *et al.*,

Respondents.

Civil Action No. 08-2083 (PLF)

**[PROPOSED] ORDER**

Pending before this Court is Petitioner's Updated Motion for Permanent Injunction or Mandamus with Respect to Unlawful Trial by Capital Military Commission. For good cause appearing, it is hereby ORDERED granting Petitioner's motion. It is FURTHER ORDERED that Petitioners are permanently enjoined from trying Petitioner by Capital Military Commission or otherwise subjecting Petitioner to the possibility of execution for the offenses with which he is charged.

DATED this _____ day of _____.

_____
JUDGE PAUL L. FRIEDMAN
United States District Judge

UNCLASSIFIED//FOR PUBLIC RELEASE

~~TOP SECRET//CODEWORD~~

### Attorneys to be notified

JON M. SANDS (LCvR 83.2(e), (g))
Federal Public Defender

DANIEL L. KAPLAN (LCvR 83.2(e), (g))
SARAH S. GANNETT (LCvR 83.2(e), (g))
Assistant Federal Public Defenders
Office of the Federal Public Defender,
    District of Arizona
850 West Adams, Suite 201
Phoenix, Arizona  85007-2730
Telephone: (602) 382-2700
Fax: (602) 382-2800
Email: jon_sands@fd.org
        dan_kaplan@fd.org
        sarah_gannett@fd.org

Counsel for Petitioner Ammar al-Baluchi

KRISTINA A. WOLFE
ANDREW I. WARDEN
SCOTT D. LEVIN
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Suite 5100
Washington, DC 20530
Telephone: (202) 353-4519
Email: kristina.wolfe@usdoj.gov

Counsel for Respondents

Proposed Order / Motion for Permanent Injunction or Mandamus

2  ~~TOP SECRET//CODEWORD~~

UNCLASSIFIED//FOR PUBLIC RELEASE