1IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMMAR AL BALUCHI | ) | |
|     *Mr. al Baluchi/Plaintiff,* | ) | Civ. No. 08-CV-2083 (PLF) |
| | ) | |
| v. | ) | |
| | ) | |
| LLOYD J. AUSTIN III, | ) | |
| Secretary of Defense, *et al.*, | ) | |
| | ) | |
|     *Respondents/Defendants.* | ) | |
| | ) | |

## MOTION TO LIFT STAY ON HABEAS PROCEEDINGS AND COMPEL EXAMINATION BY A MIXED MEDICAL COMMISSION

## TABLE OF CONTENTS

Introduction………………………………………………………………………………..3

Background of Mr. al Baluchi's Medical Condition…………………………………………...4

Argument………………………………………………………………………………………..10

    I.      The stay on Mr. al Baluchi's habeas case should be lifted to adjudicate this motion.

    II.     Mr. al Baluchi is entitled to a Mixed Medical Commission pursuant to AE 190-8.

    III.    Mr. al Baluchi's deteriorating health requires evaluation by a Mixed Medical Commission.

    IV.    Mr. al Baluchi's entitlement to a Mixed Medical Commission is unaffected by AR 190-8 "Clarification/Exception."
        a.  The "Clarification/Exception" is procedurally defective and therefore invalid.

            (1) The Secretary of the Army's cited authority does not allow him to unilaterally issue exceptions to Army Regulations.

            (2) The Secretary of the Army lacked the authority to issue exceptions to AR 190-8.

            (3) Secretary McCarthy's issuance of the "Clarification/Exception" to AR 190-8 impermissibly usurped authority delegated to a subordinate officer.

        b.  The "Clarification/Exception" does not change this Court's rationale for granting Mr. Al-Qahtani's petition for a Mixed Medical Commission.

Conclusion………………………………………………………………………………….32

[Proposed] Order to Permit a Mixed Medical Commission…………………………………..33

## INTRODUCTION

Ammar al Baluchi had no known psychiatric illness or chronic medical conditions prior to his entrance into U.S. custody in April 2003.[1] Following his arrest in Pakistan, he spent over three years in incommunicado detention at five different CIA "black sites," where he was tortured by U.S. personnel as part of the "Rendition, Detention, and Interrogation" program. Mr. al Baluchi was transferred to Guantanamo Bay in September 2006, by which point CIA medical providers had noted his physical and psychological deterioration. Mr. al Baluchi's medical condition at Guantanamo has significantly worsened during the near-15 years he has spent there. He suffers from an untreated traumatic brain injury, chronic sleep disturbances and other medical conditions.

In May 2020, Mr. al Baluchi sent a letter to the Department of Defense ("DoD") requesting his examination by a Mixed Medical Commission pursuant to Army Regulation 190-8, Section 3-12.[2] Although the Department of Justice acknowledged their possession of Mr. al Baluchi's request,[3] no government agency ever responded to Mr. al Baluchi.

Mr. al Baluchi's *habeas corpus* proceeding was stayed by this Court in 2019 for "claims that have been, will be, or could be adjudicated at the military commission or on appeal therefrom."[4] Mr. al Baluchi's request for a Mixed Medical Commission properly sounds in *habeas*,

---

[1] Ex. A, Mr. al Baluchi's Letter to Department of Defense Requesting a Mixed Medical Commission (May 5, 2020); Ex. G, Report of Dr. Leo Shea III regarding evaluation of Ammar al Baluchi, January 2020, at 4 ("Shea Report"). "Records note that there is no personal or family history of mental illness, psychiatric treatment or use of psychotropic medications prior to 2003."
[2] *Id.*; Dept. of the Army, Army Reg. 190-8, Enemy Prisoners of War, Retained Personnel, Civilian Internees, and Other Detainees, ch. 3, §12 (Oct. 1, 1997) ("AR 190-8").

[3] Ex. B, 15 September 2020 Email from Kathryn C. Davis to Alka Pradhan.

[4] *Al Baluchi v. Esper*, 392 F. Supp. 3d 46, 66-67 (D.D.C. 2019). Mr. al Baluchi maintains that he is a civilian and not subject to military commission jurisdiction. *See, e.g.*, AE 502B (KSM, AAA) Mr. al Baluchi and Mr. Mohammad's Joint Notice of Declination of Joinder and Motion to

per this Court's ruling in *Al-Qahtani v. Trump*.[5] Therefore, Mr. al Baluchi respectfully moves the Court to lift the stay on his *habeas* case, and compel Respondents to convene a Mixed Medical Commission. AR 190-8 requires a Mixed Medical Commission to be comprised of two members from a neutral country and a medical officer of the U.S. Army selected by the Department of the Army Headquarters ("HQDA").[6] Mr. al Baluchi is entitled to the relief sought herein pursuant to the All Writs Act, 28 U.S.C. § 1651.[7]

**BACKGROUND OF PETITIONER'S MEDICAL CONDITION**

Mr. al Baluchi was disappeared in 2003 and spent over three years incommunicado in the CIA's Rendition, Detention, and Interrogation ("RDI") Program before being rendered to Guantanamo Bay in September 2006. Much of Mr. al Baluchi's torture in CIA custody has been publicly documented. In 2012, the Hollywood film "Zero Dark Thirty" utilized information obtained from the CIA to portray Mr. al Baluchi's torture, including his water dousing and stress positions.[8] Mr. al Baluchi's arrest and disappearance by the CIA in 2003 were also detailed in the redacted Executive Summary of the Senate Select Committee on Intelligence's Report on the

---

Consider Other Arguments or For Other Relief, *available at* https://www.mc.mil/Portals/0/pdfs/KSM2/KSM%20II%20(AE502B(KSM%20AAA)).pdf.

[5] *Al-Qahtani v. Trump*, 443 F. Supp. 3d 116, 125-29 (D.D.C. 2020), *appeal filed*, No. 20-5130 (D.C. Cir.).

[6] *Id.*; Army Reg. 190-8 § 3-12(a)(2).

[7] *Qahtani v. Trump*, 443 F.3d 116, 133 (2020) (citing *Al Odah v. United States*, 346 F. Supp. 2d 1, 6-8 (D.D.C. 2004); *Harris v. Nelson*, 394 U.S. 286, 290 (1969)). Pursuant to Local Civ. R. 7(m), undersigned counsel contacted Respondents' counsel to seek their consent to the relief sought herein. On March 10, 2022, Respondents' counsel informed undersigned counsel that Respondents would oppose this Motion.

[8] Carol Rosenberg, *Guantanamo War Court Screens Grisly 'Zero Dark Thirty' Torture Scenes*, Miami Herald, Feb. 18 2016, *available at* https://www.miamiherald.com/news/nation-world/world/americas/guantanamo/article61163027.html.

4

CIA's RDI Program.[9] The redacted Executive Summary described the torture at the black sites as including water torture including ice water "baths" and near drownings[10]; being stripped and left nude for extended periods[11]; being diapered without access to bathroom facilities for lengthy periods of time[12]; beatings[13]; excruciating sleep deprivation[14]; and confinement in painful "stress" positions including hanging by the wrists for prolonged periods of time.[15] Mr. al Baluchi experienced all of these techniques, often in combination.[16]

One of the RDI program's initial organizers, Dr. James Mitchell, testified in January 2020 that Mr. al Baluchi had been experimented on as a "training prop" for CIA personnel to receive their certifications to use "enhanced interrogation techniques."[17] The CIA's own Office of the Inspector General ("OIG") reviewed Mr. al Baluchi's treatment (and its effects) at the black sites, and issued a 2008 report concluding that Mr. al Baluchi had been subjected to unauthorized and

---

[9] Executive Summary of the Report of the Senate Select Committee on Intelligence on the CIA's Rendition, Detention, and Interrogation Program, (Dec. 9, 2014) at 243-46, *available at* http://www.feinstein.senate.gov/public/index.cfm/files/serve?File_id=7c85429a-ec38-4bb5-968f-289799bf6d0e&SK=D500C4EBC500E1D256BA519211895909 ("SSCI Redacted Executive Summary").

[10] *Id*. at 69, 82, and 107.

[11] *Id*. at 4, 79.

[12] Sen. Dianne Feinstein, "SSCI Study of the CIA's R&I Program," remarks in the Senate, Congressional Record, daily edition, vol. 160, no. 149 (December 9, 2014), p. S6409.
[13] SSCI Redacted Executive summary at 4, 79, 86.

[14] *Id*. at 16, 149.

[15] *Id*. at 53, 101.

[16] *See generally* Ex. C, AE628RRRRR (AAA), Mr. al Baluchi's Notice of Exhibits, Att. C: Report of the Office of the CIA Inspector General Regarding Allegations of Torture By Ammar al Baluchi CIA OIG Report Regarding Al Baluchi Torture").

[17] Sacha Pfeiffer, "CIA Used Prisoner as 'Training Prop' for Torture, Psychologist Testifies," National Public Radio (Jan. 23, 2020), *available at* https://www.npr.org/2020/01/23/799130233/psychologist-who-helped-create-interrogation-methods-says-cia-may-have-gone-too.

excessive use of interrogation techniques, resulting in physical pain and "psychosomatic attacks."[18] Moreover, the CIA "was aware" that interrogators "were using techniques that fell outside permissible interrogation techniques."[19]

As one example, Mr. al Baluchi recalled that government agents slammed his head against a wall repeatedly: "As my head was being hit each time, I would see sparks of light in my eyes. As the intensity of these sparks were increasing as a result of repeated hitting[,] all of a sudden I felt a strong jolt of electricity in my head then I couldn't see anything[.] Everything went dark and I passed out."[20] The CIA OIG confirmed that interrogators "took turns" walling Mr. al Baluchi for up to two hours at a time, "because fatigue would set in for the interrogator doing the walling."[21] Mr. al Baluchi's "walling" was severe enough to cause a traumatic brain injury.[22]

---

[18] Ex. C, CIA OIG Report Regarding Al Baluchi Torture at MEA-2C-00000484.

[19] *Id*. at MEA-2C-00000489.

[20] Ex. J, Statements of Ammar al Baluchi at 1, 8. According to torture experts, "blunt force trauma . . . may be a 'softening up' prior to more elaborate methods of abuse." Pounder, D, "The Medical Contribution to Assessing Allegations of Torture in International Fact-Finding Missions," Forensic Science Int'l 208, 244 (2011)["Pounder"].

[21] *Id*. at MEA-2C-00000444. Further:



[22] Ex. E, Report of Dr. David Hanrahan regarding evaluation of Ammar al Baluchi, October 2018, at 5-6 ("Hanrahan Report").

Other unauthorized or excessive techniques used included placing a wooden rod behind Mr. al Baluchi's knees during a kneeling stress position, and use of ice water during water dousing,[23] in addition to standing sleep deprivation for 82 hours that resulted in chronic back and knee pain.[24] Following intense physical torture, Mr. al Baluchi was subjected to psychological torture, including prolonged incommunicado detention, sleep deprivation, and explicit and implicit threats of physical harm, for over three years.[25] One CIA official who interacted with Mr. al Baluchi in multiple black sites commented in 2008 that following the torture, Mr. al Baluchi had "major psychological issues," and feared that Agency officers would dislike any requests he made "and hurt him in response."[26] The CIA OIG's report concluded that Mr. al Baluchi's allegations of torture at the black sites were "understandable" given the use of "enhanced interrogation techniques" in combination and the "context of his detention facilities."[27]

Given Mr. al Baluchi's medical history prior to his years of incommunicado CIA detention and 15 years at Guantanamo Bay, it is clear that Mr. al Baluchi's torture is the cause of his many medical problems now.[28] In August 2015, Brigadier General (U.S. Army ret.) Stephen Xenakis, a psychiatrist, examined Mr. al Baluchi at Guantanamo Bay. Brig. Gen. Xenakis concluded that Mr.

---

[23] *Id*. at MEA-2C-00000489.

[24] *Id*. at MEA-2C-00000436, 442, and 463.

[25] *Id.* at MEA-2C-00000451 (One interrogator present during Mr. al Baluchi's "enhanced interrogation techniques" attended his later debriefings to "intimidate by his presence" and "make veiled references to the previous bad times the detainees went through – meaning when they went through EITs." The "interrogator's presence, strong language, and inferred threat – that life could get a lot harder – was sufficient to make a detainee cooperate.")

[26] *Id*. at MEA-2C-00000470.

[27] *Id*. at MEA-2C-00000483.

[28] *Id*. at MEA-2C-00000464 (when assessing Mr. al Baluchi for the use of "enhanced interrogation techniques in 2003 after his transfer to COBALT, one officer commented that "there was nothing in his presentation to suggest serious mental impairment . . .")

al Baluchi required evaluation for post-concussional syndrome ("PCS") and likely moderate traumatic brain injury, post-traumatic stress disorder, major depression, sleep disturbances, chronic pain and other osteoarthritic conditions, thyroid dysfunction, and metabolic dysfunction, among other illnesses.[29] Brig. Gen. Xenakis listed the description of "walling" as supporting chronic PCS as Mr. al Baluchi's "predominant injury and illness."

In October 2018, LCDR David Hanrahan (U.S. Navy), a board-certified psychiatrist, conducted an independent psychiatric evaluation of Mr. al Baluchi and diagnosed him with "many repetitive mild traumatic brain injuries, and at least one moderate traumatic brain injury."[30] LCDR Hanrahan also noted that Mr. al Baluchi's symptoms "meet criteria for both Post-Traumatic Stress Disorder and Post-Concussional Syndrome," but that further neuropsychological testing would be required to determine whether Mr. al Baluchi has any neurocognitive disorder. LCDR Hanrahan noted Mr. al Baluchi's chronic pain and highlighted the necessity of resolving his sleep disorder.[31]

In April 2019, Dr. Ruben Gur, a neuropsychologist specializing in neuroimaging, conducted a volumetric analysis of Mr. al Baluchi's December 2018 magnetic resonance imaging (MRI) results. Dr. Gur concluded that Mr. al Baluchi's MRI showed "abnormalities indicating moderate to severe brain damage" in parts of the brain affecting memory formation and retrieval as well as behavioral regulation.[32] Dr. Gur noted that the abnormalities observed were consistent with traumatic brain injury.

---

[29] Ex. D, Report of Dr. Stephen Xenakis regarding evaluation of Ammar al Baluchi, August 2015, at 1-2.

[30] Hanrahan Report at 5-6.

[31] *Id*. at 6.

[32] Ex. F, Report of Dr. Ruben Gur regarding volumetric analysis of al Baluchi MRI, April 2019, at 2.

In January 2020, Dr. Leo Shea III, a neuropsychologist specializing in neuropsychological profiling, conducted a neuropsychological evaluation of Mr. al Baluchi, including administration of more than two dozen tests. Dr. Shea noted that Mr. al Baluchi "consistently showed speed of processing challenges throughout the evaluation,"[33] and that he exhibited other "neurocognitive limitations" attributable to his torture.[34] Mr. al Baluchi received "lower scores on working memory,"[35] suggesting a "statistical likelihood of neurological damage,"[36] and his performances on multiple measures of depression "all fell in the moderate to severe level of dysfunction,"[37] Dr. Shea reported that Mr. al Baluchi had a "highly elevated score on [the Trauma] index," consistent with "multiple traumas in his life."[38] Dr. Shea concluded that the damage done by [CIA torture] "seriously diminished [Mr. al Baluchi's] psychological functioning and has left him with mild to moderate Traumatic Brain Injury and moderate to severe anxiety, depression, and Post-traumatic Stress Disorder."[39]

A Mixed Medical Commission should be appointed pursuant to Army Regulation 190-8 to confirm the findings of Drs. Xenakis, Hanrahan, Gur, and Shea, and to find that Mr. al Baluchi is

---

[33] Ex. G, Report of Dr. Leo Shea regarding evaluation of Ammar al Baluchi, January 2020, at 18 ("Shea Report").

[34] *Id*. at 19.

[35] *Id*. at 14.

[36] *Id*. at 13.

[37] *Id*. at 16.

[38] *Id*. at 15.

[39] *Id*. at 20. All scores for the tests conducted by Dr. Shea are appended to the report.

entitled to release for "lifelong rehabilitation services similar to the Veterans Health Administration Polytrauma TBI System of Care."[40]

## ARGUMENT

**I.    The stay on Mr. al Baluchi's habeas case should be lifted to adjudicate this motion.**

Upon suspension of Mr. al Baluchi's habeas case in July 2019, this Court stated that the stay "will not prevent the Court from exercising its jurisdiction over a subsequent habeas petition that merits an exception to abstention: for example, one that raises a claim that cannot be raised before the military commission."[41] Respondents supported "lift[ing] the stay for the limited purpose of considering the underlying merits of the motion . . . should Mr. al Baluchi follow through with his intent to file a motion challenging the conditions of his confinement."[42] Mr. al Baluchi's request for a Mixed Medical Commission resulting from his deteriorating health is exactly such a challenge to his conditions of confinement requiring this Court to lift the stay.[43]

When Mr. al-Qahtani moved this Court to compel a Mixed Medical Commission in *Al-Qahtani v. Trump*, Respondents attempted to argue that such a request does not properly sound in habeas. This Court roundly rejected that argument:

> The D.C. Circuit . . . has permitted prisoners to use habeas to challenge the conditions of their confinement, not just its legitimacy or duration . . . "The

---

[40] Ex. E, Hanrahan Report at 6; *see also*, Ex. J, United Nations Working Group on Arbitrary Detention, A/HRC/WGAD/2017/89 "Opinion No. 89-2017 Concerning Ammar al-Baluchi (United States of America)" (concluding that "taking into account all the circumstances of the case, the appropriate remedy would be to release Mr. al Baluchi immediately and accord him an enforceable right to compensation and other reparations, such as appropriate physical and psychological rehabilitation for the torture he has suffered, in accordance with international law.")

[41] *Al Baluchi v. Esper*, 392 F. Supp. 3d 46, 66-67 (D.D.C. 2019).

[42] *Al Baluchi v. Mattis*, Dkt. No. 208, Respondents' Reply re Cross Motion at 26.

[43] *Id*.

illegality of a Mr. al Baluchi's custody may flow from the fact of detention. . . the duration of detention. . . , the place of detention, or the conditions of detention."[44]

In fact, the D.C. Circuit determined as early as 2009 that the Supreme Court in *Boumediene v. Bush* extended jurisdiction to the federal courts "with respect to all habeas claims brought by Guantanamo detainees, not simply with respect to so- called 'core' habeas claim."[45] In *Aamer I*, the D.C. Circuit found with respect to the then-remaining section of the 2006 Military Commissions Act (stripping federal jurisdiction over "all other actions" brought by a Guantanamo Bay detainee) that the section "has, by its terms, no effect on habeas jurisdiction" which includes requests made under AR 190-8.[46]

Jurisdiction over Mr. al Baluchi's request for a Mixed Medical Commission, similar to Mr. al-Qahtani, is therefore "found in this Court because the final relief he seeks is release under Army Regulation 190-8 for which a mixed medical commission is merely a procedural necessity."[47] In determining its jurisdiction over Mr. al-Qahtani's request, this Court recalled that

This Court has previously held that a request for review by a mixed medical commission is a request for "release pursuant to domestic law (Army Regulation

---

[44] *Al-Qahtani*, 443 F. Supp. 3d at 128-29 (quoting *Aamer v. Obama*, 742 F.3d 1023, 1036 (D.C. Cir. 2014) (*Aamer I*)). This Court also referenced *United States v. Wilson*, 471 F.2d 1072, 1081 (D.C. Cir. 1972) (finding defendant brought his claim in the wrong jurisdiction, but noting that a claim of cruel and unusual punishment because of mental illness was "unquestionably" a challenge to the conditions of his confinement which sounded in habeas); *Hudson v. Hardy*, 424 F.2d 854 (D.C. Cir. 1970) (holding a petition seeking relief from beatings and threats by jail officials was a complaint about "an unlawful deprivation of liberty" that sounded in habeas); *id*. at 855 n.3 ("Habeas corpus tests not only the fact but also the form of detention."); *Creek v. Stone*, 379 F.2d 106, 109 (D.C. Cir. 1967) ("[I]n general habeas corpus is available not only to an applicant who claims he is entitled to be freed of all restraints, but also to an applicant who protests his confinement in a certain place, or under certain conditions, that he claims vitiate the justification for confinement.").

[45] *Kiyemba v. Obama (Kiyemba II)*, 561 F.3d 509, 512 (D.C. Cir. 2009).

[46] *Aamer I*, 742 F.3d at 1031.

[47] *Qahtani*, 443 F.3d at 133.

190-8) and those portions of an international accord that it incorporates (the Third Geneva Convention)." *Aamer v. Obama*, 58 F. Supp. 3d 16, 25 (D.D.C. 2014) (*Aamer II*). As a request for release, Mr. al-Qahtani's motion fits *squarely into this Court's habeas jurisdiction*. The Court may also, under the All Writs Act, compel a mixed medical commission evaluation of Mr. al-Qahtani to provide the Court with the necessary medical facts to reach a legal conclusion on his habeas petition.[48]

Mr. al Baluchi's motion to compel the convening of a Mixed Medical Commission likewise fits squarely into this Court's habeas jurisdiction.[49] Added to the fact that the CIA OIG report found that the United States "did not [even] adhere to the standards set forth in the [2001 Memorandum of Notification] for detaining [Mr. al Baluchi]" in U.S. custody before torturing and continuing to hold him for 17 years,[50] this Court should lift the stay on his habeas proceeding in order to evaluate Mr. al Baluchi's motion, and compel Respondents to convene a Mixed Medical Commission.

## II.   Mr. al Baluchi is entitled to a Mixed Medical Commission pursuant to AR 190-8

In *Al-Qahtani v. Trump*,[51] this Court stated that "the manner in which Army Regulation 190-8 may apply to any particular detainee turns on that person's designation," and found that AR 190-8 applied to "Alien Unprivileged Enemy Belligerents," such as Mohammed al-Qahtani, another Guantanamo Bay detainee whose state-directed torture is well-documented.[52] Mr. al

---

[48] *Id*. at 134 (emphasis added).

[49] In *Qahtani v. Trump*, Respondents attempted to equate the Periodic Review Board ("PRB") for Mr. al-Qahtani with a Mixed Medical Commission, a comparison that was roundly rejected by this Court due to the PRB's exercise of discretion in its deliberations regarding the release of Guantanamo Bay detainees. *Qahtani*, 443 F.3d at 131. Mr. al Baluchi, unlike Mr. al-Qahtani, does not even have access to a PRB due to his status as a military commission defendant.

[50] Ex. C, CIA OIG Report Regarding Al Baluchi Torture at MEA-2C-00000487.

[51] *Al-Qahtani*, 443 F. Supp. 3d at 125.

[52] Bob Woodward, *Guantanamo Detainee Was Tortured, Says Official Overseeing Military Trials*, The Washington Post, Jan. 14, 2009 (quoting Susan J. Crawford), *available*

Baluchi is likewise designated "an alien unprivileged enemy belligerent ("AUEB") as that term is defined in 10 U.S.C. 948(a)(7),"[53] thereby placing him in the category of "other detainees" to whom AR 190-8 was applicable at the time of Mr. al Baluchi's.

Section 3-12(h) of AR 190-8 states that qualifying detainees such as Mr. al Baluchi "*will be examined*" by a Mixed Medical Commission pursuant to a written request.[54] As determined by this Court in *Qahtani*, AR 190-8 does not leave room for discretion: "under the plain language of the regulation," a qualifying detainee must be evaluated by a Mixed Medical Commission following his written request.[55] Mr. al Baluchi submitted the written request to the Department of Defense on 5 May 2020. Respondents filed a version of Mr. al Baluchi's request as part of their appeal of this Court's order to the D.C. Circuit, to argue that requests for Mixed Medical Commissions by seriously ill detainees interfere with the government's attempts to prosecute them.[56] Despite the Respondents' attempt to use Mr. al Baluchi's request to avoid convening a Mixed Medical Commission for Mr. al-Qahtani, they have provided no response to Mr. al Baluchi's request for nearly two years, during which Mr. al Baluchi has continued to suffer. Respondents' silence regarding Mr. al Baluchi's request does not absolve them of their obligation under AR 190-8 to convene a Mixed Medical Commission.

---

*at* http://www.washingtonpost.com/wp-dyn/content/article/2009/01/13/AR2009011303372.html [hereinafter "Washington Post"].

[53] *See* AE502O (GOV), Government Consolidated Response to AE502L (MAH) Mr. Hawsawi's Witness List for the August 2017 Hearings, and AE502J (AAA) Mr. al Baluchi's List of Potential Witnesses for Personal Jurisdiction Hearing, at 10, *available at* https://www.mc.mil/Portals/0/pdfs/KSM2/KSM%20II%20(AE502O(Gov)).PDF.

[54] Army Reg. 190-8 § 3-12(h)(1)-(4)(emphasis added).

[55] *Al-Qahtani,* 443 F. Supp. 3d at 137.

[56] See *Al-Qahtani v. Trump*, USCA 20-5130, Initial Public Redacted Brief for Respondents-Appellants, at 21-22.

### III.    Mr. al Baluchi's deteriorating health requires evaluation by a Mixed Medical Commission.

Section 3-12 of AR 190-8 states that qualifying detainees are eligible for release if they are (1) "suffering from disabilities as a result of injury, loss of limb, paralysis, or other disabilities, when these disabilities are at least the loss of a hand or foot, or the equivalent," or (2) are ill or injured and their "conditions have become chronic to the extent that prognosis appears to preclude recovery in spite of treatment within 1 year from inception of disease or date of injury."[57] Mr. al Baluchi's medical records and limited evaluations to date all indicate that his conditions are indeed chronic, in part because he has never received adequate treatment or rehabilitation in his seventeen years in U.S. custody.

Mr. al Baluchi has sought full medical rehabilitation since his initial torture in CIA custody. According to CIA officials, he "continually" raised his physical ailments, "particularly digestive complaints, headaches, and difficulty sleeping"[58] to the point where black site personnel stated that he seemed "overly concerned with his physical health."[59] Yet, CIA officials also noted that Mr. al Baluchi was "afraid to complain" about some injuries in case they had been inflicted "purposely."[60] By 2005, Mr. al Baluchi's psychological condition had deteriorated significantly, with CIA officials noting that "[s]trange sounds . . . would make him think that he might be harmed" and by 2006, his "capacity to 'effectively cope with sustained confinement' had

---

[57] Army Reg. 190-8 § 3-12(a)(2).

[58] Ex. C, CIA OIG Report Regarding Al Baluchi Torture at MEA-2C-00000462, 454. Mr. al Baluchi was denied solid food for four days during his initial custody at COBALT.

[59] *Id*. at MEA-2C-00000463.

[60] *Id*. at MEA-2C-00000460. One CIA official noted that Mr. al Baluchi was "consumed with the uncertainty of his position and what would happen to him once his intelligence value was exhausted." *Id*.

diminished."[61] Mr. al Baluchi "had begun to imagine increasingly harsh punishments . . . the thoughts were increasing in frequency, intensity, and duration and he was having startle [sic] morning awakenings occasionally accompanied by night sweats, increased heart rate, and stomach tension."[62] The CIA OIG reported that in their periodic assessments throughout Mr. al Baluchi's black site detention, medical providers "downplayed the possibility of 'genuine mental health concerns.'"[63]

Ironically, Mr. al Baluchi has endured largely indifferent "medical care" during his fourteen years at Guantanamo Bay because of the torture that caused his deterioration. Medical experts at Physicians for Human Rights commented that "torture and ill treatment can result in severe health consequences potentially affecting every aspect of the body and mind," and that "Uncovering such trauma exposure is essential to documenting adequate and accurate medical history and *to the treatment of patients*."[64] However,

> [A]ccording to Dr. Michael Fahey Traver, an Army psychiatrist stationed at Guantánamo in 2013 and 2014, mental health professionals understood that they were not to ask about a detainee's interrogation experiences, either at Guantánamo or with the CIA. "You just weren't allowed to talk about those things, even with them," he said. If a detainee raised the subject of his prior treatment, Dr. Traver said his predecessor had told him "to redirect the conversation."[65]

---

[61] *Id*. at MEA-2C-00000468.

[62] *Id*. at MEA-2C-00000469.

[63] *Id*. at MEA-2C-00000467-470. The OIG report provides six different examples of such dismissal of Mr. al Baluchi's mental condition.

[64] Physicians for Human Rights, "Deprivation and Despair: The Crisis of Medical Care at Guantanamo" (June 26, 2019), at 21, *available at* https://phr.org/our-work/resources/deprivation-and-despair/.

[65] *Id*. at 20.

That unwillingness of the Joint Medical Group to undertake full and complete medical evaluations "also impacts doctors' ability to diagnose and properly treat physical conditions. These include musculoskeletal pain (e.g., in a detainee's shoulders, from having had his wrists shackled behind his back and then being hung from his arms)," and particularly in Mr. al Baluchi's case, "traumatic brain injury (e.g., from repeated blows to the head)."[66] The preservation of secrecy regarding the torture program dominates all functions at Guantanamo Bay, including detainee health. Even the CIA OIG could not access Mr. al Baluchi in order to question him about his claims of torture for their review, commenting that "In order to pursue the [torture] allegations more thoroughly, OIG would need clarification from Ammar . . .[for example,] OIG, without talking with Ammar, cannot define precisely what Ammar might mean by the term 'psychosomatic attacks'."[67]

Mr. al Baluchi's records regarding the chronic nature of his medical conditions appear compelling enough on their own to fulfill the eligibility standard for release under AR 190-8. However, the issue of release is not before this Court. This Court is simply called upon to compel Respondents to comply with the non-discretionary provisions of AR 190-8, and convene a Mixed Medical Commission that will conduct a comprehensive evaluation and issue its own conclusions on Mr. al Baluchi's eligibility.

IV.    **Mr. al Baluchi's entitlement to a Mixed Medical Commission is unaffected by AR 190-8 "Clarification/Exception."**

---

[66] *Id*. at 21.

[67] Ex. C, CIA OIG Report Regarding Al Baluchi Torture at MEA-2C-00000484-485. The OIG goes on to analogize Mr. al Baluchi's "psychosomatic attacks" to Post-Traumatic Stress Disorder.

Following this Court's order of a Mixed Medical Commission for Mr. al-Qahtani in March 2020, Respondents both appealed the order to the D.C. Circuit, and sought a stay from this Court.[68] In August 2020, this Court denied the stay, and in September 2020, the D.C. Circuit dismissed the appeal.[69] Following the dismissal, Respondents no longer had any basis to delay Mr. al-Qahtani's Mixed Medical Commission, or to ignore Mr. al Baluchi's April 2020 request for a Mixed Medical Commission. However, on 15 January 2021, Respondents filed a Motion for Reconsideration of Order Granting [Mr. al-Qahtani's] Motion to Compel Examination by a Mixed Medical Commission.[70] Respondents enclosed a "Clarification/Exception" to AR 190-8, signed by the Secretary of the Army on 11 January 2021, newly purporting to exclude all Guantanamo Bay detainees from application of AR 190-8.[71]

Respondents have been on notice that AR 190-8 is applicable to Guantanamo Bay detainees since 2013.[72] Yet, Respondents took no action to modify, change, revise, revoke, or issue an exception to AR 190-8 until losing their argument before this Court and the D.C. Circuit in 2020.

---

[68] *Qahtani v. Trump*, USCA 20-5130, Initial Public Redacted Brief for Respondents-Appellants, at 21-22.

[69] *Id.*; *Qahtani v. Trump*, Per Curiam Order https://ccrjustice.org/sites/default/files/attach/2020/09/Qahtani_%20CADC_%20ORDER%20gtg%20MTD%20Appeal_%202020.09.29.pdf

[70] Ex. G, Appendix to Respondents' Motion for Reconsideration of Order Granting [Mr. al Qahtani's] Motion to Compel Examination by a Mixed Medical Commission, 1:05-civ-1971 (PLF) ("Memorandum to Commander, U.S. Southern Command on Army Regulation (AR) 190-8 Clarification/Exception") (" 'Clarification/Exception' to AR 190-8") https://ccrjustice.org/sites/default/files/attach/2021/01/Motion%20for%20reconsideration.pdf

[71] *Id.*

[72] *Al Warafi v. Obama*, 716 F.3d 627, 629 (D.C. Cir. 2013) (*Al Warafi II*) (finding Army Regulation 190-8 applicable to detainees); *see also Ameziane v. Obama*, 58 F. Supp. 3d 99, 102-03 (D.D.C. 2014) (analyzing and applying AR 190-8 to a Guantanamo detainee's *habeas* petition); *Aamer v. Obama*, 58 F. Supp. 3d 16, 21-27 (D.D.C. 2014) (same).

Having written a rule, contested the appropriate interpretation of that rule, and lost that contest, Respondents not only refuse to give effect to this Court's binding decision, but attempt to co-opt this Court into participating in its own undermining through an *ex post* change in regulation.

Regardless of timing, the procedural defects of the "Clarification/Exception" render it invalid. The Secretary of the Army did not (and does not) have the authority to unilaterally issue a "Clarification/Exception" to AR 190-8. First, the Secretary of the Army exceeded his authority as an Executive Agent in promulgating a "Clarification/Exception" to AR 190-8 without coordination with the Under Secretary of Defense for Policy ("USD(P)"), the Senate Armed Services Committee, and House Armed Services Committee.[73] Second, the Secretary impermissibly exercised power previously delegated to a subordinate in order to issue the "Clarification/Exception," an act recognized as an administrative violation by the Supreme Court. Finally, even if the "Clarification/Exception" to AR 190-8 were procedurally valid, the legal reasoning therein was previously rejected by this Court in *Qahtani*.

### a. The "Clarification/Exception" is procedurally defective and therefore invalid.

In promulgating the "Clarification/Exception," the Secretary of the Army hurdled over the Department of Defense ("DoD") and Department of the Army's ("DA") procedural requirements for issuing exceptions to Army or multi-service regulations. As the Supreme Court and the D.C. Circuit have repeatedly explained, government agencies are required to follow their own regulations,[74] and superior officials are prohibited from exercising authority they have delegated

---

[73] Department of Defense Directive 5101.1, DoD Executive Agent (Sept. 3, 2002, as amended); Department of Defense Directive 2310.01E, DoD Detainee Program (Aug. 19, 2014) (Change 2 Sept. 18, 2020).

[74] *See Service v. Dulles*, 354 U.S. 363, 387-388 (1957); *In re Grand Jury Investigation*, 315 F. Supp. 3d 602, 639 (D.D.C. 2018) ("'So long as' these regulations are 'extant,' they have 'the force

to subordinates. [75]   The purported "Clarification/Exception" to AR 190-8 runs afoul of both of

those principles and is therefore a nullity.

(1)  The Secretary of the Army's cited authority does not allow him to unilaterally issue
     exceptions to Army Regulations.

In asserting his authority to issue changes to AR 190-8, Secretary McCarthy improperly

referenced his role as Executive Agent of AR 190-8,[76] as delineated by DoD 2310.01E.[77]

Department of Defense Directive 5101.1 ("DoDD 5101.01") describes an Executive Agent's role

as inherently an implementation and support function: "performing related or collateral joint or

multi-component support responsibilities and functions,"[78] and "provid[ing] defined levels of

support for operational missions, or administrative or other designated activities that involve two

or more of the DoD Components."[79]   In keeping with DoDD 5101.01, DoD 2310.01E states that

the Executive Agent's function is to oversee "the *administration* of the DoD detainee program."[80]

Pursuant to DoD Directive 2310.01E, such administrative activities include "communicat[ing]

directly with the DoD Component heads as necessary to carry out assigned functions,"

---

of law.'") (citing and quoting *United States v. Nixon*, 418 U.S. 683, 695 (1974)); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954).

[75] *Black v. Snow*, 272 F. Supp. 2d 21, 26 n.5 (D.D.C. 2011) ("This doctrine [that superior official cannot exercise authority they have previously delegated to subordinates] both derives from and embodies the general principle that agencies are obligated to follow their own regulations.").

[76] AR 190-8 is a multi-service regulation; see (i).

[77] Ex. G, "Clarification/Exception" to AR 190-8.

[78] DoDD 5101.1 at 4.4.

[79] *Id*. at 3.1.

[80] DoD 2310.01E at 1(c). DoD 2310.01E has no geographic limitation, as the U.S. has operated detention programs in multiple locations around the world. Yet Secretary McCarthy limited the "Clarification/Exception" solely to detainees at Guantanamo Bay, without offering a reason for the distinction.

"designat[ing] a single point of contact within the Department of the Army for detainee operations," and "establish[ing] detainee operations training and certification standards."[81] None of the responsibilities of the Executive Agent listed in DoD 2310.01E include the power to unilaterally enact policies or guidance, much less make unilateral changes to an Army Regulation.[82]

In fact, DoDD 2310.01E officially designates the Under Secretary of Defense for Policy ("USD(P)")  as the "lead proponent" of DoDD 2310.01E, "for developing, coordinating, and implementing policies and guidance pertaining to detainee operations."[83] Where DoDD 2310.01E confers responsibility on the Executive Agent to "develop and publish guidance necessary for the DoD-wide implementation of detainee programs," any such endeavors must be made "in coordination with the USD(P)."[84] Similarly, the Executive Agent may provide "implementing regulations" to the USD(P) for review and coordination with the Senate Armed Services

---

[81] DoD 2310.01E at Enclosure 2, para. 9(c)-9(d), 9(g).

[82] *Id*. at para. 9. *See also* Department of Defense Publication Definitions, "Army Regulation," *available                                                                                          at* https://www.pdhealth.mil/sites/default/files/images/docs/DoDPublicationsDefinitions.pdf :

> A publication that sets forth missions, responsibilities, and policies; delegates authority; sets objectives; and prescribes mandated procedures to ensure uniform compliance with those policies. Mandated procedures in Army regulations are required and authoritative instructions that contain the detail needed to make sure basic policies are carried out uniformly throughout the Army. These mandated procedures also ensure uniform implementation of public law, policy guidance, and instructions from higher headquarters or other Government agencies, such as Joint Committee on Printing (JCP), Office of Management and Budget (OMB), or Department of Defense (DOD).

[83] DoDD 2310.01E at 1(b). Department of Defense Instruction 5025.01, August 1, 2016 (Change 3 Effective May 22, 2019) at Table 2 states that the "signature/approval level" for a DoD Directive is the Secretary of Defense or Deputy Secretary of Defense.

[84] *Id*. at Enclosure 2, para. 9(b).

Committee and House Armed Services Committee. Even if the "Clarification/Exception" to AR 190-8 could be considered an "implementing regulation," Secretary McCarthy provided no evidence of any review or coordination pursuant to DoDD 2310.01E beyond copying the USD(P) with other government officials at the bottom of the "Clarification/Exception" memorandum.[85] DoDD 2310.01E therefore does not support Secretary McCarthy's issuance of the "Clarification/Exception" to AR 190-8. "There is no room for dispute that no attempt was made to comply" with the coordination requirements of DoDD 2310.01E.[86]

(2) The Secretary of the Army lacked the authority to issue exceptions to AR 190-8.

The proponent of AR 190-8 in January 2020 was (and remains) the Provost Marshal General ("PMG"), who has the *exclusive authority* to issue exceptions to the regulation, to the exclusion of Secretary McCarthy.[87]

Army Regulation 25-30 ("AR 25-30") establishes procedures for the Department of the Army to develop, publish, change, and issue exceptions to Army Regulations generally.[88]  In particular, AR 25-30 codifies the "proponency" system, whereby the Secretary of the Army delegates responsibility for "initiating, developing, coordinating, approving content, and issuing" Regulations or other publications to an agency or command.[89]  Only *one* of the Headquarters Department of the Army (HQDA) principal officials - a category that does not include the

---

[85] Ex. G, "Clarification/Exception" to AR 190-8 at 2.

[86] *Service v. Dulles*, 354 U.S. at 387.

[87] Army Regulation 25-30, Army Publishing Program (Amended 13 June 2018)("AR 25-30") at 3.

[88] *Id*.

[89] *Id*. at 67 ("Each publication has only one proponent.").

Secretary of the Army[90] - may be the proponent for a regulation like AR 190-8 at a time.[91]  HQDA

principal officials, like the PMG, are charged with "advis[ing] and assist[ing] the [Secretary of the

Army] and [the Chief of Staff of the Army] by executing the duties and responsibilities assigned

to them in these general orders and . . . regulations . . . .  [but] Principal Officials have inherent

authority within their areas of responsibilities; are authorized to act for the [Secretary of the Army

---

[90] Army General Orders No. 2020-01 establishes the positions that comprise "HQDA principal officials."  They include, exhaustively, the Undersecretary of the Army; the Deputy Undersecretary of the Army; the Assistant Secretaries of the Army; the Assistant Secretary of the Army (Manpower and Reserve Affairs), the Assistant Secretary of the Army (Civil Works); the Assistant Secretary of the Army (Financial Management and Comptroller); the Assistant Secretary of the Army (Acquisition, Logistics and Technology); the Assistant Secretary of the Army (Installations, Energy and Environment); the General Counsel; the Administrative Assistant to the Secretary of the Army; the Chief Information Officer; the Inspector General; the Army Auditor General; the Chief of Legislative Liaisons; the Chief of Public Affairs; the Executive Director, Office of Army Cemeteries; the Director of Small Business Programs; the Chief of Staff of the Army; the Vice Chief of Staff of the Army; the Sergeant Major of the Army; the Director of the Army Staff; the Deputy Chief of Staff, G-1; the Deputy Chief of Staff, G-2; the Deputy Chief of Staff, G-3/5/7; the Deputy Chief of Staff, G-4; the Deputy Chief of Staff, G-6; the Deputy Chief of Staff, G-8; the Deputy Chief of Staff, G-9; the Chief of Engineers; the Surgeon General; the Judge Advocate General; the Chief of Operations; the Provost Marshal General; the Director, Army National Guard; the Chief of the Army Reserve.  G.O. No. 2020-01 at 2-22 (Mar. 6, 2020).

[91] AR 25-30 at 67 ("Only HQDA principal officials can be proponents for DA policy publications."); *id.* at 1-8 ("Only HQDA principal officials will be proponents for DA policy publications.")  (citing Table 2-1); *id.* at 13-14 (listing Army Regulations); *see* G.O. 2020-01 at Addendum (describing the purpose of Army Regulations as "permanent directive[s] that set[] forth missions, responsibilities, and policies; delegate[] authority; or set[] objectives to ensure uniform compliance with policies," and noting that the "office of primary responsibility" is responsible for drafting ARs and that each AR is subject to legal review before being authenticated and released by the Administrative Assistant to the Secretary of the Army).

and] are responsible to the [Secretary of the Army]."[92]  HQDA principal officials are also required

to, among other things, "enforce" the policy publication requirements found in AR 25-30.[93]

An Army Regulation's proponent has exclusive authority to issue exceptions to that

regulation[94] which must be "consistent with controlling law and regulations" and they must include

an expiration date of "no later than 1 year" from their date of issuance.[95]  AR 190-8 confirms that

"*[t]he proponent* has the authority to approve exceptions to this regulation that are consistent with

controlling law and regulation."[96] Requests for exceptions may be made "[w]hen the provisions of

a regulation create unnecessary barriers to high performance and mission accomplishment . . . after

ensuring the request does not violate Federal statute or DOD and/or Army policy."[97] There is no

evidence that the PMG or any other official made a request for an exception to AR 190-8 prior to

Secretary McCarthy's memorandum,  or that the "Clarification/Exception" was analyzed for any

potential violation of federal law or DoD policy. Secretary McCarthy's unilateral

"Clarification/Exception," therefore, is invalid.

---

[92] G.O. 2020-01 at 2.  HQDA principal officials are required to "inform the [Secretary of the Army] . . . in advance of a proposed [Department of the Army] action or decision that represents a change in precedent or policy; that is of significant Presidential, congressional, or Department of Defense . . . [Department of the Army], or public interest; or that is, or should be, of interest to the [Secretary of the Army] . . . ."  *Id.*  Additionally, "for matters in which the [Secretary of the Army] is designated the [Department of Defense] Executive Agent and delegated responsibilities to them, Principal Officials will serve as the [Secretary of the Army]'s Responsible Official."  *Id.*

[93] AR 25-30 at 2.

[94] AR 25-30 at 3.

[95] AR 25-30 at 3.

[96] AR 190-8 at i.

[97] AR 25-30 at 3. AR 25-30 also requires exception requests to "[i]nclude formal review by the proponent agency's senior legal officer and be endorsed by the activity's commander or senior leader[,] . . . [b]e coordinated through all appropriate proponent agency channels before submission to APD[, and] . . . [i]nclude a copy of the proponent agency's formal legal review, coordination, and concurrence."  *Id.*

(3) Secretary McCarthy's issuance of the "Clarification/Exception" to AR 190-8 impermissibly usurped authority delegated to a subordinate officer.

Secretary McCarthy's hasty and procedurally defective release of the "Clarification/Exception" to AR 190-8 violates the fundamental principle of administrative law that officials are prohibited from exercising authority they have previously delegated to a subordinate officer or instrumentality.[98]

The Supreme Court has long recognized that when a superior official delegates authority to a subordinate, she divests herself of that authority for so long as the delegation persists.[99]  She is thereafter prohibited from exercising the delegated authority while the delegation is extant— even if she is empowered to "to amend or revoke the [delegation] . . . . [b]ut [s]he has not done so."[100]  Perhaps most notably in *Nixon v. United States*, the Court affirmed the principle that

---

[98] *Nixon*, 418 U.S. at 694-95; *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954) (holding that the Attorney General of the United States could not dictate to the Board of Immigration Appeals the outcome of a decision he previously delegated to the Board).  This principle is closely related to the principle that agencies are bound by their own regulations, even when they were not required to issue such regulations in the first place.  *See Service v. Dulles*, 354 U.S. 363, 388 (1957); *Black v. Snow*, 272 F. Supp. 2d 21, 26 n.5 (D.D.C. 2011) ("This doctrine [that superior official cannot exercise authority they have previously delegated to subordinates] both derives from and embodies the general principle that agencies are obligated to follow their own regulations.").

[99] *Nixon*, 418 U.S. at 695 ("[S]o long as the Attorney General's regulations remained operative, he denied himself the authority to exercise the discretion delegated to the Board even though the original authority was his and he could reassert it by amending the regulations.") (citing *Vitarelli v. Seaton*, 359 U.S. 535 (1959), *Service v. Dulles*, 354 U.S. 363 (1957), *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)); *Accardi*, 347 U.S. at 266-67 ("[A]s long as the regulations [delegating authority to the Board of Immigration Appeals] remain operative, the Attorney General denies himself the right to sidestep the Board or dictate its decision in any manner."); *Black v. Snow*, 272 F. Supp. 2d 21, 22-26 (D.D.C. 2011); *Am. Vanguard Corp. v. Jackson*, 803 F. Supp. 2d 8, 14 (D.D.C. 2011) ("[W]here an agency official delegates authority to a subordinate, the official binds himself by such delegation and may not exercise such powers absent express retention of them.").

[100] *Nixon*, 418 U.S. at 696; *Accardi*, 347 U.S. at 267-68; *Black*, 272 F. Supp. 2d at 26.

authority once delegated may not be exercised *ad hoc* by the superior, delegating authority.[101] Any action she may purport to take in exercise of the delegated authority is therefore *ultra vires*.[102]

The D.C. Circuit also stated in *Am. Vanguard Corp. v. Jackson*[103] that delegations of power are governed by "the well-established rule that regulations validly prescribed by a government administrator are binding upon him as well as the citizen . . . [it follows that] where an agency official delegates authority to a subordinate, the official binds himself by such delegation and may not exercise such powers absent express retention of them."[104]  The Provost Marshal General retained exclusive responsibility for issuing exceptions to AR 190-8, a power delegated to him by the Deputy Chief of Staff for Operations and Plans.[105]  The Secretary of the Army was divested of any authority to issue an exception to AR 190-8, even if - as here - he was a  "superior of the

---

[101] *Nixon*, 418 U.S. at 696.

[102] *Accardi*, 347 U.S. at 267-68 (granting *habeas corpus* review of an immigration decision because the Attorney General usurped authority previously delegated to the Board of Immigration Appeals); *Black*, 272 F. Supp. 2d at 26 ("While the . . . Attorney General could rescind that delegation, unless and until that happens, he lacks the power to grant or deny § 925(c) applications on his own. . . . any such action would therefore be ultra vires . . . ."); *Am. Vanguard Corp.*, 803 F. Supp. 2d at 15 (vacating the "illegal" product of usurped authority).

[103] *Id.*

[104] *Id.* (citing Cf. C&W Fish Co. v. Fox, 931 F.2d 1556, 1559-1560 (D.C. Cir. 1991) (relying on express reservation of authority to permit intervening action by higher-ranking agency official).

[105]      Army      Publishing      Directorate,      Pub/Form:      AR      190-8, https://armypubs.army.mil/ProductMaps/PubForm/Details.aspx?PUB_ID=50730 (indicating that AR 190-8's proponent is the P[rovost] M[arshal] G[eneral]).  *See* G.O. 2020-01 at 20-21 (identifying the Provost Marshal General as the HQDA principal official "responsible for . . . [p]lanning and supervising the execution of . . . [d]etainee operations"); AR 190-8 at i (identifying the Army Deputy Chief of Staff for Operations and Plans as AR 190-8's proponent); G.O. 2020-01 at 14-15 (identifying the Army Deputy Chief of Staff, G-3/5/7 as an HQDA principal official and the "principal military adviser to the [Secretary of the Army] . . . on operations . . . planning").  It appears that at some point between 1997 and 2020, the position of Deputy Chief of Staff for Operations and Plans was replaced by the Deputy Chief of Staff, G-3/5/7.

official who properly possessed authority to act."[106]   Indeed, in his "Clarification/Exception" to AR 190-8, Secretary McCarthy indicated that that delegation remained in place as of 11 January 2021.[107]   Consequently, he "denied himself the authority to"[108] issue an exception to AR 190-8; the "Clarification/Exception" to AR 190-8 is a nullity.[109]

Even if the Secretary of the Army were somehow able to act as AR 190-8's proponent, the putative "Clarification/Exception" to AR 190-8 itself violates the Army's requirements for valid exceptions to policy.   The "Clarification/Exception" memo fails to include an expiration date, which AR 25-30 requires for any valid exception to policy.[110]   The absence of an expiration date means that, on its face, the Secretary of the Army's "Clarification/Exception" to AR 190-8 is invalid.   Worse,   the   Secretary's   failure   to   include   an   expiration   date   for   his

---

[106] *Am. Vanguard Corp.*, 803 F. Supp. 2d at 15 ("[T]he fact that the person who [usurped authority] in this case is the *superior* of the official who properly possesses authority to act . . . is immaterial.") (citing *Service v. Dulles*, 354 U.S. 363, 386-87 (1957)).

[107] Ex. G, "Clarification/Exception" to AR 190-8" ("In issuing AR 190-8, the Secretary of the Army has authorized subordinate Army officials 'to approve exceptions to this regulation that are consistent with controlling law and regulation.'"). Proponency of an Army Regulation may be transferred by one HQDA principal official to another but in order to do so, "the losing proponent's [publishing champion] will initiate a transfer of proponency memorandum outlining the transfer, in coordination with the gaining proponent's [publishing champion]. This transfer of proponency memorandum will list all affected publications and forms and will be signed by both the losing and gaining HQDA principal officials." Otherwise, "Proponent and exception authority for [Army Regulations] . . . remain[s] with the HQDA principal officials. AR 25-30 at 2. At no point did the PMG transfer proponency of AR 190-8 to Secretary of the Army.

[108] *Nixon*, 418 U.S. at 696.

[109] *E.g.*, *Am. Vanguard Corp.*, 803 F. Supp. 2d at 12 ("Thus, a court may uphold agency action only where the record establishes that the official who took such action was authorized to do so."); *see Ctr. for Auto Safety & Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 810 (D.C. Cir. 2006).

[110] AR 25-30 at 3.

"Clarification/Exception" is not merely a formal error[111] but one that implicates additional Army

Regulations governing policy revision.   The expiration date requirement ensures that policy

exceptions do not become policy revisions[112] without undergoing requisite coordination across

Army[113] or multi-service stakeholders, and without satisfying applicable revision requirements.[114]

In issuing the "Clarification/Exception" to AR 190-8, the Secretary of the Army appears

to have impermissibly disregarded or deviated from all applicable Army regulations governing the

---

[111] Military courts, including the Court of Appeals for the Armed Forces, have suppressed evidence and reversed criminal convictions under the Uniform Code of Military Justice due to regulatory exceptions or changes that failed to comply with AR 25-30.   *E.g.*, *United States v. Kelly*, 72 M.J. 237 (Ct. App. Arm. For. 2013) (suppressing evidence of child pornography, reversing conviction for possession thereof, and dismissing charges for possession thereof due to a search of a soldier's laptop conducted under a regulatory change made invalid by its failure to adhere to AR 25-30); *United States v. Wiley*, 37 M.J. 885 (Ar. Ct. Mil. Rev. 1993) (reversing wartime convictions for desertion and missing movement because a soldier's obligation to participate in movement arose from a regulatory change found invalid for failure to comply with AR 25-30).

[112] Among other things, policy revisions change the effective date of policies and reset the five-year policy review, currency, and certification cycle.   *See* AR 25-30 at 18; *id.* at 23 ("In accordance with the [Secretary of the Army]'s requirements that [Department of the Army] administrative publications remain within a 5-year currency window, all DA administrative publications will be revised, certified current, or rescinded at least every 5 years.").   Like exceptions, only a regulation's proponent is permitted to revise it.   *Id.* at 20.

[113] AR 25-30 at 2 ("When . . . revising a policy publication, HQDA principal officials with proponency over a DA publication must coordinate with other HQDA principal officials who have oversight or imposed responsibilities within that DA publication.").

[114] *Id.* at 23 ("Revisions to DA administrative publications must conform to the policy in this regulation and the procedures prescribed by [Department of the Army] Pam 25-40.").   AR 25-30 allow only five revision types--administrative, mandated, expedited, major, and multi-service--and establish requirements for each type.   *Id.* at 23-24.   Each type of policy revision potentially implicated by the Secretary of the Army's unlimited "Clarification/Exception" to AR 190-8 would trigger a formal legal review by both the Judge Advocate General of the Army and the Office of General Counsel, and require authentication of the resulting, revised version of AR 190-8.   *See id.*; *id.* at 26 ("The following [Department of the Army] administrative publications and publishing actions require a TJAG and OGC legal review: . . . ARs [Army Regulations] (mandated revision; major revision; and expedited revision; rescind request).")   In addition, because AR 190-8 is a multi-service regulation, its revision would require coordination not just within the Department of the Army but across the Navy and the Air Force, as well.   *Id.* at 35-36.

issuance of exceptions or revisions to Army Regulations. [115] As in *Nixon* and *Accardi*, the impact of the Secretary's violation of the proponent's authority must not be minimized. This Court has found that the plain provisions of AR 190-8 offer Mr. al Baluchi the ability to obtain comprehensive medical assessments pursuant to his right to *habeas corpus*. The procedurally invalid "Clarification/Exception" to AR 190-8 must not be allowed to violate Mr. al Baluchi's substantive rights.

    **b.**    **The "Clarification/Exception" does not change this Court's rationale for granting Mr. Qahtani's petition for a Mixed Medical Commission.**

In *Qahtani*, this Court, following the law of this Circuit,[116] recognized AR 190-8 as domestic law that governs the treatment of detainees in U.S. military custody at Guantanamo

---

[115] *See Service v. Dulles*, 354 U.S. at 388 (1957) ("While it is of course true that under the McCarran Rider the Secretary [of State] was not obligated to impose upon himself these more rigorous substantive and procedural standards, neither was he prohibited from doing so, as we have already held, and *having done so he could not, so long as the Regulations remained unchanged, proceed without regard to them.*") (emphasis added).  Significantly, Mr. al Baluchi here is not claiming that the processes adopted by the Secretary of the Army created a judicially enforceable right.  *See United States v. Manafort*, 312 F. Supp. 3d 60, 76-78 (D.D.C. 2018).  Instead, Mr. al Baluchi notes that the Secretary of the Army's failure to abide by his own regulations, renders his purported "Clarification/Exception" to AR 190-8 *ultra vires* and deprives it of effect.  The Secretary of the Army cannot on the basis of an invalid—and, therefore, ineffective—regulation deprive Mr. al Baluchi of the limited protections, including a Mixed Medical Commission, to which he is entitled under AR 190-8.  *See also Ctr. for Auto Safety & Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 810-11 (D.C. Cir. 2006) (distinguishing between legal and practical consequences resulting from an agency's change in policy guidance).  Moreover, notwithstanding the D.C. district court's *dicta* in *Manafort* concerning the effect of the Special Counsel Regulations, military tribunals *have* assigned significant criminal consequences to the Army's failure to follow AR 25-30.  *E.g.*, *United States v. Kelly*, 72 M.J. 237 (Ct. App. Arm. For. 2013) (suppressing evidence of child pornography, reversing conviction for possession thereof, and dismissing charges for possession thereof due to a search of a soldier's laptop conducted under an regulatory change made invalid by its failure to adhere to AR 25-30); *United States v. Wiley*, 37 M.J. 885 (Ar. Ct. Mil. Rev. 1993) (reversing wartime convictions for desertion and missing movement because a soldier's obligation to participate in a movement arose from a regulatory change found invalid for failure to comply with AR 25-30).

[116] *Al Warafi II*, 716 F. 3d at 629 (finding Army Regulation 190-8 applicable to detainees).

Bay.[117]  Also following the law of this Circuit, this Court determined that, because Mr. Qahtani is an "alien unprivileged enemy belligerent" he is an "other detainee" in contradistinction to a prisoner of war for AR 190-8 purposes.  As a consequence, AR 190-8 requires that Mr. Qahtani be examined by a Mixed Medical Commission upon request.[118]  Respondents designate Mr. al Baluchi, like Mr. Qahtani, as an "alien unprivileged enemy belligerent"; Mr. al Baluchi, like Mr. al Qahtani, is therefore entitled to a Mixed Medical Commission under AR 190-8.

The Secretary of the Army's memo excepting  AR 190-8 entirely ignores the reasoning of this Court and the D.C. Circuit in its analysis of AR 190-8.[119] The classification of Guantanamo detainees has been legally fraught since the opening of the prison in 2002, and Respondents have rested on the classification of "alien unprivileged enemy belligerent" as incorporating all of the punitive measures of detention without any of the privileges of traditional prisoners of war under the Geneva Conventions.[120]  Secretary McCarthy relied on two key propositions in the "Clarification/Exception": 1. "[U]nprivileged belligerents . . . are not entitled to prisoner of war status"; and 2. Department of Defense Directive 2310.01E "makes clear that the requirement to treat certain detainees as prisoners of war in case of doubt . . . applies only during international armed conflicts."[121] Both statements have previously been rejected by this Court and the D.C. Circuit.

---

[117] *Al-Qahtani*, 443 F. Supp. 3d at 134.

[118] Army Reg. 190-8 § 3-12(h)(1)-(4).

[119]*Al Warafi II*, 716 F. 3d at 629; *Ameziane v. Obama*, 58 F. Supp. 3d 99, 102-03 (D.D.C. 2014) (analyzing and applying AR 190-8 to a Guantanamo detainee's *habeas* petition); *Aamer v. Obama*, 58 F. Supp. 3d 16, 21-27 (D.D.C. 2014) (same).

[120] Department of Defense Directive 2310.01E (Aug. 19, 2014) (Change 2 Sept. 18, 2020).

[121] Ex. G, "Clarification/Exception" to AR 190-8.

First, Mr. al Baluchi does not claim, as Mr. al-Qahtani did not claim, the status of "prisoner of war" under the Third Geneva Convention. AR 190-8 is a domestic law that specifically provides "other detainees" with the rights of prisoners of war for the limited purpose of providing impartial medical evaluations for "sick and wounded" detainees, of whom Guantanamo Bay historically contains many examples.[122] The D.C. Circuit in *Al Warafi II* found that AR 190-8 may be invoked by Guantanamo detainees in habeas proceedings *despite* their designation of "unprivileged belligerent." Therefore, application of AR 190-8 does not change the status of a detainee, but rather applies a single humanitarian condition to a Guantanamo detainee as part of his right to habeas corpus.

Second, former Secretary McCarthy's reliance on DoD Directive 2310.01E is misplaced. No provision of the Directive expressly limits the application of certain prisoner of war rights to "international armed conflict."[123] When Respondents attempted to make the same argument in *Qahtani*, this Court noted that "Respondents cite nothing in the Regulation that suggests the exception."[124] Similarly, former Secretary McCarthy and Respondents cite nothing in DoDD 2310-01E that suggests the exception for detainees held in a non-international armed conflict. AR 190-

---

[122] *Al Warafi v. Obama*, 716 F.3d 627, 629 (D.C. Cir. 2013) (Al Warafi II) (finding Army Regulation 190-8 applicable to detainees).

[123] DoDD 2310.01E, para. 3(h):

> During international armed conflict, should any doubt arise as to whether a detainee belongs to any of the categories enumerated in Article 4 of Reference (d) and as such is entitled to the protections and privileges afforded POWs, such detainees shall enjoy treatment as POWs until a tribunal convened in accordance with Article 5 of Reference (d), determines whether the detainee is entitled to such status or treatment.

[124] *Al-Qahtani,* 443 F. Supp. 3d at 134 n.7.

8 "Clarification/Exception" provides no legal basis for contradicting eight years of jurisprudence from this Court and the D.C. Circuit.[125]

Because AR 190-8 "expressly incorporates relevant aspects of the Geneva Conventions" into domestic law, this Court has stated that it "may and must analyze" those provisions.[126] DoDD 2310-01E explicitly states at Section 3 that

> Until a detainee's release, repatriation, or transfer from DoD custody or control, all
> persons subject to this directive will, *without regard to a detainee's legal status*, at
> a minimum apply . . . [t]he principles in Articles 4-6 of [Additional Protocol II of
> the Geneva Conventions] during non-international armed conflict.[127]

Article 5(d) and 5(e) of Additional Protocol II further provide that detained persons shall have access to medical examinations, and that their "physical or mental health and integrity shall not be endangered by an unjustified act or omission."[128] Contrary to Respondents' argument and AR 190-8 Clarification/Exception, DODD 2310-01E and Article 5(d-e) of Additional Protocol II *support* Section 3-12(h) of AR 190-8 mandating a Mixed Medical Commission for those detainees who follow the delineated procedures to request one. Denying Mr. al Baluchi his right to a Mixed Medical Commission now, after torturing and unjustly detaining him[129]  for 17 years, would constitute – at least - an "unjustified act or omission" in violation of Additional Protocol II.

---

[125] *Al Warafi II*, 716 F.3d at 629. Respondents have been on notice regarding the potential application of AR 190-8 to Guantanamo detainees since the D.C. Circuit's ruling in 2013.

[126] *Al-Qahtani,*443 F. Supp. 3d at 135 (*citing Al Warafi II*, 716 F.3d at 629).

[127] DoDD 2310.01E, Section 3(a)(2).

[128] Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II) of June 8, 1977, art. 5(d-e).

[129] Ex. C, CIA OIG Report Regarding Al Baluchi Torture at MEA-2C-00000485-487 ("Headquarters logic in detaining Ammar was fuzzy and circular . . . If the Agency did not adhere

## CONCLUSION

For the reasons stated above, this Court should lift the stay on Mr. al Baluchi's habeas proceedings and grant the relief sought in the Motion, compelling Respondents to convene a Mixed Medical Commission to conduct comprehensive physical and psychological examinations of Mr. al Baluchi under AR 190-8.

Respectfully submitted,


    /s/ Alka Pradhan
**MILITARY COMMISSIONS**
**DEFENSE ORGANIZATION**
Alka Pradhan (D.C. Bar #1004387)
James G. Connell III (Bar ID MD29186)
1620 Defense Pentagon
Washington, DC 20301
*james.g.connell.7.civ@mail.mil*
*alka.pradhan.civ@mail.mil*


*Counsel for Mr. al Baluchi*


Dated:  March 10, 2022

---

to the standards set forth in the MON for detaining Ammar, then Agency officers could not have adhered to the DCI Guidelines for his interrogations.").

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **AMMAR AL BALUCHI** | ) | |
| *Mr. al Baluchi/Plaintiff*, | ) | **Civ. No. 08-CV-2083 (PLF)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **Lloyd J. Austin III, Secretary of Defense,** *et al.*, | ) | |
| | ) | |
| *Respondents/Defendants.* | ) | |
| | ) | |

**[PROPOSED] ORDER TO PERMIT A MIXED MEDICAL COMMISSION**

It is hereby ordered that Respondents shall convene a Mixed Medical Commission to undertake comprehensive physical and psychological examinations of Mr. al Baluchi, pursuant to Army Regulation 190-8.

Date:

_____
Hon. Paul L. Friedman
United States District Judge

Exhibit A: Mr. al Baluchi's Letter to Department of Defense Requesting a Mixed Medical Commission (May 5, 2020)

Exhibit B: 15 September 2020 Email from Kathryn C. Davis to Alka Pradhan

Exhibit C: AE628RRRRR (AAA), Mr. al Baluchi's Notice of Exhibits, Att. C: Report of the Office of the CIA Inspector General Regarding Allegations of Torture By Ammar al Baluchi ("CIA OIG Report Regarding Al Baluchi Torture")

Exhibit D: Report of Stephen Xenakis regarding evaluation of Ammar al Baluchi, August 2015

Exhibit E: Report of Dr. David Hanrahan regarding evaluation of Ammar al Baluchi, October 2018

Exhibit F: Report of Dr. Ruben Gur regarding volumetric analysis of al Baluchi MRI, April 2019

Exhibit G: Report of Dr. Leo Shea III regarding evaluation of Ammar al Baluchi, January 2020

Exhibit H: Appendix to Respondents' Motion for Reconsideration of Order Granting [Mr. al Qahtani's] Motion to Compel Examination by a Mixed Medical Commission, 1:05-civ-1971 (PLF) ("Memorandum to Commander, U.S. Southern Command on Army Regulation (AR) 190-8 Clarification/Exception")

Exhibit I: Unclassified Statements of Ammar al Baluchi

Exhibit J: Opinion 89/2017 of the United Nations Working Group on Arbitrary Detention (24 January 2018), Doc. A/HRC/WGAD/2017/89