MILITARY COMMISSIONS TRIAL JUDICIARY,
GUANTANAMO BAY, CUBA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | **(U)  AE628RRRRR (AAA)**<br>**CORRECTED COPY\*** |
| KHALID SHAIKH MOHAMMAD, WALID MUHAMMAD SALIH MUBARAK BIN 'ATTASH, RAMZI BIN AL SHIBH, ALI ABDUL-AZIZ ALI, MUSTAFA AHMED ADAM AL HAWSAWI | **(U)  Defense Notice of Exhibits**<br><br>(U)  29 January 2020 |

(U)  1.  The attached exhibits are submitted in support of the evidentiary hearing in the AE628 series.

**(U)  2.  <u>Attachments:</u>**

 A.  (U)  Certificate of Service  (U)

 B.  (U)  AAA-RDI-007076 – AAA-RDI-007089 (U)

 C.  (U)  MEA-2C-00000428 – MEA-2C-00000491 (U//FOUO)
   (U)  MEA-2C-00001034 – MEA-2C-00001035 (U//FOUO)
   (U)  MEA-2C-00001472 (U//FOUO)

 D.  (U)  MEA-STA-00001824 – MEA-STA00001826  (U//FOUO)

 E.  (U) MEA-JDM-00000074 - MEA-JDM-00000079 (U//FOUO)
   (U) MEA-JDM-00000297 - MEA-JDM-00000300 (U//FOUO)
   (U) MEA-JDM-00000338 - MEA-JDM-00000340 (U//FOUO)

---

\* Corrected copy is submitted to remove a page that the government inadvertently produced.

FOR OFFICIAL USE ONLY ATTACHMENTS

(U)  Very Respectfully,

(U)  //s//                                              (U)  //s//
    JAMES G. CONNELL, III                           STERLING R. THOMAS,
    Learned Counsel                                 Lt Col, USAF
                                                    Defense Counsel

(U)  //s//                                              (U)  //s//
    ALKA PRADHAN                                    BENJAMIN R. FARLEY
    Defense Counsel                                 Defense Counsel

(U)  //s//
    MARK E. ANDREU
    Capt, USAF
    Defense Counsel


(U)  *Counsel for Mr. al Baluchi*

FOR OFFICIAL USE ONLY ATTACHMENTS

# (U) Attachment C

UNCLASSIFIED//FOR OFFICIAL USE ONLY

~~SECRET//ORCON/NOFORN~~

~~TOP SECRET/~~     ~~HCS//NOFORN//MR~~

further approvals." ☐ replied to ALEC that rendering Khallad probably would be easier than Ammar, who showed "a greater willingness to talk" and claimed Pakistani citizenship. (25)

a foreign country

36. ~~(TS/~~   ~~HCS//NF)~~ ☐ and ALEC sought the DCI's intervention during a meeting at Headquarters in mid 2003 with ☐ convince ☐ to allow the rendition. A mid 2003 cable from ☐ pointed out that, "by the DCI waiting until ☐ to request rendition, ☐ has been provided sufficient 'cover' so as not to appear to be handing over the al-Qa'ida terrorists to the United States too quickly." (26)

~~TOP SECRET/~~   ~~HCS//NOFORN//MR~~

~~SECRET//ORCON/NOFORN~~

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000428

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ███████ HCS//NOFORN//MR

*(TS/ ███████ HCS//NF) When Did the Rendition Occur and What Techniques Did Headquarters Approve?*

37. (TS/ ███████ HCS//NF) According to a cable from Ammar and Khallad were "successfully rendered from ███████ to ███████ " during the evening of ███ 2003. [DI] ███████ told Headquarters and ALEC ███ 2003 that officers at Loc No 2 were preparing to process and begin interrogating Ammar and Khallad as soon as they arrived. The ███████ stated:

> Both detainees are believed to have critical perishable information, including possible information on pending terrorist attacks. Therefore, it is imperative that we move quickly to obtain the information from these two terrorists. Both subjects have been non-cooperative during multiple questioning sessions in

TOP SECRET/ ███████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ██████████ HCS//NOFORN//MR

a foreign country

████████ and it is anticipated they will continue with the non-cooperative posture at ████████ unless enhanced techniques are applied.

Upon arrival at ████████, both subjects will be first examined individually by medical officer and then the psychological interrogation assessment will be conducted by ████████ psychologist [ JP2 ]. The subjects will then be photographed, facial and full body, then their beards and heads will be shaved. Depending on their condition, they may also be bathed following the shaving. They will then be interviewed by the HVTI team. The first sessions will be non-enhanced and will be used to determine their willingness to cooperate without enhanced techniques. ...We do not anticipate an extended initial session with either subject upon arrival. Our goal upon arrival is to displace their expectations and begin the conditioning of subjects.

Until we receive clarification on "loaner" status of Ammar, we do not plan enhanced techniques against him, unless directed by Headquarters. However, we will employ the non-enhanced technique of standing sleep deprivation against Ammar. As Headquarters is aware, standing sleep deprivation is considered non-enhanced if applied for less than 72 hours. We will also conduct an initial interrogation session with Ammar upon arrival to determine his resistance level. If he is non-cooperative, he will immediately placed in the standing sleep deprivation position for circa 12 hours before conducting the next interrogation session[02].

38. (TS/ ██████ HCS//NF) Headquarters responded to ██████ Station [ in mid ] 2003 with the approval for some officers at ████—lead interrogator [ NX2 ] and [ Loc No 2 ] "warden" [ 22c ]—to use specific enhanced measures on Ammar with the caveat that a determination be made by a medical officer and a special mission psychologist that the detainee would not suffer severe psychological or physical harm from the measures. The enhanced measures Headquarters officers—including approvers and coordinators [ R19 ] [ KM4 ] [ OU4 ] [ a CIA officer ], and [ ST5 ]—approved for Ammar included: the facial attention grasp, the facial slap, the abdominal slap, walling, the stress position of standing with his forehead against the wall, the stress position of kneeling with his back inclined toward his feet, water dousing, cramped confinement, and sleep deprivation in excess of 72 hours. Except for approving sleep deprivation in excess of 72 hours, the cable traffic did not

TOP SECRET/ ██████████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ████████████ HCS//NOFORN//MR

indicate how many times or for how long interrogators at [Loc No 2] could perform a particular measure or combination of measures[42].

39. (TS/ ████████ HCS//NF) In addition to the preceding enhanced measures, officers at [████] could use without special approval any of the standard measures: isolation, sleep deprivation not to exceed 72 hours, reduced caloric intake (so long as the amount is calculated to maintain the general health of the detainee), deprivation of reading material, use of loud music or white noise (at a decibel level calculated to avoid damage to the detainee's hearing), and the use of diapers for limited periods (generally not to exceed 72 hours or during transportation where appropriate). ✳

(TS/ ████████ HCS//NF) *What Happened to Ammar At* [Loc No 2]

40. (TS/ ████████ HCS//NF) When Ammar arrived at [Loc No 2], Agency officers questioned him [for 1 hrs and 45 minutes] [██████]. After the session, the interrogators placed Ammar in the standing sleep deprivation position and sent a cable to Headquarters requesting authorization to use enhanced measures on him. (The interrogators had not received the cable Headquarters sent [in Mid] 2003 providing its approval for EITs when they sent their cable.) During an interview in [mid] 2005, interrogator [██████] [FU2] said he wrote cables—he believed in advance of the detainee's arrival at [Loc No 2]—requesting authorization for enhanced interrogation techniques for Ammar[44]., [X3L] said he believed [NX2] managers [Y47] and [C12] and [████] at Loc No 2 [DY8]—probably made the decision to use enhanced measures on Ammar before the detainee arrived at [Loc No 2][45].

41. (TS/ ████████ HCS//NF) The interrogation team's justification for the use of measures was that Ammar had information on imminent threats, particularly against US Consulate personnel in

COPY

TOP SECRET/ ████████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

~~TOP SECRET/~~ ████ ~~HCS//NOFORN//MR~~

████ and a residential compound in ▢ According to the team,

The planned attacks could occur in two weeks to one month. According to Khallad, Ammar knows the location of explosives and a safe house that will be used for the attack. Given the critical threat information that Ammar is believed to possess, request approval for level one enhanced interrogation techniques for Ammar al-Baluchi....We believe Ammar is withholding threat information regarding his planned operations in ████ and elsewhere in ▢ as well as other parts of the world. These plans may still be underway. Ammar also likely had prior knowledge of the recent attacks in ▢ and recent location information on UBL. Based on the imminent threat information subject holds, request immediate approval for certified senior interrogator ▢ NX2 and certified interrogator ▢ Z2C to utilize the following level one enhanced techniques against Ammar al-Baluchi: facial attention grasp, facial slap, abdominal slap, walling, stress position—standing with forehead against wall, stress position—on knees with back inclined towards feet, and water dousing[98]

42. (TS/ ████ HCS//NF) The cable also requested permission for "trained and qualified interrogators," ▢ PU2 , ▢ X3L , ▢ SG1 and ▢ X7Q to use the enhanced techniques on Ammar under ▢ NX2 s supervision and noted that Ammar received a medical exam upon his admission to ▢ Loc No 2 with "no apparent medical contraindications for enhanced measures[99]."

43. (TS/ ████ HCS//NF) ████ Psychologist ▢ JP2 performed a psychological assessment of Ammar and said he "answered all questions with brief, minimal responses and, as such, was only minimally cooperative with the interview....He appears to be engaging in stonewalling, denial, and minimization in responding to interrogator's questions." The cable stated, "There are no indications that enhanced methods, if used, would cause profound and permanent psychological or emotional harm[99]."



~~TOP SECRET/~~ ████ ~~HCS//NOFORN//MR~~

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000432

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/█████████/HCS//NOFORN//MR

44. (TS/█████/HCS//NF) According to [QY7] the interrogation team determined that Ammar's responses to questions were false based upon the analysts' views and threat information. He said Ammar was "hard corps," "defiant," gave false statements, and exhibited that he "hated Americans." [QY7] stated that the interrogation team also assessed that Ammar was an "imminent" threat because of what they knew about a motorcycle attack Ammar planned against the US Embassy in [_____] According to [QY7] [NX2] made the decision to move to EITs[39]. a foreign country

45. (TS/█████/HCS//NF) Interrogators held another session with Ammar in the evening of [Mid] 2003. According to a cable from the Station, the interrogators kept Ammar standing during the session, and he was hooded and naked. The Station reported that he was "somewhat more affected by his period of isolation and had become somewhat more compliant" but "continues to lie by omission and make outright denials of known facts." [JP2] assessed that Ammar "often engaged in stonewalling and denial" and "is likely to continue these behaviors without the stress associated with aversive treatment such as sleep deprivation and standing." [JP2] for the second time noted that, "Based on this interview, there are no indications that enhanced methods, if used, would cause profound and permanent psychological or emotional harm[40]."

46. (TS/█████/HCS//NF) [JP2] told OIG he based his analysis that the EITs would cause no permanent psychological harm to Ammar on the detainee's general reactions and "what he participated in." [JP2] said he would ask himself, "is this a character who's going to be okay?" to include not hallucinating or having psychotic episodes. [JP2] stated that he did not see "any of these guys as weak," and "they had the ego strength to do what they did," and "any of them released would be back at Jihad." [JP2] also described Ammar as "too robust" to require his intervention. [41]

TOP SECRET/█████████/HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000433

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

~~TOP SECRET/~~ ████ ~~/HCS//NOFORN//MR~~

47. ~~(TS/~~ ████ ~~HCS//NF)~~ The same day ████ Headquarters notified the interrogation team to proceed with its interrogation plan for Ammar "pursuant to Ref determination by the medical officer and special mission psychologist that the detainee will not suffer severe psychological or physical harm.  Headquarters approves the use of all the measures requested plus cramped confinement and sleep deprivation in excess of 72 hours." Headquarters also provided a rehash of the interrogation team's justification for use of enhanced measures against Ammar, saying that:

> Ammar al-Baluchi has himself provided information on attacks planned against U.S. Consulate personnel in ████ and a pending suicide car bomb attack at a residential compound in ████ where official Americans are believed to live, possibly within two weeks to a month.  Other detainee reporting indicates Ammar knows the location of explosives and a safe house that will be used for the attack.  Ammar provided some tidbits of threat information against several targets in ████ including residences, vehicles, and compounds, however he has not provided full details.  Ammar appears to be withholding threat information regarding his planned operations in ████ and elsewhere in ████ as well as other parts of the world, some of which appear to be underway, to include possible attacks in ████  Given his confirmed role within al-Qa'ida, Ammar also likely holds knowledge of the recent location information on Usama Bin Laden[92].

48. ~~(TS/~~ ████ ~~HCS//NF)~~ In Mid ████ 2003, interrogators held another session with Ammar and for the first time used enhanced techniques in addition to sleep deprivation on him. X3L commented that, once the interrogations began, Ammar "took a while to make admissions," and QY7 commented that Ammar "was as defiant as ever" despite the use of EITs, "never soft," and maintained "a tough demeanor" all the way through EITs." QY7 explained that, "you could see the hatred" with Ammar. JP2 noted that Ammar, "appears to be tolerating the enhanced methods as well as can be expected.  There are no indications of profound and permanent psychological or emotional harm as a result of the use of enhanced methods."  Medical officer PG6 reported he

~~TOP SECRET/~~ ████ ~~HCS//NOFORN//MR~~

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/███████/HCS//NOFORN//MR

examined Ammar after prolonged standing, approximately 20 hours, and before and after enhanced measures. [PG6] wrote that "aside from complaining of some muscle fatigue in the legs there were no other subjective complaints or objective medical findings[43]."

49. (TS/███████/HCS//NF) [In Mid 2003] Agency officers interrogated Ammar a second time using enhanced measures in addition to sleep deprivation. At that point the interrogators had kept Ammar naked, in the standing sleep deprivation position, and without food since his arrival at [███] ([In 764] 2003. [JP2] commented that Ammar became more cooperative after interrogators subjected him to a cold water bath but stated, "Ammar continues to struggle with the process and will possibly revert to resistance unless periodically negatively reinforced with cold water baths. There are no indications of profound and permanent psychological or emotional harm as a result of the enhanced methods used thus far[44]."

50. (TS/███████/HCS//NF) During an interview with OIG, [JP2] said he believed Ammar was minimizing his role in terrorist activity, but [JP2] stated that he could not remember the specific questions the interrogators posed or Ammar's responses that caused him to believe the detainee was being deceptive or reticent. [JP2] commented that Ammar was "pretty robust" during the water dousing but that the combination of sleep deprivation/standing and water dousing probably was the most effective set of techniques to get him to talk. The interrogators were doing the EITs in "coordination," [JP2] stated, and all were meant to cause Ammar discomfort[45].

51. (TS/███████/HCS//NF) Medical officer [PG6] reported that he again examined Ammar after prolonged standing—approximately 44 hours—and pre and post enhanced measures. [PG6] said, "aside from complaining of some muscle fatigue in the legs there were no other subjective complaints or objective medical complaints or findings." After withholding food from Ammar for at

COPY

6

TOP SECRET/███████/HCS/█████OFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET//███████HCS//NOFORN//MR

least four days, the interrogators provided him with two cans of
Ensure vitamin supplement.[46]

52. (TS/███████/HCS//NF) Interrogators held another
session with Ammar ▢in Mid▢ 2003. According to reporting from
▢▢▢▢▢Station, at that point, Ammar had been without sleep for about
82 hours. Ammar was naked for the session, as he was during
previous sessions, and had been without solid food since at least his
arrival at ▢▢▢▢▢▢▢▢▢▢▢▢. Agency officers, who provided him
two cans of Ensure ▢in Mid 200▢ provided him with five more cans on
▢▢▢▢▢▢. Cable traffic indicates the interrogators assessed that
Ammar "was clearly fatigued, and much of his arrogance had
disappeared." They noted, "he appears to be answering questions
truthfully.[47]"

53. (TS/███████/HCS//NF) ▢▢ JP2 ▢▢, who observed the
session ▢▢▢▢▢▢, reported that Ammar, "was drowsy and nodded
off for a few seconds frequently during the interview, consistent with
three days of sleep deprivation associated with standing." He
elaborated that Ammar "may have been experiencing some sensory
distortion in his cell, but with questioning it is more likely he was
dreaming during the brief moments he dozed off." ▢ JP2 ▢ gave his
opinion that "Ammar will continue to cooperate. If not, even the
threat of a return to a sleep deprived state will probably have a
salutary effect. ▢ JP2 ▢ also gave his opinion that, "there are no
indications of profound and permanent psychological and emotional
harm as a result of the use of enhanced methods." Medical officer
▢ PG6 ▢ reported that he examined Ammar after the detainee had
been standing for about 82 hours and that Ammar expressed no
medical complaint other than fatigue and the desire to sleep. [48]

54. (TS/███████/HCS//NF) According to ▢ X3L ▢ ▢ NX2 ▢
stopped the EITs on Ammar ▢in mid 03▢ and Ammar then went
through an "assessment period." ▢ X3L ▢ said he stayed with Ammar
at ▢in mid 03▢ after ▢mid 200▢ and, as far as he knows, Agency officers
used no more EITs on the detainee. When ▢ NX2 ▢ended the EITs,

TOP SECRET/███████HCS//NOFORN//MR

COPY

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000436

SECRET//ORCON/NOFORN

TOP SECRET/ ~~████~~ HCS//NOFORN//MR

Ammar seemed to be providing plausible responses and giving some accurate information, [X3L] said. Interrogators allowed Ammar to rest and began giving him solid food during the evening of [Mid 2003]. They found [████] that he "not only fully answered the questions asked but also elaborated in detail and provided other information of interest without being prompted. This is completely different from the first three days of interrogation when information had to be pried from him in bits and pieces." [38][149] Relative to their plans for Ammar, the interrogation team reported:

> Subject is still developing a sense of learned helplessness which is contributing to his compliance, and team will continue to lessen the intensity of the interrogation sessions relative to subject's cooperation. During the second half of today's session, subject answered questions posed to him in a broader manner than he has in the past. Subject would answer the question posed to him, and then continue to discuss peripheral issues that were related. Subject was sternly informed he should continue to answer questions in this manner, expand on his answers, and let the team officers tell him when he no longer needs to continue on a particular topic[150].

55. (TS/ ~~████~~ HCS//NF) [X3L] stated that when the interrogators stopped the measures on Ammar, they did not know he was fabricating information. [X3L] said he got Ammar to admit to him after six to 10 days of work that he was lying about part of his story. Ammar subsequently confessed to him during debriefing sessions that everything he told the interrogators when they were using enhanced measures on him was "B.S." and that he lied to get Agency officers to stop the measures. [X3L] said Ammar then "came

---

[39] (TS/ ~~████~~ HCS//NF) During a meeting with an OIG officer [████] 2003, the Chief [████] ALEC Station [████] gave her view that people associated with the interrogations believe the detainees are compliant when their behavior changes, rather than when the intelligence is good. She stated that compliant to interrogators means the detainee is answering their questions, not how well. The detainees have simply moved from active to passive resistance. Asked to comment on the criticism that decisions on whether a detainee is compliant were based more on an analyst's idea of what the detainee should know than actual fact, [████] that this is a problem with the process. They do not have proof of what the detainee knows, or the intelligence to say definitely what the truth is. If they did, they would not need the detainee. All they have to work with is analysis of what the detainee has, from people who have worked the target for years.

8

TOP SECRET/ ~~████~~ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

MEA-2C-00000437

**Case 1:08-cv-02083-PLF Document 225-3 Filed 03/10/22 Page 14 of 67**

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

~~TOP SECRET/~~ ████████ ~~HCS//NOFORN//MR~~

clean," made his admissions on "really good, important topics,"and provided "a big, helpful chunk of information," which was not the norm.

56. (TS/ ████████ HCS//NF) A cable from █████ Station on Mid 2003 indicated Ammar's level of responsiveness during interrogation sessions—in which interrogators were questioning him without enhanced measures—was "approaching satisfactory." According to the cable, the interrogation team planned to:

> Continue to monitor subject during subsequent sessions for signs of resistance and/or fabrication, and apply pressures when necessary…subject is reminded regularly that his limited comfort is fully contingent on his total truthfulness. Subject is clear that his situation can regress to the state it was when he first arrived at [Loc No ] which he did not enjoy), and that this experience only represented 'ten percent' of what was possible for him to experience. Subject believes that his current imprisoned state represents the rest of his life, and his self-interest is more important to him than the al-Qa'ida cause.

(TS//████████HCS//NF) **How Did the Interrogators Apply the EITs to Ammar?**

57. (TS/ ████████ HCS//NF) Several interviewees reported that lead interrogator [NX2] was in charge of what happened during the interrogation, which officers would be present, and how other officers would participate. [X7Q] explained that the interrogation team planned for the interrogations before conducting them, decided on the focus of each session, and documented the measures they planned to use and their actions during the interrogations. [X7Q] said much of the guidance [NX2] and the other certified interrogator, [QY7] provided was "cut and dried." █████ Station had to send a cable to Headquarters asking for permission to use specific EITs with a detainee. Usually the cable was a standard "cut and paste" effort based on previous requests to use EITs with other detainees. If the interrogation team received approval from Headquarters to apply the EITs, the team almost always did so.

~~TOP SECRET/~~ ████████ ~~HCS//NOFORN//MR~~

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000438

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/███████████HCS//NOFORN//MR

58. (TS/███████████HCS//NF) During the planning meeting before interrogation sessions, NX2 directed the progression of escalating measures, X7Q said. For example, NX2 would direct other interrogators that, "if I ask him this, and he doesn't answer, then we will use this" progression. When the interrogators used any of the EITs, X7Q said he tried to make a mental note of the number of times each measure was applied so he could provide the number in a cable to Headquarters. Nonetheless, he generally had to estimate the numbers he used in the cables he drafted, he said [55].

59. (TS/███████████HCS//NF) Before the interrogation teams began their sessions, X7Q said PG6 and the psychologist JP2 had to assess the detainees and provide medical and psychological clearances to the interrogators to perform the EITs. According to X7Q , the team needed "both" before "anything happened." In addition to assessing the detainees' psychological states, he said the psychologist sometimes would provide suggestions to the interrogators to guide them in their approaches to the detainees. [56]

60. (TS/███████████HCS//NF) ███████████ QR9 said the process and measures used at Loc No 2 were a standard routine for all the detainees she saw, including Ammar. She noted that after changing from street clothes into black outfits, the interrogation team would go into a questioning room and wait for the facility guards to bring the detainee—who was shackled and naked—into the room. While the interrogators questioned the detainee in the questioning room, other Loc No 2 personnel would prepare a "conditioning" room. After the detainee failed to answer questions to the interrogators' satisfaction, the guards would take the detainee to the "conditioning" room for enhanced techniques, which including water dousing. After the detainee experienced the "conditioning" room, the guards would return him to a "questioning" room, and the interrogators would try to get different or more complete responses to the questions they had posed prior to the "conditioning." During the interrogations she

COPY

TOP SECRET/███████████HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000439

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/█████████HCS//NOFORN//MR

witnessed, QW9 said she did not observe any treatment of detainees that was inappropriate or out of line with approved standards. She commented that, "I was briefed before I went out. It doesn't mean I like it[157]."

61. (TS/█████████HCS//NF) X3L described the situation at ███████ as "a training setting" with the addition of the detainees. Besides ███ and ███ "a new crop of interrogators" was present to watch and participate in the measures, X3L stated. He said the COS also came out to watch and provide oversight. X3L said the "whole host of things we were trained on were used," with the exception of waterboarding. According to X3L the interrogators began using enhanced measures on the detainees as soon as they began the session. X3L said he remembered that the interrogations were "late night affairs" and that the first measures the interrogators used were insult slaps and attention grabs. X3L stated that Ammar showed defiance. According to X3L the interrogators talked to Ammar, told him he had new rules, took his clothes, and used measures to demonstrate that his situation had changed. Interrogator QV7 also said "the new guys trained on him [Ammar] and Khallad" (sic) and each of the interrogators NX2 was training used each of the measures on Ammar in order to gain their certification. SG1 explained that the goal was for NX2 to observe the ███ 2003 interrogation class members employ EITs during an actual interrogation, such as Ammar's, and then to certify class members as interrogators. Similarly, interrogator X7Q explained his role as that of a student doing on-the-job training. X7Q said he was "one of many" who were trying to learn what they were doing and how to apply the "approved level of coercion." X7Q noted that he needed to do substantial learning on the job and felt "behind the curve," in part because he needed to practice interrogation tactics[68].[19]

(TS/█████████HCS//NF) *Slaps and Attention Grab*

[19] (TS█████HCS/NF) S█████ ███ the immediate pre-wave interrogation course.

TOP SECRET/█████████HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ████████ HCS//NOFORN//MR

62. (TS/ ████████ HCS//NF) Among the least severe EITs the interrogators used on Ammar were the attention grab and facial and belly slaps. [ X7Q ] described the attention grab as one step up from "yelling," saying the interrogator would grab the detainee's face to focus his attention. [SG1] also said the purpose of the facial and belly slaps was to gain the detainee's attention. According to [ SG1 ] the facial slap involved an interrogator slapping the meaty part of a detainee's face with an open palm, fingers separated. Interrogators administered the belly slap on a detainee's abdomen with the back of an open hand, fingers separated. [ SG1 ] said the interrogator would stand a couple of feet directly in front of the detainee to administer the slaps and that, at the start of the slaps, the interrogators' hands would be positioned between the interrogator and detainee at abdomen level. The interrogator was not allowed to swing his arms in a roundhouse fashion in administering the slaps, according to [ SG1 ] [ QN9 ] said she observed no really hard slaps to deliberately hurt the detainees and stated that she did not observe any bruises or "anything like that." She elaborated that, "maybe things happened," but she said she did not see; she was transcribing information. [ X7Q ] stated that "no one was beaten mercilessly," and "I always tried to do the right thing" or "what was expected." [ SG1 ] opined that Ammar could have thought the facial and belly slaps were beatings, even though they were approved EITs. [ QY7 ] said he recalled that [ PU2 ] concerned him. According [ QY7 ] [ PU2 ] had trouble doing the facial slap correctly and was "too much into it," with his arm too far extended to do the slap correctly. [ QY7 ] said he "said something to [ PU2 ]," but [ NX2 ] was in charge. [ PU2 ] said in an interview with OIG on [ Mid ] 2005 that he thinks a facial slap to someone who is shackled and cannot do anything is "beating the crap out of him." "There is no honor in it."

(TS/ ████████ HCS//NF) *Stress Positions*

63. (TS/ ████████ HCS//NF) Interrogators used at least two stress positions on Ammar. [ SG1 ] explained that in one, the interrogators had Ammar stand a few steps away from a wall, lean

COPY

TOP SECRET/ ████████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000441

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

~~TOP SECRET~~/ █████ ~~HCS//NOFORN//MR~~

forward, and place his forehead against the wall. The detainee remained in the position, with interrogators on either side of him to ensure he did not fall, for five to 10 minutes at most, according to ▨SG1▨. ▨SG1▨ said the position seemed to have no effect on Ammar. The second position required Ammar to kneel on the floor and lean back 45 to 60 degrees to place stress on his legs and abdomen ▨SG1▨ said. ▨X7Q▨ said the idea behind both positions was to make the detainees uncomfortable if they were failing to be forthcoming with information[61].

64. ~~(TS/~~ █████ ~~HCS//NF)~~ ▨X3L▨ said he saw ▨NX2▨ place a stick under the knee joints of a detainee sometime ▨in mid▨ ▨▨ 2003, and ▨X3L▨ stated initially that "it might have been Ammar" and then that, "I think it was Ammar." ▨X3L▨ stated that ▨NX2▨ "said it was done for balance" and that he thought it made sense and "did not think twice" about the measure. ▨X3L▨ said he recalled that the stick was made of wood and might have been a broomstick. According to ▨X3L▨ he later learned the technique could cause pain. ▨JP2▨ stated he remembered that ▨NX2▨ may have used a piece of wood—like a broom handle—behind the knees of a detainee while he was in the kneeling stress position to keep the detainee from resting on his haunches. ▨JP2▨ said ▨NX2▨ might have used the broom handle on Ammar but that "it probably was the only time used." ▨X7Q▨ also said he saw ▨NX2▨ use a cut-off broomstick handle behind the knees of a detainee to increase the level of the detainee's discomfort in the kneeling position. According to ▨X7Q▨ he saw ▨NX2▨ use the broomstick only once, and he did not remember which detainee ▨NX2▨ subjected to the broomstick treatment. ▨X7Q▨ stated that he has since come to the opinion that the broomstick use probably was not appropriate. He elaborated that the "broomstick kind of bothers me." ▨X7Q▨ said ▨NX2▨ put his weight on the broomstick so that the detainee would go from squatting to the kneeling position with the stick behind his knees. [62]

65. ~~(TS/~~ █████ ~~HCS//NF)~~ ▨QY7▨ when OIG asked him about ▨NX2▨'s use of the stick, stated that ▨NX2▨ "may have mentioned

~~TOP SECRET~~/ █████ ~~HCS//NOFORN//MR~~

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

~~TOP SECRET/~~ ████████ ~~HCS//NOFORN//MR~~

it to him." According to [QY7] [NX2] told him using the stick behind a detainee's legs was a SERE school technique and that he was fighting criticism of his use of it. Later in the interview, [QY7] stated that he felt betrayed by [NX2] "disappointed in the whole thing," and "concerned we're doing it again." [QY7] said he feels that the interrogations "should be done the right way." Debriefer ████ [NE5] ████████ who went on a temporary duty assignment to ████ from [mid to late] 2003, stated that he knew from others at the Station—possibly [X3L] or debriefer ████ [RN9] ████—that [NX2] "had a history," was "accused of doing something with a detainee," and "that there was lots of controversy around him."[20][163][164]

66. ~~(TS/~~ ████ ~~HCS//NF)~~ [NX2] in a Lotus Note [in Mid] 2003 to ████████ and several other senior officials at Headquarters, acknowledged that he used a broom handle behind the knees of a detainee in a stress position but said he did not do it to cause pain to the detainee. According to, [NX2]

> The thing with the broom handle is a part of the stress position that is used in sere training. ████████ it was a round broom handle, less than an inch in diameter, that was used to keep the detainee from rolling from his knee to the floor, it was not used to cause him pain and in no way harmed him. It is interesting to me that we can condon IC's water boarding a detainee 70 plus time and threatening his family but I have no leeway with the most benign position. (Sic)[165]

~~(TS/~~ ████ ~~HCS//NF)~~ *Walling*

67. ~~(TS/~~ ████ ~~HCS//NF)~~ Several interviewees described the walling process for Ammar. The interrogators would place the detainee's heels against a specially designed plywood wall—which had flexibility to it—and put a rolled up towel around

[NZ7]

[20] ~~(TS/~~ ████ ~~HCS//NF)~~ Interrogator [NZ7] ████ who was not present for Ammar's interrogation, said [NX2] used a stick behind the knees of detainee Zubair while he was in the kneeling position. According to ████ the technique did not concern anyone at the time because officers in the SERE school taught it. ████ said ████ also taught the technique in the CIA interrogation training program ████████████████ te list it.

[NZ7]                                                           [NX2]

~~TOP SECRET/~~ ████ ~~HCS//NOFORN//MR~~

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

~~TOP SECRET//~~ ████ ~~HCS//NOFORN//MR~~

the detainee's neck.  The interrogators would then grab the ends of the towel in front of and below the detainee's face and shove Ammar backward into the wall, never letting go of the towel. [SG1] said the towel was used to prevent the detainee's head from slamming into the wall when the interrogators pushed him against it.  The towel also served as a fulcrum to provide leverage for the interrogators as they rocked the detainee back and forth against the wall. [X7Q] said the "walling" was meant more for "sensation" than to hurt the detainee.  The goal, [X7Q] said, was to "bounce" the detainee off the wall. [QW9] said the interrogators told her the "walling" did not really hurt the detainees but simply made a big noise.  Ammar was naked for the proceedings, according to [JP2] and, [SG1] recalled that interrogators removed his hood. According to [SG1], [X3L], [PU2], and, [X7Q] took turns walling Ammar." [SG1] said the interrogators took turns because fatigue would set in for the interrogator doing the walling.[22][666][23][667] He explained that, although no set time limit existed for walling sessions, typically a session did not last for more than two hours at a time. [X7Q] said he recalled practicing the technique in his interrogation class, but he remembered participating in only one "walling" session in [Loc No 2].  He said all the interrogation students lined up to "wall" Ammar so that [HX2] could certify them on their ability to use the technique.[668].

[21] (TS//) ████ HCS//NF [X3L] said he does not recall participating in the walling of Ammar. (Interview [X3L] late 2007, 8-13.) ████ HCS//OC/NF//MR)

[22] (TS//) ████ HCS//NF) According to a transfer assessment in ████ 2006, Headquarters recorded Ammar's intake weight as 141 pounds.  At least one of the interrogators performing the walling on Ammar was 6'1" tall and weighed 225 pounds.

[23] (TS//) ████ HCS//NF) According to [MA2] an interrogator who helped design and teach the interrogation class, an interrogator typically would bang a detainee against the walling wall multiple times while asking questions. [MA2] to provide an example, said imagine asking a question, pausing for a response, if the response is not good, then "boom, boom, boom, boom, boom" against the wall.  The interrogator would then pause and repeat the process until the detainee responds or the interrogator gives up on the technique as ineffective. [MA2] said students seeking their certification probably would not bang the detainee against the wall once and then stop; such a practice would neither demonstrate the students' proficiency nor extract information from the detainee.

5

~~TOP SECRET//~~ ████ ~~HCS//NOFORN//MR~~

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000444

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

~~TOP SECRET/~~ ████████ ~~/HCS//NOFORN//MR~~

~~(TS/~~ ████████ ~~/HCS//NF)~~ *Water Dousing/Bathing*[24]

68. ~~(TS/~~ ████████ ~~/HCS//NF)~~ Several interrogators and observers described how Agency officers used water dousing, "washing," or the "bath" on Ammar. [X3L] stated that 12 or 13 people were in the room for the technique. [X7Q] said the guards would bring the detainee, hooded, to the water room, remove his hood, and leave a blindfold in place. They would put the shackled detainee on the tarp- or plastic-covered concrete floor, and the interrogation team would pour water on the detainee from cups, bottles, and buckets.

69. ~~(TS/~~ ████████ ~~/HCS//NF)~~ The water, [X3L] stated, was "definitely cold," [QW9] and [X7Q] said the water was iced or refrigerated. [X7Q] said he remembered that the interrogation team also kept the water cold by placing frozen water bottles in the buckets. According to [X7Q], the experience was not supposed to be "fun" for the detainees, and "sometimes there was ice in the water." [JP2] said he could not recall the temperature of the water but noted, "any water in that situation will cause distress." According to [QW9], the "baths" would cause the detainees to start shaking. [QW9] remembered [Loc No 3] being cold and said she needed to wear layers of clothing to keep warm, even in May. [X7Q] said he remembered the outside air temperature and temperature inside [Loc No 3] as warm and commented that the idea was to create an uncomfortable temperature contrast for the detainee. [NX2] during an interview in 2003, said during the water dousing the interrogators would maintain a temperature of 65 degrees Fahrenheit in the room while pouring cold tap water over the body of the detainee to make him cold and uncomfortable.

70. ~~(TS/~~ ████████ ~~/HCS//NF)~~ [X3L] said water dousing was "not waterboarding" and "not dunking" and that, during the

────────

[24] ~~(TS/~~ ████████ ~~/NCS//NF)~~ The DCI Guidelines do not mention water dousing as a technique. The [late] 2003 draft OMS Guidelines identify "water dousing" as one of 12 standard measures. OMS listed it, in ascending degree of intensity, as the 11th standard measure OMS did not further address "wa████████████████"

~~TOP SECRET/~~ ████████ ~~/HCS//NOFORN//MR~~

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000445

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ████████ HCS//NOFORN//MR

interrogation course, instructors taught Agency officers to be careful not to splash water in the faces, noses, and mouths of the detainees. ████ ██ X7Q stated that the interrogators tried to keep the water out of the detainee's face and did not splash water in the detainee's mouth or nose intentionally.  Nonetheless, ████ X7Q stated that, with the detainee squirming because of the cold water, "sure" some water might go into the detainee's nose and mouth ██ ██.

71.  (TS// ████████ HCS//NF ████ X7Q stated that after the detainee was doused with water from the buckets, the interrogators, while holding the detainee down, would soap his body and use probably a rag to wash him.  The interrogators rinsed the detainee with more cold water after the soaping and washing.  According to ████ X7Q the interrogators washed the detainee's head as well as body, trying to avoid getting the eye mask wet.  According to ████ X7Q , the "washing" was pitched—he did not say by whom—as hygienic when he was at ████ Loc No 2 , but he said he believed it had more of an interrogation aspect and probably was "outside the bounds of what we were supposed to be doing." ██ ██ QY stated that he did not participate in the "bath"—saying he was uncomfortable with the technique—and instead sat in the break room with the ████ foreign country

████ HCS//NF//MR ████ who was not present at Ammar's water dousing said ████ instructor with the SERE program training school.  According to ████ the Agency water dousing technique, as he helped define it, was the same technique the US military used in the SERE program.  He said he spent hours with CTC Legal Officer ████ and eight to 10 other officers developing the water dousing procedure and determining what interrogators could legally do. ████ said that Agency officers perceived water dousing as an interim procedure or solution to avoid using the water board.  According to ████ he recommended that interrogators use a poncho on the floor of the interrogation chamber as insulation against the cold floor. ████ stated the water should have come "out of the tap," but he said warm water would have defeated the purpose of the water dousing.  According to ████ he tried to differentiate water dousing during interrogations from bathing for hygiene purposes and strongly urged RDG and the legal officers to separate the two.  Nonetheless ████ stated that "lots of gray" areas existed. ████ said the first class of interrogators in ████ 2002 practiced the water dousing technique on each other, but he said he was not sure if the instructors "pulled a hose out and said, this is how you hose someone down," or if the technique was a formal part of the curriculum. ████ did not like "being told how to do things" but had to adhere to written guidance. ████ said ████ (TS// ████ HCS//NF//MR ████ X7Q said he never received training in the "bath" or water dousing in the classified ████ and ████

TOP SECRET/ ████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000446

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

~~TOP SECRET/~~ ████ ~~HCS//NOFORN//MR~~

guards while ██ and the other interrogators had Ammar in the "bath" room.

72. ~~(TS/~~ ████ ~~HCS//NF)~~ JF2 said he could not recall how long the water dousing lasted. He said the interrogators might have stopped the water dousing if the detainee was providing information or if they believed they were "not getting anywhere" using the technique. X3L said he recalled that the water dousing was "really cold" to Ammar and that the detainee "started describing things," "blurting out information," and "making it up," because he wanted Agency officers to stop the technique. X3L also stated that he recalled that Ammar received more than one water dousing; he could not recall how many.

~~(TS/~~ ████ ~~/HCS//NF)~~ *Standing Sleep Deprivation*
a foreign country

73. ~~(TS/~~ ████ ~~HCS//NF)~~ After his arrival and initial interrogation session, interrogators at Loc No 2 placed Ammar in a standing sleep deprivation position which lasted about 82 hours, according to reporting from Loc No 2 tion. Ammar, before his arrival at Loc No 2, underwent "around-the-clock" interviews and at least one 24-hour period of sleep deprivation in ████ When OIG interviewed him in 2003, NX2 stated that in implementing the sleep deprivation process, interrogators sometimes handcuffed detainees, while standing, to a bar attached to the center of the ceiling to prevent them from sleeping. NX2 explained that the rules said a detainee's wrists could not be elevated above his forehead for more than two hours at a time or for four hours during a 24-hour period. If the wrists are below the forehead, the detainee can stay in the position for not more than 72 hours without a break of four hours or more. Headquarters—as in Ammar's case—had to approve standing sleep deprivation in excess of 72 hours. To ensure that no physical harm occurs as a result of the procedure, medical personnel monitor the detainee, NX2 explained. Debriefer No 6 said the detainees with whom she met referred to standing sleep deprivation as "being hung." She commented that standing sleep deprivation

~~TOP SECRET/~~ ████ ~~HCS//NOFORN//MR~~

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET// ████████ //HCS//NOFORN//MR

was "an extremely awful position to be put in" and that the detainees generally suffered leg and ankle swelling as a result[██].

74. (TS/ ████████ //HCS//NF) ☐ NX 2 described several other techniques he used on detainees undergoing standing sleep deprivation. He said he used auditory disruption—including music from Eminem—up to 79 decibels to keep the detainees from falling asleep. In addition to handcuffing the detainee's wrists behind his back, ☐ NX 2 sometimes placed a strap between the detainee's biceps and behind his back to further restrict movement. OIG could not determine whether ☐ NX 2 used such a strap with Ammar. ☐ NX 2 commented that the purpose of having the detainee standing and naked while undergoing sleep deprivation is to humiliate the detainee and make him uncomfortable in the cold. ☐ NX 2 said the detainees also experienced sensory deprivation at ☐ Loc No 2 —total darkness, because there was no lighting in the cells[██].

(TS/ ████████ HCS//NF) Did the ████████ Guards Mistreat Ammar at ☐ Loc No 2 ?

(TS/ ████████ HCS//NF) Several officers expressed uncertainty about whether the ☐ guards at ☐ harmed the detainees but explained that they never saw the guards abuse Ammar. Agency officers were not at ☐ Loc No 2 on a 24-hour basis. Interrogator ☐ X3L stated that he could not be 100 percent certain that the guards did nothing wrong. Debriefer ☐ stated that some of the detainees complained that the ☐ guards beat them. ☐ said he does not remember how many times he heard complaints; he said it was more than once and from more than one detainee. He explained that when Agency officers heard complaints, they would ask the guards about them, caution the guards not to hurt the prisoners, and "to move them and that's it." ☐ did not remember whether Ammar complained about the guards; he may have. ☐ QW9 noted that, "I don't know what happens when we give these people to the guards[██]."

TOP SECRET// ████████ //HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET//███████HCS//NOFORN//MR

(TS/██████/HCS//NF) *What Happened to Ammar at*
[Loc No 7        ]?

75. (TS/█████HCS//NF) [ In late      ] 2003,
Headquarters authorized the transfer of Ammar from [Loc No 2] to
[Loc No 7   ] and [ in late      ] 2003 told [       ] Station to
prepare him for travel in accordance with standard rendition
procedures, including a body cavity check.[27][83] Headquarters
indicated the Station needed to have the Station medical officer
examine Ammar, Station officers take pictures of him to document
his physical condition at the time of transfer, blindfold Ammar, cover
his mouth to prevent him from communicating, place noise
suppressors over his ears to prevent him from hearing ambient
sounds, re-clothe Ammar in a jumpsuit for travel, shackle Ammar's
hands and ankles, and turn over the key to his shackles to the senior
[            ] Division representative[82].

76. (TS/█████/HCS//NF) Once Ammar arrived at
[Loc No    ], Agency officers only debriefed him; they did not
interrogate him. According to CTC officer [SM1        ], she
helped open [Loc No 7  ] and initially was the only debriefer there.
She said she worked with Ammar almost every day for 45 minutes to
two hours. Other than when the Security Protective Officers touched
Ammar to guide him during the transfer between his cell and the
debriefing room—he was hooded while being moved—[SM1    ]
stated that Agency officers had no physical contact with the detainee.
[SM1  ] explained the role of interrogators at [Loc No 7 ] as that of
"a safety net" to enhance Ammar's comfort with his new
surroundings[86]. Similarly, Debriefers [WC2      ] and
[R12          ] stated that Agency officers did nothing physically to
Ammar while the detainee was at [Loc No 7 ].[84]

<hr>

[27] (TS/█████HCS//NF) According to OMS draft guidelines, "a cavity search with the
intent of locating potential harmful devices must be performed during the acceptance medical
evaluation." The medical officer must search the following cavities: "oral cavity to include
under the tongue; head; hair / behind and in the ears; behind the scrotum; rectum (employing
adequate lubricant)."

TOP SECRET//███████HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ███████ /HCS//NOFORN//MR

77. (TS/ ████ /HCS//NF) Shortly after his transfer, SM1 and interrogator NZ7 met with Ammar in late 2003. They reported that Ammar appeared bright, fully engaged, and interacted easily and pleasantly with debriefers. The Agency officers asked Ammar how he was able to withstand confinement, and Ammar told them he had always assumed he would be captured, had prepared for that eventuality, and believed he had a story to tell. He elaborated that his telling the truth would not change what God had willed to happen. Ammar told the Agency officers he "always told every brother who worked for him that when a brother is captured, he will tell everything, and those not captured had to take care of themselves." [85]

78. (TS/ ████ /HCS//NF) Nonetheless, SM1 described one incident with Ammar in which she and NZ7 confronted the detainee with what she said was their discovery that he had not been truthful in providing them information about the Richard Reid/shoebomber plot.[86] When she presented Ammar with questions and gave him an opportunity to be truthful, saying the initial information he had provided her "didn't add up," he became "very, very nervous." SM1 said she and NZ7 left the room, giving Ammar time to think and "sit and stew." SM1 said she observed Ammar though the monitor "clearly worried," fidgeting, and rocking back and forth in his chair. She stated that she noticed his legs shaking but explained that "he was a nervous type anyway." SM1 commented that when she and NZ7 returned to the room, Ammar said he would tell them everything they wanted and gave them the whole story. According to SM1, neither she nor NZ7 talked of repercussions or threatened Ammar with "other measures." SM1 stated that she and NZ7 instead approached Ammar "almost like talking to your kid," saying "not to behave that way,"

[85] (TS/ ████ /HCS//NF) According to cable traffic from Loc No 7 about the incident, the interrogator present with SM1 was VE4. The cable does not indicate why SM1 believed Ammar was not being truthful. A cable in late 2003 indicated ALEC was asked to review its existing debriefing material from Ammar on the Reid/shoebomber plot and involvement of an "Issa," saying it wished to confirm whether statements made during Ammar's interrogations and determined to be "untrue may not actually have been valid statement.

TOP SECRET/ ███████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000450

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET//███████████HCS//NOFORN//MR

"I'm disappointed," "this is really disappointing," and then sending him to his cell. She said she remembered neither she nor [N17] displaying anger or yelling at Ammar.[76]

79. (TS/█████████HCS//NF) Interrogator [████]████, who said he was present during some debriefings of Ammar at [Loc No 7] stated that his role during the debriefings was to be silent and "intimidate by his presence." [████] elaborated, stating that the interrogators wore black clothes to symbolize a "menacing black presence." According to [████], if the detainees tried to give evasive answers to the debriefers' questions, the interrogators would intervene to try to "get them back on track," telling the detainees that their responses were not acceptable [████] commented that he would make veiled references to the previous bad times the detainees went through—meaning when they underwent EITs—but he did not use measures on them. According to [████], Ammar was "never anything other than cooperative," and he neither made threats to Ammar nor did anything physically to the detainee.[77]

80. (TS/█████████HCS//NF) Debriefer [No. 6]████ said she met Ammar at [Loc No]████ three-to-four months into his debriefing phase.[78] [No.]████said she recalled a time when Ammar was "being difficult" but noted "he started to come around" after [another interrogator] attended a debriefing session with her. She said [he] used no enhanced measures on Ammar at [Loc No 7] [No.]████related that the detainees would regularly have bad days, "ups and downs," or "be difficult" in responding to the debriefers' questions, but their recalcitrance almost never resulted in the application of physical measures once they reached the debriefing stage. [No.]████said usually the interrogator's presence, strong language, and inferred threat—that life could get a lot harder—was sufficient to make a detainee cooperate.[79]

[76] (TS/████████HCS//NF) She noted that detainees went through different stages in their captivity, starting with the interrogation phase then moving to the full debriefing stage.

TOP SECRET/████████HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

~~TOP SECRET/~~ ▓▓▓▓▓▓ ~~HCS//NOFORN//MR~~

81. (TS/ ▓▓▓▓ /HCS//NF) [No 6] stated that all the detainees with whom she met at [Loc No 7] told her they "were tortured" in the past and cited the "mental torture" they were continuing to experience. Nonetheless, [No 2] said she does not recall any specifics about the type of torture the detainees claimed they experienced in the past or any foundation for the claims of ongoing "mental torture." She said she does not recall Ammar being unique from the other detainees in his complaints about torture; she heard such complaints every day, but she did not ask for details[sm]. According to [No 6] she saw "no inappropriate treatment."

82. (TS/ ▓▓▓▓ /HCS//NF) [No 6] described the conditions at [Loc No 7] as stark but said it probably was the "nicest facility" she had visited. She said the facility was clean, "sterile," efficient, and modern and that it had an almost "surreal" feel to it. [No 6] stated that all the detainees had cells and necessary amenities, and each detainee had blankets and a Koran. According to [No 6] Ammar was always dressed when she met with him. The guards brought him to the debriefing room with hand and feet cuffs and sat him at a table. The debriefers sometimes asked for one of his hands to be freed so he could point to items on documents or maps. [No 6] said a security personal always remained in the room when the debriefers were with the detainees[sm].

83. (TS/ ▓▓▓▓ /HCS//NF) According to [3M1] [Loc No 7] was a much better facility than [Loc No 2] and she found Ammar in good health, possibly with "more meat on his bones" than at [Loc No 2]. She explained that Ammar was "a little bit of a hypochondriac" and that he frequently complained about some physical ailment—related to his eyes or stomach, for example—but she believed his reports of problems were primarily to gain attention. According to [3M1] Ammar never complained to her about mistreatment, abuse, or torture at [Loc No 7] and she stated that she "cannot imagine anything that would resemble a beating" occurring at [Loc No 7] [sm].

~~TOP SECRET/~~ ▓▓▓▓ ~~HCS//NOFORN//MR~~

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000452

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

~~TOP SECRET/~~ █████ ~~HCS//NOFORN//MR~~

84. ~~(TS/~~ ████ ~~HCS//NF)~~ ████ explained that the atmosphere at █ Loc No 7 █ as "bizarre," elaborating that he could not describe it as "collegial" but that his interactions with the detainees were "normal" as far as they could be. He recounted a 90-minute discussion he had with Ammar, explaining that Ammar is a philosopher, thoughtful, rational, and logical—but he had no question about Ammar's commitment to his cause. █ He █ said he believed the detainees were treated well at █ Loc No 7 █ He commented that the cells were spotless, and Agency officers provided good food, showers, and regulated the temperature of the facility well so the detainees would be comfortable. He said the facility was quiet, with no loud background noise. █ He █ stated that, when detainees made requests, "people responded." ████

~~(TS/~~ ████ ~~/HCS//NF)~~ *What Happened to Ammar at* █ Loc No 5 █

85. ~~(TS/~~ ████ ~~HCS//NF)~~ █ In early █ 2004, Headquarters was planning the transfer of Ammar out of █ Loc No 7 █ to █ Loc 5 █ and requested that █ Loc No 7 █ officers deliver him to the rendition aircraft handcuffed, wearing minimal clothing, with some type of eye covering, and with no personal effects. A cable from █ Loc No 7 █ indicates Agency officers, █ in early █ 2004 were preparing Ammar to leave █ Loc No █ for █ Loc No 5g, █

86. ~~(TS/,~~ ████ ~~HCS//NF)~~ Agency officers who were present at █ Loc 5 █ say they debriefed Ammar at the facility; they did not interrogate him. According to █ SG1 █ ████ Agency personnel never interrogated Ammar using EITs after his first interrogation at █ Loc No 2 █ in █ mid █ 2003. █ N75 █ ████████ ████ that handled █ Loc 5 █ stated that Headquarters authorized debriefings at █ Loc 5 █ and that she knew of no requests or Headquarters' authorizations of EITs. █ N75 █ stated that, to her knowledge, "nothing was physically done to Ammar" at █ Loc 5 █ Similarly, CTC officer █ KG5 █ who served temporarily as the ████ █ from █ early to mid █

~~TOP SECRET/~~ ████ ~~HCS//NOFORN//MR~~

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000453

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

~~TOP SECRET/~~ [redacted] ~~HCS//NOFORN//MR~~

2004, said Agency officers only debriefed Ammar at [ Loc 5 ] and that, "when I had access to him, absolutely no measures were used whatsoever[95]."

87. ~~(TS/~~ [redacted] ~~/HCS//NF)~~ [ KG5 ] said the detainees were in [redacted] custody at [ Loc 5 ] and she explained that she had daily contact with them because she wanted to ascertain their state. According to [ KG5 ] and other debriefers, Ammar and the other detainees were in good condition and health when they were at [ Loc 5 ] and neither the debriefers nor the doctors who examined the detainees found any reason to suspect abuse.[31][96] Debriefer [redacted] [redacted] stated that the "head guy" at the facility was the only one among the [redacted] service personnel at the facility who had much interaction with the detainees, and her impression was that he was on fairly friendly terms with them. [ Another debriefer ] [redacted] described the food and care at the facility as good but said the sanitation conditions—the cells lacked toilets—were more primitive than at some other detention facilities[97].

_the debriefer_

88. ~~(TS/~~ [redacted] ~~/HCS//NF)~~ According to [redacted] and [ KG5 ] Ammar was "fairly forthcoming" with information; the debriefers did not have to coax it from him. [ KG5 ] said Ammar is "a young man who likes to please" and seemed almost gregarious at times. According to [ KG5 ], Agency officers were able to generate "a fair number of reports" from Ammar's comments. [ KG5 ] stated that he may have been withholding information, but she never got the sense that Ammar was being deceptive. Discussing the detainees at [ Loc 5 ] she stated that "everyone was considered

[31] ~~(TS/~~ [redacted] ~~HCS//NF)~~ See Annex B for information on possible liaison abuse of prisoners at _Loc No 5_
[32] ~~(TS/~~ [redacted] ~~HCS//NF)~~ [ KG5 ] described Ammar as a hypochondriac and said he "always had some medical problem," particularly digestive complaints, headaches, and difficulty sleeping. She said a physician examined Ammar at the facility each month and discussed his problems with him. [ KG5 ] commented that Agency officers gave Ammar Ensure, which the doctors recommended and Ammar liked. She said Agency officers instructed the guards that Ammar could have the Ensure whenever he asked for it and had the liaison service buy a small refrigerator to keep in the hallway outside his cell where they could keep the stock of Ensure cold for him.

~~TOP SECRET/~~ [redacted] ~~HCS//NOFORN//MR~~

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ███████ HCS//NOFORN//MR

cooperative" and "we went to great lengths to ensure they had the best of everything[██]."

89. (TS/ ███████ HCS//NF) Agency officers at [Loc No 5] reported one injury of Ammar. According to a cable from [Loc 5] on [mid] 2004, Ammar during the evening of [____] fainted in his cell [mid 2004] and cut his head. The warden—who saw Ammar faint on the cell monitor—cleaned and dressed the wound, which was about half an inch long on the back side of Ammar's head. The warden reported that he believed Ammar became dizzy and fainted after fasting. Ammar claimed his dizziness was not the result of fasting and that he had also felt dizzy at his previous facility. The COS commented that the Station could not corroborate the warden's story but found it plausible given Ammar's dietary habits. The COS also said Ammar's "unperturbed mental and emotional state suggests to us that his injury likely was accidental and occasioned by a fall, either due to his or [the warden's] version of events[██]."

90. (TS/ ███████ HCS//NF) Related to the injury, [Loc No 5] officers expressed concern to Headquarters about Ammar's eating habits and [in mid] 2004 advised Headquarters that they asked Ammar if "maybe he could eat a little more food." [Loc 5] officers noted that Ammar told them he had been trying to eat more, but the additional food made him sick and that he had vomited five out of his seven meals during the past week. OMS recommended that [Loc 5] encourage Ammar to take Ensure and to eat as much as possible during morning and evening meals but said, "there is no need to force him to eat a specific amount." OMS also noted that, "Given the isolated nature of [Ammar's]…fall, lack of any continuing difficulties, and apparent good health, OMS will continue with its plan to deploy a medical officer later this month …to conduct regular medical exams of all detainees at site…the deploying medical officer will further discuss any regular health issues with [Ammar] during his next assessment." [In mid] 2004, medical officer [TU2] [TU2] evaluated Ammar and said he was in good health[██].

TOP SECRET/ ███████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET// ██████████ HCS//NOFORN//MR

(TS/ ██████ HCS//NF) *What Happened to Ammar at* ██████

91. (TS/ ██████ HCS//NF) ██ In early ██ 2005, Headquarters provided transfer mission guidance for Ammar's move to ██ Loc No # ██ The cable instructed transport officers to restrain Ammar with flex cuffs, restrict his visual and auditory senses, diaper him because of the lengthy journey, and dress him in a loose fitting sweatshirt/pants, socks, and waterproof feet coverings[1101].

92. (TS/ ██████ HCS//NF) ██ Loc No # ██ sent a cable to Headquarters ██ in early ██ 2005 explaining the site's plan for reception/integration of Ammar and several other detainees transferred in ██ in early ██ 2005. According to the cable, an interrogator, ██ NZ7 ██ conducted a "neutral probe" of each detainee and provided them with their personal religious items from their previous locations. The cable noted that "additional personal items will be provided to the detainees within the next few days to insure positive motivation and establishment of control." ██ Loc No # ██ also planned to begin debriefings as soon as possible "to reassure detainees the facility is business as usual and to maintain their conditioning to provide information." The cable indicated the detainees would be provided with books, clocks and a prayer time chart, and Halal food. ██ NZ7 ██ also planned to reassure the detainees— who were worried that their move to a new location and seeing an interrogator indicated a problem for them—that "there is no problem[1102]."

93. (TS/ ██████ HCS//NF) Several Agency officers who worked with Ammar at ██ Loc No # ██ indicated that Agency officers only debriefed him and that he received good care at the facility.[1103]

──────────────────────────────

[1101] (TS/ ██████ HCS//NF) According to a draft cable, "Immediate Standdown On the Use of All Enhanced Interrogation Techniques," in ██ late ██ 2005, the Director suspended use of interrogation techniques 'in anticipation that the defense appropriations acts for Fiscal Year 2006 will become law and include a provision that, 'no individual in the custody or under the physical control of the United States Government, ██████████████████ or physical location, shall be

TOP SECRET// ██████████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET//███████//HCS//NOFORN//MR

♦   `A medical provider` stated that she believed `Loc No 8` was a well-run facility where Agency officers were careful to ensure detainees were treated respectfully. She stated that she was surprised at how nice facility personnel were to the detainees. ▢ said she observed no `The medical provider` inappropriate staff behavior—physical or mental measures— toward the detainees, and she heard no complaints of any mistreatment, abuse, or torture. ▢ commented that she saw some of the detainees' food trays, and the portions looked "huge." ✷          `The medical provider`

♦   `Debriefer` ▢ who served as a debriefer at `Loc No 8` `in late` 2005, explained that no interrogations occurred at `Loc No 8` when he was present; the facility was only for debriefings and was more relaxed than other places. According to to ▢, Agency officers at `Loc No 8` did nothing physically to Ammar. `He` explained that Ammar was known to Agency officers as one of the more cooperative, likeable, even "gentle" detainees. `He` stated that the staff at the facility tried to determine what comforts they could provide detainees to improve their cooperation, but neither the staff nor CTC/RDG withheld benefits or comforts

subject to cruel, inhumane, or degrading threat or punishment." According to the draft cable, the Director ordered the suspension because "there simply is not a sufficiently established and clear body of case law from U.S. courts defining 'cruel, inhumane, and degrading' in the context of U.S. counterterrorist intelligence interrogations to provide us with adequate comfort that some U.S. court will not disagree with the DOJ legal opinion and find one or more of the 13 interrogation techniques to constitute such treatment or punishment.  If U.S. courts were to make such a finding, any CIA officers who had employed those techniques after enactment of the McCain Amendment might, repeat might, be put in legal jeopardy of civil lawsuits.  (Note: No officer who employed an authorized interrogation technique in an authorized manner before the enactment of the McCain amendment faces legal jeopardy because of pre-McCain activity)." The Director "has considered this language with the history of the negotiations during which Congress consistently rejected multiple executive branch efforts to include language that would permit CIA personnel and contractors to rely with confidence on the legal advice of the Department of Justice.  Congress refused to include such language, with negotiators even commenting that they did not trust the Attorney General on this topic.  Given Congress is unwilling to rely on AG's legal advice, the D/CIA, D/NCS, and D/CTC do not intend to ask you to rely on it."

TOP SECRET//███████//HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000457

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

~~TOP SECRET/~~ ███████ ~~HCS//NOFORN//MR~~
Debriefer

based on the debriefings. ▢ said Ammar appeared
healthy, mentally alert, and cooperative with him and security
officers at ▢ Loc No 8 ▢ *

- According to interrogator ▢ ▢ who managed the
detainees at ▢ Loc No 8 ▢ in ▢ early ▢ 2006, when he saw Ammar at
the facility, Ammar was in good condition and good spirits.
▢ He ▢ said he was certain that Agency personnel did not apply
"measures" at ▢ Loc No 8 ▢ which he stated was a long-term
management facility and "the last place for abuse."[1600]

- Debriefer ▢ DC1 ▢ described ▢ Loc No 8 ▢ as "a palace" compared to
other facilities[1608].

▢ ~~(TS/~~ ███████ ~~HCS//NF)~~ Time Limits For Interrogation
Process

▢ ~~(TS/~~ ███████ ~~HCS//NF)~~ Interrogator ▢ explained the time
limits on the interrogation process that were in place when he saw Ammar
in ▢ early ▢ 2006 at ▢ Loc No 8 ▢ to underscore that Agency officers would not
have used EITs on Ammar at the facility. ▢ He ▢ explained that
Headquarters must approve an interrogation plan with "measures" and
generally provides written notification for a specific period in which the
interrogators are authorized to use "measures." ▢ He ▢ stated that the
usual or standard period for authorization of "measures" is 30 days. The
"measures" stop, he said, when the detainee is "compliant." When the 30
days are over, if interrogators believe "measures" continue to be
necessary, then they must seek renewed approval from Headquarters.
According to ▢ him ▢ if a detainee is in a "transition" mode during the 30
day window, interrogators continue to have the authority for use of
"measures" but rarely employ them. ▢ He ▢ said the interrogators usually
decide before their Headquarters' authorization ends whether they need
to seek renewed authorization or whether the detainee is sufficiently
"compliant" to end the "measures." According to ▢ him ▢ physical contact

▢ ~~(TS/~~ ████ ~~HCS//NF)~~ ▢ stated that he spent a significant amount of time with
Ammar, who he described as one of the more intelligent or "bookish" of the detainees. working
with him on a reading problem Ammar reported he had. ▢ ██ ▢ stated that he looked up on the
internet the symptoms Ammar described related to his reading difficulties and supplied Ammar
with a colored filter to help him with his reading.

~~TOP SECRET/~~ ███████ ~~HCS//NOFORN//MR~~

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ██████ HCS//NOFORN//MR

between the interrogators and detainees usually happens only in the first
four to six weeks of the detainees' detention. He explained that some
detainees in the debriefing mode have provided false or erroneous
information and failed polygraph exams, but their interrogators do not
return the detainees to "measures[106]."

(TS/ ██████ HCS//NF) If the detainees are not being
"compliant" after the interrogators have stopped "measures," [    ] said
the interrogators might withdraw amenities as a discipline measure. The
withdrawal of amenities—removal of a DVD player, for example—would
generally happen only if a detainee was being a discipline problem; it
would rarely happen if a detainee had "a bad debrief," [    ] said, [    ]
commented that, if a detainee is being difficult during a debriefing, the
interrogator usually talks with the detainee to find out why the detainee is
having a problem. [    ] commented that sometimes the detainees have
"bad days" like everyone else[107].

94. (TS/ ██████ HCS//NF) Interrogator [NZ] prepared an
assessment of Ammar at [Loc No 8] in [early] 2005, commenting on
Ammar's mental state and indicating that Ammar's behavior pattern
could, at times, "produce a barrier to information flow." According
to [NZ] Ammar told him:

When he was captured he had an initial period when he was afraid to say
anything, for he was concerned any answer would be the wrong answer.
Quickly, [Ammar] realized his situation had changed, he would be with [Agency
officers] for 'a very long time,' and he could survive only by telling the truth.
Interestingly, [Ammar] said his motivation for telling the truth was not to gain a
shorter sentence or more favorable treatment, but 'because of reality—you are
my life now.' In practice, the manner in which [Ammar] sometimes tends to
answer questions can lead one to think he might be resisting—given a specific
question, [Ammar] often is unable to give a specific answer without a long,
rambling preamble. Whether he is actively resisting or not, focused and
persistent questioning will yield results[108].

95. (TS/ ██████ HCS//NF) [NZ] went on to say that
Ammar described to him his concern that he was being used as an
experiment. [NZ] said Ammar told him he understood his concern

TOP SECRET/ ██████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ████████ HCS//NOFORN//MR

was irrational. Nonetheless, as an example of what he meant, Ammar told ▢ ᴺᶻ⃝ he was afraid to complain about a pressure sore on his nose from his rendition to ▢ Loc No ▢ because he was afraid Agency officers had caused it purposely to see what his reaction would be. ▢ ᴺᶻ⃝ concluded that actions can have unintended consequences with Ammar; he is sensitive to small gestures of kindness and equally sensitive to what he perceives as acts of punishment—even though Agency personnel may not intend them as [such][199].

96. (TS/ ████████ HCS//NF) When ▢ ᴺᶻ⃝ asked Ammar to describe the interrogation process and his interaction with interrogators, Ammar frequently used the word "fear," ▢ ᴺᶻ⃝ said. Ammar told ▢ ᴺᶻ⃝ that, when he was captured and transferred to US custody, he was terrified. Ammar said he was afraid to tell a lie, and he was afraid to tell the truth, because he did not know how either would be received. He told ▢ ᴺᶻ⃝ "it wasn't about truth and untruth, it was about clear and unclear," and he wanted to explain properly every answer so he could put it into context. Ammar elaborated that he realized his tendency to want to explain his answers was frustrating to "someone who wanted a simple answer to a simple question," but he said he was afraid to give a simple answer and have it misunderstood later. He told ▢ ᴺᶻ⃝ he felt he was surrounded by the enemy, that feeling has never left him, and, at times, he feels consumed by fear. The detainee explained to ▢ ᴺᶻ⃝ that the smallest thing can remind him of his early interrogation days and cause him to tremble. Ammar said he knew he could trust some interrogators, but he also knew some interrogators he could not trust. ▢ ᴺᶻ⃝ assessed that Ammar was "consumed with the uncertainty of his position" and what would happen to him once his intelligence value was [exhausted][191].

97. (TS/ ████████ HCS//NF) Similarly, ▢ a mid ▢ 2005 interrogator assessment of Ammar indicated that, although he appeared to have adjusted well to ▢ Loc No ▢ and was more comfortable and relaxed than in the previous liaison controlled facility, he described multiple instances of attributing fears to

COPY

TOP SECRET/ ████████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000460

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/███████HCS//NOFORN//MR

unrelated events. For example, Ammar said hearing the noise of a cell door might make him begin to think that the security officers were coming for him. Strange sounds or other unrelated activities also would make him think that he might be harmed. The interrogators said Ammar explained to them that "he knew this was irrational and would remind himself that he was safe in our (Agency) custody and well taken care of in order to make those fears pass." According to the interrogators, "while Ammar retains vivid memories of his earlier interrogations, he knows that interrogators can help him and seeks to establish a connection with them[411]."

98. (TS/███████HCS//NF) In late 2005 and in early 2006, CTC/██████interrogators ██████prepared additional assessments of Ammar indicating that he appeared to be "participating in a relatively reliable and predictable manner," was comfortable and relaxed in the facility, and that his anxiety and fearfulness that he would be harmed had declined significantly. Nonetheless, the interrogators reported that Ammar, "retains vivid memories of his earlier interrogations[412]."

(TS/███████/HCS//NF) *What Happened to Ammar at* Loc No 9

99. (TS/███████HCS//NF) Headquarters approved the transfer of detainees at Loc No 8 to a new facility called Loc No 9 for early 2006. According to Headquarters, the transfer would allow the detainees to maintain the amenities and routines they had at Loc No 8, and each detainee would have a cell with an in-room shower and climate control as well as access to a gym. The transfer plan called for the detainees to dress in track suits and gym sneakers and travel with their personal effects. [413]

100. (TS/███████HCS//NF) According to debriefer ██████, all of the detainees, including Ammar, were in "full debriefing mode" when they were at Loc No 9.

TOP SECRET/███████HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ [redacted] HCS//NOFORN//MR

commented that [Loc No 9] was "a boarding house" and that Agency officers "spoiled" and "coddled" the detainees with access to video games, movies, books, and their own showers. He said the detainees had fantastic medical care with [medical providers] routinely visiting them. [ ] said the food was fine, "probably the same we ate." He commented that the prevailing sense among the officers at [Loc No 9] was "God forbid anything should happen to these guys."[114]

101. (TS/ [redacted] HCS//NF) Debriefer [Interrogator] the facilities for detainees as "okay" and almost the same in configuration as those at [Loc No 9]. According to [Interrogator] atmosphere at [Loc No 9] seemed casual, as at [Loc No 8], and he said the guard force from [Loc No 8] traveled with the detainees to [Loc No 9] because [Loc No 9] was closing. [Interrogator] ted that none of the detainees "seemed too disturbed by the change of scenery."[115]

**(TS/ [redacted] HCS//NF)** *What Were the Medical Assessments of Ammar?*

102. (TS/ [redacted] HCS//NF) After Ammar arrived at [Loc No 2] in [mid]2003, medical officer [PG6] examined him. [PG6] noted that Ammar expressed no medical complaints, nor did the medical officer identify any problems other than a history of Gastro esophageal Reflux Disease (GERD) or a hiatal hernia. The medical officer indicated he saw "no pathology" and "no apparent contraindications for enhanced measures[116] While Ammar was undergoing EITs and just after they ended, medical officers assessed that he experienced "no detrimental physical effects from enhanced measures."[117]

103. (TS/ [redacted] HCS//NF) Agency medical officers have since assessed Ammar as "basically healthy" with "multiple minor complaints." Ammar has consistently mentioned to medical personnel that he has headaches and a sensitive stomach, and during

TOP SECRET/ [redacted] HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ████████ HCS//NOFORN//MR

████ mid ████ 2003 he began reducing his food intake to decrease the "hyperacidity" and because "the weight loss makes him more comfortable in the summer heat," according to a cable from ██ Loc No ██ Station. By ██ late ██ 2003, Ammar weighed 54 kilograms (119 pounds). Nonetheless, he later regained the weight and was back to about 142 pounds when he moved to ██ Loc No 6 ██ ████.

104. (TS/ ████ /HCS//NF) Reporting from Headquarters and the facilities in which Agency officers detained Ammar indicates that doctors usually visited the detainee at least once a month and that he received periodic dental care. Agency doctors consistently described Ammar as healthy but having GERD ██ TU2 ██ reported in 2004 that Ammar at times seemed overly concerned about his physical health. Agency medical personnel have prescribed medications for Ammar's hyperacidity/indigestion, provided him with advice on exercising, recommended he drink sufficient fluids, and indicated he could take over-the-counter pain relievers—such as aspirin and acetaminophen for headaches. Agency officers also provided Ammar with medicines for his dry eyes and acne. They gave him vitamins and immunizations for Hepatitis A and B, influenza, and diphtheria-tetanus. A dentist ██ in mid ██ 2004 checked Ammar's teeth and filled two cavities. ██ ██ TU2 ██ treated Ammar in ██ late ██ 2004 for a tapeworm and in ██ late ██ 2004 advised him to use an Agency-provided neoprene knee supporter and Flexeril ointment for a sore knee Ammar mentioned was bothering him. ██ TU2 ██ in ██ late ██ 2004 also assessed that Ammar had continued gastro-intestinal dysfunction, probably irritable bowl syndrome, and mild nasal allergies and suggested Ammar use docusate sodium and Actified. In ██ early ██ 2005, ██ TU2 ██ during Ammar's rendition flight to ██ Loc No █ ██ gave Ammar Azithromycin for a possible strep throat. He also said Ammar could receive Naprosyn and Bengay as needed for back pain that Ammar reported. In ██ early to mid ██ 2005, OMS officer ██ ██ IC4 ██ examined Ammar and indicated he was a healthy male who suffers from lactose intolerance ████. Similarly, According

COPY

TOP SECRET/ ████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ██████ HCS//NOFORN//MR

to a transfer assessment in [Mid] 2006 prior to Ammar's move from [Loc No 9] to Guantanamo Bay, Ammar was in good health. [(120)]

(TS//██████ /HCS//NF) *How Did the Psychologists Assess Ammar?*

105. (TS//██████ /HCS//NF) [JP2] conducted the initial Psychological Interrogation Assessment (PIA) of Ammar after Agency officers brought the detainee to [Loc No 2] on [Mid] 2003. Reporting from [    ] Station indicated the purpose of the assessment was to "determine Ammar's psychological stability and mental status and to assess the suitability for use of enhanced methods." [JP2] after meeting with Ammar, noted that the detainee's "thinking was clear and goal-directed, and there was nothing in his presentation to suggest serious mental impairment in the form of hallucinations or delusions."

106. (TS//██████ /HCS//NF) [JP2] said Ammar denied a family history of mental illness or psychiatric treatment but described his mood as "down," acknowledged that he was "maybe depressed," and termed himself as "very sensitive." Nonetheless, [JP2] reported that closer questioning of Ammar did not elicit true symptoms of a depressive syndrome nor did Ammar report ever being suicidal or planning self-injury. [JP2] also said Ammar had no history of brain injury, seizures, panic attacks, or symptoms of post traumatic stress disorder. In providing an assessment of Ammar's resistance posture as well as the suitability of enhanced measures, [JP2] concluded:

> Of all the detainees [JP2] has observed, Ammar's presentation has elicited the strongest reactions from interrogators and others who have interacted with him. His dismissive, condescending, and arrogant style coupled with his obvious stonewalling, minimizing, and denying, serve to frustrate others and make a difficult task even harder. With respect to eliciting more cooperation from Ammar, interrogators may opt to emphasize KSM's [Khalid Shaykh Muhamad], Khallad's, and others' cooperation as a way to move Ammar away from his oppositional and stonewalling behavior. Based on this interview, there are no indications

TOP SECRET/ ██████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ███████ HCS//NOFORN//MR

that Ammar will experience profound and permanent psychological or
emotional harm if enhanced methods are used[121].  medical provider
medical provider

107. (TS/ ███████ HCS//NF) ████████ Y5X
explained that a ████████ usually will give
a detainee a mental status exam—which includes questions about
personal history—before EITs are administered and again after the
EITs.  Y5X commented that lasting harm is difficult for a
████████ to predict and that he is not sure such an assessment is
possible.  A ████████ can pick up indications that someone might
be susceptible to stress, is under stress, and is having poor reactions
to trauma.  Nonetheless, Y5X said no uniform set of criteria exists
for determining whether lasting harm can accrue from EITs; the
medical provider makes the call subjectively and based primarily on gross
behaviors or lack of them[122].
medical provider

108. (TS/ ███████ HCS//NF) According to reporting from
Loc No 2 lation, on Mid 2 ████
Y5X conducted a psychological evaluation of Ammar
after the detainee reported experiencing symptoms of a possible
psychotic episode during a custodial interview with interrogator
X3L on, ████, The cable indicated Ammar told X3L that, while
he was undergoing standing sleep deprivation, he overheard English
speaking interrogators beat, torture, and finally murder his
friend/wife Aafia [Siddique] and her family, including her infant
child.  Ammar, according to the report, also told X3L that he heard
Khalid Shayk Muhammad and Khallad being interrogated and then
executed.  X3L reported that Ammar was calm and showed no sign
of confused thinking when he related the episode.  Ammar also told
X3L he was worried that, after interrogators used enhanced
techniques on him, he might have made up partial answers to their
questions.  For example, he said that after interrogators walled him,
he could not recall complete memories because he tended to
daydream.  Ammar said he hoped he would not have a similar
problem in the future if he was walled.  [123]

TOP SECRET/ ███████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET// ███████ HCS//NOFORN//MR

medical providers

109. (TS/ ███████ HCS//NF) ‾Y5X‾ assessed that, if Ammar's report was genuine, it could be evidence of a delusional disorder or psychotic disturbance. Nonetheless, he believed that Ammar more likely was fabricating the incident. ‾Y5X‾ recommended that Agency [ ] monitor Ammar. During an interview with OIG on ‾Early‾ 2007, ‾Y5X‾ said he could not see any physical signs of abuse on Ammar and remembered that Ammar's emotions did not match what he was saying. ‾Y5X‾ said his conclusion after interviewing the detainee was that Ammar was probably fabricating the symptoms of a psychological disorder or disturbance, possibly to undermine the reliability of the information he had provided during his interrogations[124].

110. (TS/ ███████ HCS//NF) Headquarters reacted with skepticism to the incident ‾Y5X‾ reported. On ‾Mid‾ 2003, ALEC asked [ ] Station for its assessment of Ammar's level of responsive and plans for addressing his "ongoing resistance and fabrications." According to ALEC, it saw reporting of Ammar's "faked psychotic episode as a sign that, while Ammar remains resistant, base's efforts are getting to him." ALEC noted that it surmised that faked psychoses are possibly standard al Qa'ida practice, "and the fact that Ammar feels the need to fall back on this method to avoid the hard questions shows that base's efforts are making him increasingly uncomfortable[125]."

111. (TS/ ███████ /HCS//NF) On ‾Mid‾ 2003, [ ] Station responded to Headquarters, submitting a cable with an assessment of Ammar's "faked delusions and fabrications." The Station noted that after the incident occurred on ‾Mid‾ 2003, Ammar made several off-hand comments about his dreams, mostly about them being related to topics covered in previous debriefing sessions but "nothing remotely approaching what was discussed on ‾Mid 2003‾." The cable indicated that the episode had no impact on Ammar's progress or willingness to talk and that Ammar's debriefers believed he used the incident to try to determine Aafia Siddiqui's status, whether Khalid Shaykh Muhammad or Khallad were in the

TOP SECRET// ███████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000466

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/████████HCS//NOFORN//MR

same facility or still alive, and whether the US Government condoned torture or execution. According to the assessment, the interrogation team was going to continue to monitor Ammar for signs of resistance and/or fabrication and "apply pressures when necessary." The cable also noted that Ammar "lasted longer than most under enhanced measures before he began to move toward compliance. The experience was profound for [Ammar], and it is highly likely that he is concerned that his experiences only represented '10 percent' (in his mind) of what he could experience[1286]."

112. (TS/████████HCS//NF) On [mid] 2003, [████████] [████████] [F3K] prepared an updated psychological assessment of Ammar, concluding that his results were consistent with those of [Y5K] [████████] assessment [F3K] said Ammar's previous alleged psychotic symptoms appeared to have been done to avoid being the recipient of enhanced measures. [F3K] reported that, when he asked Ammar what his primary question or concern was in the aftermath of his alleged symptoms, he said he was concerned about being "tortured for personal business." Ammar explained he was afraid interrogators would again use enhanced measures on him despite his recent cooperation. [F3K] noted in his assessment that, "At this time there is no evidence of depressive, anxious, or psychotic symptomatology. It continues to seem highly unlikely that Ammar has suffered any true symptoms of a psychotic disorder while at [Loc No 4]"[1287]

113. (TS/████████HCS//NF) Agency [medical providers] continued to monitor Ammar and conduct periodic assessments of him during his detention in Agency facilities[1288]. The [medical providers] reported "characterological issues" and downplayed the possibility of "genuine mental health concerns." For example,

* On [Mid] 2003, [JP2] observed Ammar and noted that his thinking was "focused, and there were no indications of serious

────────────

[1289] (TS/████████HCS//NF) Cable traffic indicates the assessments generally occurred every two to six months.

TOP SECRET/████████HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ███████ HCS//NOFORN//MR

mental impairment in the form of hallucinations or delusions." JP2 commented that, "at times, he [Ammar] can come across as condescending and dismissive, especially when he thinks a question is not relevant or when the answer seems obvious to him....there were no indications of permanent and profound psychological or emotional harm as a result of the prior use of enhanced measures[128]."

- On Mid 2004, F3K assessed that Ammar's behavior related to an incident indicated an obsessive, histrionic, and self-defeating personality style. Ammar, according to F3K experienced leg spasms and became upset, initially explaining that the spasms were the work of genies, spells, or some other type of mystical spirit and subsequently claiming the spasms were the work of the American management and guards at Loc No 1 who were studying him in an experiment. F3K assessed that Ammar's "characterologically sensitive and histrionic (attention seeking) personality style" contributed to his "exaggerated emotional reaction" and that he saw "no evidence that the subject is experiencing any severe or prolonged psychological disturbance[130]."

- In, Early and Mid 2005, a medical provider reported that Ammar complained of attention problems, described symptoms of attention deficit disorder, reported that his sleep, energy, and concentration were all decreased, and was "most likely experiencing some anxiety symptoms due to the stress of being in custody." Nonetheless, the medical provider indicated, "there is no evidence that [Ammar] is experiencing any severe or prolonged psychological disturbance[131]."

- On Early 2006, OMS indicated that she found that Ammar's capacity "to effectively cope with sustained confinement" had diminished. said Ammar is a "chronic worrier" and was fearful of what happened or

TOP SECRET/ ███████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000468

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

~~TOP SECRET~~ ███████ ~~HCS//NOFORN//MR~~

could happen to him.  She reported that he told her he had been
experiencing sleep problems during the past few months and
had "increased feelings of anxiety accompanied by intrusive
thoughts of imagined potential mistreatment while confined."
Ammar denied to ▢ that the guards or other base
personnel had mistreated him but explained that he was fearful
that they would if he made a request in the wrong way.
According to ▢ Ammar had begun to imagine
increasingly harsh punishments. ▢ indicated Ammar
explained to her that he had had similar thoughts throughout
his detention but that the thoughts were increasing in
frequency, intensity, and duration and that he was having
startle morning awakenings occasionally accompanied by night
sweats, increased heart rate, and stomach tension.[35]  (S//NF)

  ♦  On, `Early` 2006, ▢ `B7F`
    reported that Ammar was "making moderate adjustment
    to detention." ▢`B7F` indicated that the detainee was
    complaining of "sub-clinical anxiety" and "is an anxious
    individual by character."  The ▢ commented that he
    believed Ammar's attention difficulties, which previous
    assessments noted, were related to obstructive anxiety and not
    to an underlying attention deficit disorder. ▢`B7F` noted that
    Ammar had been in isolated detention for approximately three
    years and recommended that "as with all long-term detainees,
    pro-active consideration should be given to arranging a social
    pairing with another detainee to reduce the negative
    psychological effects of long-term isolation."  Nonetheless,
    ▢`B7F` assessed that Ammar, "overall...remains a
    psychologically stable individual and there is no evidence of
    any significant or prolonged mental harm."  (S//NF)    `medical provider`

  ♦  On ▢ `Late` 2006, when the Agency transferred Ammar to
    facilities at Guantanamo Bay, a transfer package report noted

[35] (TS// ███████ HCS//NF) ▢ said prisoners typically become increasingly fearful
because of their inability to control their environment.

~~TOP SECRET~~ ███████ ~~HCS//NOFORN//MR~~

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000469

SECRET//ORCON/NOFORN

TOP SECRET// ███████ HCS//NOFORN//MR

that he was continuing to struggle with adjusting and had trouble sleeping, relaxing, and refraining from obsessing over his inability to focus. The report said that, historically, Ammar has "fought with anxiety problems that simply took time and continual reinforcement by HVDIs [High Value Detainee Interrogators] that he was safe." According to the report, Ammar retains vivid memories of his earlier interrogations. The report recommended that Ammar "be seen on a regular basis as he has developed a level of dependency on interrogators to help him manage his days, his anxieties, and basic coping skills for detention.₍₄₁₉₎"

114. (TS/ ███████ HCS//NF) Debriefer ██ DC1 ██ who said she talked to Ammar "everywhere," including ██ Loc No 7, Loc No 5, ██ ██ Loc No 8 ██ and ██ Loc No 9 ██ said she sometimes spent the majority of her time with Ammar trying to get him "down from his pole," because he had "major psychological issues." She elaborated that she believes Ammar is a hypochondriac—without contact with other people, he focuses on his health—and exhibits obsessive compulsive behavior. ██ DC1 ██ stated that Ammar has trouble structuring his time, setting realistic expectations for himself, and finishing tasks. She also stated that Ammar has difficulty asking Agency personnel for "things" and fears Agency officers will dislike the requests and hurt him in response.²⁰₍₄₂₀₎

(TS/ ███████ HCS//NF) *What Allegations Has Ammar Made?*

115. (TS/ ███████ /HCS//NF) Since he arrived at the Guantanamo Bay facility in ██ Late ██ 2006, Ammar has made multiple allegations that Agency officers mistreated and even "tortured" him. Among the more specific, key allegations he has made at Guantanamo are that interrogators: hit him in the head, including with a pipe or bar; hit him on his nose, causing it to bleed;

²⁰ (TS ███████ HCS//NF//MR) ██ said she observed Agency officers generally responding positively to the few ██████████.

TOP SECRET// ███████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

MEA-2C-00000470

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

~~TOP SECRET/~~ ███████ ~~HCS//NOFORN//MR~~

would not allow him to sleep for days; "hung him with my head sometime and some other times with my feet (sic); gave him a vaccination that made him crazy; kept him in the dark; subjected him to loud music 24 hours per day; deprived him of food; forced him to eat; kept him tied or chained for months; hit him with water and ice; threatened him sexually; kept him in a freezing cell; and would not let him pray or wash for months.[37] Ammar also has asserted that an Agency man, "at my father's age" gave him "psychosomatic attacks."

116.  ~~(TS/~~ ███████ ~~/HCS//NF)~~ The detainee mentioned his alleged abuse primarily to staff members at Guantanamo Bay and during conversations with other detainees. He may have made allegations to ICRC representatives, but the ICRC report does not list him by name as a complainant. During his Combatant Status Review Tribunal Hearing on [ Early ] 2007, Ammar raised no issues regarding his treatment. Nonetheless, Ammar told fellow detainee Ghailani on [ Early ] 2007 that he was not permitted to talk about his treatment—it was "classified." He explained to Ghailani that he made a mistake by not saying that any "classified evidence" against him should be inadmissible because it was obtained while he was being tortured. According to Ammar:

> "I said anything when I was being tortured. They asked me classified questions when I was being tortured....they took my papers from me and my clothes and I wasn't permitted to pray and ...I was tied up by a hanging chain and they were hitting me with the water and the ice and they threatened me sexually and that's what happened other than hitting...those are the words I want to say...so I say how can they take these words while this is going on...then they gave me this medicine. It was a vaccination. I drank it and then I went crazy...All this I wanted to tell but...So I asked...all classified[r138]. (sic)

~~(TS/~~ ███████ ~~/HCS//NF)~~ *What Were the Guidelines Under Which Agency Officers Were Operating?*

~~(TS/~~ ███████ ~~HCS//NF)~~ See Annex C for a more detailed description of Ammar's allegations of abuse.

~~TOP SECRET/~~ ███████ ~~HCS//NOFORN//MR~~

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000471

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/~~~~~~~~~~HCS//NOFORN//MR~~

117. (TS/~~~~~~~~HCS//NF) After President Bush signed the ☐Late☐ 2001 MON, OGC took the lead in determining and documenting the legal parameters and constraints for interrogations.[38] In addition to conducting independent research, OGC consulted extensively with DoJ and National Security Council (NSC) legal and policy staff members. Working with DoJ/OLC, OGC determined that, in most instances relevant to the counterterrorism detention and interrogation activities under the MON, the criminal prohibition against torture, 18 U.S.C. 2340-2340B, is the controlling legal constraint on interrogations of detainees outside the United States.[39][(u)]

118. (U) The criminal prohibition against torture, 18 U.S.C. 2340-2340B, defines torture as:

(1) An act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control;
(2) "Severe mental pain or suffering" means the prolonged mental harm caused by or resulting from—
   (A) the intentional infliction or threatened infliction of severe physical pain or suffering;

---

[38] In August 2002, President Bush determined that the Geneva Conventions did not apply to al-Qa'ida members, and the Agency program proceeded according to that determination during the time in which Agency officers rendered and detained Ammar. The Supreme Court in June 2006, in *Hamdan v. Rumsfeld*, held that, at a minimum, Common Article 3 protections extend to detainees the United States holds under the auspices of the Global War on Terror.

[39] ☐☐☐☐☐☐☐ stated during an interview with OIG on ☐☐☐ 2008 that, with respect to the Convention Against Torture, the United States did not sign or ratify Article 16, which deals with "cruel, inhuman, or degrading treatment." He noted, "some of what we are doing now clearly is cruel, unusual, or degrading under Article 16." Nonetheless, he said the United States considers itself bound by the obligation under Article 16 to prevent cruel, inhuman, or degrading treatment only insofar as the phrase "cruel, inhuman, or degrading treatment or punishment" means the cruel, unusual, or inhumane punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution. ☐☐☐☐ noted that with respect to the Eighth Amendment, its ban on cruel and unusual punishment only attaches post-conviction, and cannot be used to challenge the treatment of persons who have not been convicted of a crime. With respect to the Fifth Amendment, ☐☐☐ noted the due process clause applied to US persons, which did not apply in the case of the detainees. He stated the United States is not undertaking any further obligations under Article 16 than under other US law.

TOP SECRET/~~~~~~~~HCS//NOFORN//MR~~

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000472

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ███████ HCS//NOFORN//MR

(B) the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

(C) the threat of imminent death; or

(C) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality; and

(3) "United States" means the several States of the United States, the District of Columbia, and the commonwealths, territories, and possessions of the United States.

119. (U) According to the statute:

There is jurisdiction over the activity prohibited in subsection (a) if—

(1) the alleged offender is a national of the United States; or

(2) the alleged offender is present in the United States, irrespective of the nationality of the victim or alleged offender.

(c) Conspiracy.—A person who conspires to commit an offense under this section shall be subject to the same penalties (other than the penalty of death) as the penalties prescribed for the offense, the commission of which was the object of the conspiracy[141].

120. (TS/ ███████ HCS//NF) In [Mid] 2002, DoJ provided to the Agency several legal opinions—"Legal Standards on Torture," "Legal Memorandum RE: Standards of Conduct for Interrogations Under 18 U.S.C. 2340-2340A ( [Mid] 2002), "Memorandum for John Rizzo, Acting General Counsel of the Central Intelligence Agency, Interrogation of al-Qa'ida Operative" ( [Mid] 2003)—in which it took the position that, as Commander-in-Chief, the President independently has the Article II Constitutional authority to order the detention and interrogation of enemy combatants to gain intelligence information. In addition to determining that 10 specific EITs—the attention grasp, walling, facial hold, facial or insult slap, cramped confinement, placing harmless insects in the confinement box with the detainee, wall standing, stress positions, sleep deprivation not to exceed 11 days, and the waterboard—would not violate the torture prohibition in 18 U.S.C. 2340-2340B, OLC opined that "certain acts may be cruel, inhuman, or degrading, but still not produce pain and suffering of the requisite

TOP SECRET/ ███████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ███████ HCS//NOFORN//MR

intensity to fall within Section 2340A's proscription against torture."
OLC gave the Agency its opinion that:

> Physical pain amounting to torture must be equivalent in intensity to the
> pain accompanying serious physical injury, such as organ failure,
> impairment of bodily function, or even death. For purely mental pain or
> suffering to amount to torture under Section 2340, it must result in
> significant psychological harm of significant duration, e.g., lasting for
> months or even years.[40,41]

121. (TS/ ███████ /HCS//NF) OLC also determined that a
violation of Section 2340 required that the infliction of severe pain be
the defendant's "precise objective" and concluded that necessity or
self-defense might justify interrogation methods that would
otherwise violate Section 2340A.[42]

122. (TS/ ███████ /HCS//NF) OIG could not determine
whether OLC at that time provided its opinion orally to OGC about
whether the 10 EITs could be used in combination. OIG could find
no written opinion until ███ 2005 regarding whether EITs could be
used in combination on a detainee. Nonetheless, OGC legal officers
in 2002 interpreted OLC guidance as allowing the application of
measures in combination.[42]

---

[40] (U//FOUO) See "Legal Memorandum, RE: Standards of Conduct for Interrogation under 18
U.S.C. 2340-2340A" (█████ 2002)

[41] (TS/ ██████ HCS//NF) OIG did not pursue—because of limits on the scope of this
investigation—the question of how the OLC or OGC ascertained that psychologists could
determine before or during an interrogation that "profound permanent psychological and
emotional harm" (italics added) would not result from the use of specific enhanced measures.
Nor did OIG examine the issue of whether an interrogation process that requires a health
professional to pronounce on a subject's fitness to withstand a procedure or to monitor a
procedure—which would suggest the procedure would have inherent health risks—would be
contrary to international law and international standards of medical ethics.

[42] (TS/ ██████ HCS//NF) In █████ 2004, OLC issued a memo rescinding the ███████
2002 memo, "Legal Standards on Torture," in its entirety, and a memo from Daniel Levin to
James Comey, Deputy Attorney General, indicated OLC was reassessing whether enhanced
measures could be used in combination on a detainee. On █████ 2005, OLC issued a memo for
John Rizzo, OGC, "Re: Application of 18 U.S.C. Sections 2340-2340A to the Combined Use of
Certain Techniques in the Interrogation of High Value al-Qu 'ida Detainees." According to the
memo, previous guidance analyzed only the use of techniques individually, and the █████ 2005
memo indicated "courts tend to take a more holistic approach and consider an

TOP SECRET/ ███████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000474

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ███████ HCS//NOFORN//MR

123. (TS/ ███████ HCS//NF) The `Mid` 2002 DOJ opinions provided the foundation for the policy and administrative decisions that guided the CTC Program, including the interrogation of Ammar. OLC delivered its opinions in response to Agency queries about whether Agency officers with one detainee, Abu Zubaydah, could use a more robust approach than the then authorized interrogation techniques would allow.[43] OGC continued to consult with DoJ as the Interrogation Program and use of EITs expanded beyond Abu Zubaydah, and DOJ produced an undated and unsigned document entitled, "Legal Principles Applicable to CIA Detention and Interrogation of Captured Al-Qa 'ida Personnel[nian]." According to OGC, the analysis was fully coordinated with and drafted in part by OLC and embodies DOJ agreement that the reasoning of the ___ `Mid` 2002 OLC opinion, "Interrogation of al-Qa 'ida Operative," extends beyond the interrogation of Abu Zubaydah and the conditions that were specified in that opinion[nian]. [44][n5]

124. (TS/ ███████ HCS//NF) Headquarters disseminated CTC's and OGC's interpretation of OLC legal guidance to ███████ Stations in a cable, "Legal Background on the Use of Enhanced Interrogation Techniques," dated `Late` 2002. The cable indicated that interrogation team members could request prior approval from Headquarters to use the 10 techniques OLC had

entire course of conduct to determine whether torture has occurred" because of their concern about one technique increasing a subject's vulnerability to a second or follow-on technique.
[ ] ████ opined during an interview with OIG on ████ 2003 that if the exact same or equivalent facts pertained in another case, the DOJ opinion would apply there as well. (2003-7123-IG, Review of Interrogations for Counterterrorism Purposes, Interview with ████ ████ 2003) OIG did not discover documents that indicated that CTC assessed whether Ammar's case was exactly the same or equivalent to that of Abu Zubaydah.
[44] (TS/ ████ HCS//NF) According to a ████ 2002 Training Report prepared after the first running of the High Value Target Interrogation and Exploitation (HVTIE) Training Seminar, ████ 02 (pilot running), the instructors taught a variety of interrogation techniques during the course, "Because these pressures were recommended and subsequently *approved through CTC legal, Attorney General, and DOJ for use against HVT's on a case by case basis*, we prepared selected personnel in these basic pressures in the event they would be called upon to conduct these pressure." (Italics added)

TOP SECRET/ ███████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ███████ HCS//NOFORN//MR

determined would not violate the torture provision and also added an 11th technique—the use of diapers.[4] The cable noted that:

> Applicable federal law "requires that the use of interrogation techniques in specific instances will not engender lasting and severe mental or physical harm to the detainee. It is understood that some interrogation techniques incorporate mild physical pressure, while others may place a detainee in fear for his life. It is not intended, however, that the detainee actually suffer severe physical or mental pain; in addition, appropriately trained medical and psychological personnel are present throughout the process. Our attorneys have presented our legal analysis to the legal adviser to the NSC, to the Office of Legal Counsel at the Department of Justice, and to the Criminal Division at Justice, and the Counsel to the President has been briefed as well[[44]].

125.  (TS/ ███████ HCS//NF)  The specific legal background and guidance the cable provided included:

> In general, the law provides that it is a federal crime for any person acting "under color of law" (which would include, of course, all members of the interrogation team and other personnel as well) to engage in conduct that is "specifically intended to inflict severe physical or mental pain or suffering...upon another person within his custody or physical control." The statute provides that any person who violates those prohibitions "shall be fined under (the U.S. Criminal Code) or imprisoned not more than 20 years, or both, and if death results to any person from conduct prohibited by this subsection (i.e., that quoted above), shall be punished by death or imprisoned for any term of years or for life
>
> -- The statute defines "severe mental pain or suffering" as "the prolonged mental harm caused by or resulting from: (A) the intentional infliction or threatened infliction of severe physical pain or suffering; (B) the administration or application, or threatened application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses of personality; (C) the threat of imminent death; or (D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or

---

[4] (TS/ ███ HCS//NF)  According to the cable, "One way to leverage the concerns of some detainees is to place them in adult diapers. Care must be taken to keep human waste from creating or enhancing infections."

TOP SECRET/ ███████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ██████ /HCS//NOFORN//MR

application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality."

Accordingly, the Justice Department approval for Hqs to authorize the use of enhanced techniques in specific instances relies upon our representation that those techniques, when applied by appropriately trained personnel, should not rpt not produce severe mental or physical pain or suffering. For example, the use of specific enhanced techniques may be authorized where, in light of the specific interrogator's experience with those procedures and the specific detainee's own characteristics, neither any severe physical injury (such as the loss of a limb or organ), nor death, nor prolonged mental harm continuing for a period of months or years (such as the creation of persistent post-traumatic stress disorder) should result from their use. Indeed, Justice concluded that the use of enhanced techniques carefully applied by appropriate personnel pursuant to prior Hqs approval would not have the "specific intent" to inflict severe mental or physical pain or suffering, and therefore would not violate the law.

-- For example, the Department of Justice concluded that although "the use of the waterboard constitutes a threat of imminent death," no "severe physical or mental pain or suffering" is actually expected to be produced when the technique is applied with prior Hqs approval by trained and experienced personnel[147].

126. (TS/ ██████ HCS//NF) The cable stressed the need to document in advance any decisions to use EITs and the criteria officers used to make the decision to employ measures in order to "establish that there is indeed no 'specific intent' to inflict 'severe physical or mental pain or suffering' upon any detainee." According to the cable:

The critical need for such documentation is reinforced by the concern that a detainee may suffer a heart attack, for example, and die in the course of his detention. The documentation serves a number of functions, not the least of which is to protect the officers on our interrogation teams.

-- In this respect, the Department of Justice advised us by letter on ████ 31 d 2002 that "specific intent can be negated by a showing of good faith....if, for example, efforts were made to determine what long-term impact, if any, specific conduct would have and it was learned that the



8

TOP SECRET/ ██████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000477

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ██████████ HCS//NOFORN//MR

conduct would not result in prolonged mental harm, any actions taken relying on that advice would have to be undertaken in good faith. Due diligence to meet this standard might include such actions as surveying professional literature, consulting with experts, or evidence gained from past experience."

Additionally, and as represented to Justice, we also document that the personnel engaged in the use of enhanced techniques possess extensive experience on the psychological and physical methods of interrogation and the resistance techniques employed as countermeasures to such interrogation. The Department of Justice also has relied upon our representations that we do not intend to permit any detainee to die in the course of such activities, and that we have appropriately trained medical personnel on-site to ensure the availability of emergency response should a detainee suffer a potentially lethal consequence. Nonetheless, Justice does recognize that the risk is ever present that a detainee may suffer a heart attack, stroke, or other adverse event regardless of the conditions of the detention and interrogation, as that potential is always present whether an individual is under detention or not[148].

127. (TS/ ██████████ HCS//NF) Headquarters also disseminated on [ Early ] 2003, the "Guidelines on Interrogations Conducted Pursuant to the Presidential Memorandum of Notification of [ Late ] 2001." (See attachment.) The DCI Interrogation Guidelines require that all personnel directly engaged in interrogating detainees review the Guidelines, receive appropriate training in implementing the Guidelines, and complete an acknowledgement that they have read the Guidelines. The Guidelines do not specifically prohibit improvised actions, but they specify that "unless otherwise approved by Headquarters, CIA officers and other personnel acting on behalf of CIA may use only Permissible Interrogation Techniques[149]."

128. (TS/ ██████████ HCS//NF) The guidelines listed as permissible techniques:

- Standard techniques – those that do not incorporate physical or substantial psychological pressure and include, "but are not limited to, all lawful forms of questioning employed by us law enforcement and military interrogation personnel," standard techniques were: the

9

TOP SECRET/ ██████████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000478

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ███████ HCS//NOFORN//MR

use of isolation, sleep deprivation not to exceed 72 hours, reduced caloric intake (so long as the amount is calculated to maintain the general health of the detainee), deprivation of reading material, use of loud music or white noise ) at a decibel level calculated to avoid damage to the detainee's hearing), and the use of diapers for limited periods (generally not to exceed 72 hours or during transportation where appropriate).

- Enhanced techniques – those that incorporate physical or psychological pressure beyond the standard techniques, require advance Headquarters approval, and which only approved interrogators may use with specific detainees with appropriate medical and psychological participation in the process. The enhanced techniques are: the attention grasp, walling, the facial hold, the facial slap (insult slap), the abdominal slap, cramped confinement, wall standing, stress positions, sleep deprivation beyond 72 hours, the use of diapers for prolonged periods, the use of harmless insects, the water board, and "such other techniques as may be specifically approved pursuant to paragraph 4 below."

- Paragraph 4 discussed the approvals required for the use of standard and enhanced techniques and stated:

   Whenever feasible, advance approval is required for the use of standard techniques by an interrogation team. In all instances, their use shall be documented in cable traffic. Prior approval in writing (e.g., by written memorandum or in cable traffic) from the Director, DCI Counterterrorist Center, with the concurrence of the Chief, CTC Legal Group, is required for the use of any enhanced technique(s) and may be provided only where D/CTC has determined that (A) the specific detainee is believed to possess information about risks to the citizens of the United States or other nations, (B) the use of the enhanced technique(s) is appropriate in order to obtain that information, (C) appropriate medical and psychological personnel have concluded that the use of the enhanced technique(s) is not expected to produce "severe physical or mental pain or suffering," and (D) the personnel authorized to employ the enhanced technique(s) have completed the attached acknowledgement. Nothing in these guidelines alters the right to act in self-defense[r150].

129. (TS// ████████ HCS//NF) Neither the DCI Guidelines nor the DOJ/OLC opinions mention water dousing or the "bath,"

COPY

TOP SECRET/ ████████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/⬛⬛⬛⬛⬛HCS//NOFORN//MR

one of the techniques interrogators used with Ammar. The ⬛Late⬛ 2003 draft OMS Guidelines identify "water dousing" as the 11th out of 12 standard measures (in ascending degree of intensity) but do not further address the technique. ⬛NX2⬛ stated in 2003 that CTC/Legal approved water dousing. Nonetheless, as far as OIG could determine, Headquarters failed to formally address the use of water in interrogations until ⬛Early⬛ 2004. In a cable to ⬛⬛⬛, Headquarters then stated that it was re-establishing "operational guidelines regarding the use of water as a behavioral conditioning technique" and indicated that "use of water as a conditioning tool during the interrogation of a detainee requires the submittal and Hqs approval of an interrogation plan....water for behavioral conditioning purposes may only be administered by or under the direction of specifically designated CTC/RDG interrogators[133]."

130. (TS/⬛⬛⬛HCS//NF) The "Use of Water" cable differentiated between water use as a standard and an enhanced technique.

- As a standard technique, interrogators could pour, flick, or toss water on a detainee from a hand-held container—Headquarters recommended using a one pint container—to "create a distracting effect, to startle, to instill humiliation, or to cause insult." "Water should be applied in a manner that prevents inhalation or ingestion by the detainee[157]."

- As an enhanced technique, interrogators could pour water—the cable did not mention the temperature of the water—on the detainee's body from a container or use a hose connected to a water source to douse the detainee.[158] CTC policy stipulated that the water be

---

* (TS/⬛⬛⬛HCS//NF) OMS draft guidelines from ⬛⬛⬛ 2004 provide guidelines for exposure to water based upon submersion studies: 1) for water temperature of 41 F/5 C – total duration of exposure not to exceed 20 minutes without drying and rewarming; 2) for water temperature of 50 F/10 C – total ⬛⬛⬛⬛⬛ exceed 40 minutes without drying

TOP SECRET/⬛⬛⬛⬛⬛HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY          MEA-2C-00000480

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ~~HCS//NOFORN//MR~~

potable, the room temperature be 74-78 degrees Fahrenheit, and that the interrogators first place a poncho, mat, or other form of material on the floor. Headquarters also instructed interrogators to avoid getting water into the detainee's eyes, nose, or mouth.

131. (TS/ HCS//NF) In [Early] 2003, the Chief, Medical Services disseminated a set of undated OMS draft guidelines to OMS personnel assigned to detention facilities. According to OMS, these guidelines were a compilation of previously issued guidance that had been disseminated in a piecemeal fashion. The guidelines were marked "draft" based upon the advice of CTC/Legal.[47](U//S) The guidelines quote excerpts from the [Early] 2003 DCI Interrogation Guidelines and include a list of sanctioned interrogation techniques, approval procedures, technique goals, and staff requirements. The OMS draft guidelines also expand upon the practical medical implications of the DCI Interrogation Guidelines, addressing: general evaluation, medical treatment, uncomfortably cool environments, white noise or loud music, shackling, sleep deprivation, cramped confinement (confinement boxes), and the waterboard. According to the Chief, Medical Services, the OMS Guidelines were intended solely as a reference for the OMS personnel directly supporting the use of EITs and were not intended to be Agency authorizations for the techniques discussed. OMS has periodically updated its draft guidelines. The most recent set of medical guidelines of which OIG is aware are dated [Late] 2004.(U//S).

## CONCLUSIONS

132. (TS/ HCS//NF) Agency officers rendered Ammar from [____] on [Mid] 2003, subjected him to EITs at a foreign country

and rewarming, 3) For water temperature of 59 F/15 C  total duration of exposure not to exceed 60 minutes without drying and rewarming.

47 (TS/ HCS//NF) A [____] 2003 Lotus Note from C/CTC/Legal advised Chief, Medical Services that the "Seventh Floor" would need to approve the promulgation of any further formal guidelines...For n [____] ore, [____] uidance [____] is discussion stage..."

TOP SECRET/ ~~HCS//NOFORN//MR~~

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY     MEA-2C-00000481

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ~~████~~ HCS//NOFORN//MR

Loc No 2 and held him incommunicado at six sites from Mid 2003 until Late 2006.[48] Headquarters gave its approvals for the actions, including the combined use of all but two interrogation techniques on Ammar—applying a stick behind his knee joints while in a stress position and using refrigerated or iced water on him during water dousing.

133. (TS/ ~~████~~ HCS//NF) Agency officers were determined to render Ammar and use EITs on him. The information Ammar provided prior to his rendition and immediately upon his arrival at Loc No 2 made little difference to his circumstances. Moreover, Agency officers conducting the interrogations at Loc No 2 focused more on whether Ammar was "compliant" than on the quality of the information he was providing. During a conversation with another detainee in Late 2006, Ammar claimed of his interrogators:

> They don't know how to analyze and evaluate to make very sound decisions…Them…they did not [know] how to start to establish grounds for interrogations in the first place, and the intelligence group did not have experience[r156]."

134. (TS/ ~~████~~ HCS//NF) The EITs Ammar experienced at Loc No 2 were sufficient to cause him to become "compliant" and provide information to his interrogators to try to end the techniques. His comments in Late 2006 to another detainee suggest he feared he would be killed if he did not; "you need to remember this…if a terrorist is not good for them for information…they would kill him." (sic) Nonetheless, Ammar fabricated the information he provided when undergoing EITs. He later admitted to his interrogators/debriefers that he was terrified and lied to get Agency officers to stop the measures. [49] Ammar also explained that he was

---

[48] (U) In September 2006, President Bush publicly acknowledged that the Agency had been holding suspected terrorists in secret prisons and announced that 14 detainees—including Ammar—had been transferred to Guantanamo Bay.

[49] (TS/ ~~████~~ /NF//MR) Some of the information Ammar provided to his interrogators before they began EITs—and that interrogators and analysts assumed was false—was correct. OIG did not examine Ammar's ~~████~~ the limited scope of this review.

TOP SECRET/ ~~████~~ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

~~TOP SECRET/~~ ████████ /HCS//NOFORN//MR

afraid to tell a lie and was afraid to tell the truth because he did not know how either would be received.

~~(TS/~~ ████████ HCS//NF) *To What Extent Are Ammar's Allegations Consistent With Agency Records?*

135. ~~(TS/~~ ████████ /HCS//NF) The totality of the measures Agency officers used on Ammar almost certainly caused him to interpret the techniques as the "torture" he has alleged. During the time Agency officers applied EITs to Ammar—[Mid] 2003—they used the measures in combination, meaning he was undergoing sleep deprivation while also experiencing the effects of no solid food, sensory deprivation, walling, water dousing, stress positions, and other techniques. Interrogator [X3L] commented relative to the detainees that, "they all will feel they've experienced something" they will interpret as "torture," "especially the guys who underwent measures." Similarly, interrogator [QY7] stated that Ammar most likely would consider any of the techniques the interrogators used on him as beatings, and interrogator [X7Q] said of the techniques, "all this was plenty," he "wished I'd never been asked to do" the measures, and "I wouldn't do them again." [X7Q] stated that a detainee might misconstrue any enhanced measure that incorporated skin-on-skin contact—such as facial or belly slaps—as a beating.

136. ~~(TS/~~ ████████ /HCS//NF) Many of the allegations Ammar makes relative to his treatment are analogous to the standard and enhanced measures Agency officers used on him or are understandable given the context (see table) of his detention facilities. Ammar almost certainly would agree with debriefer [SM1]'s comment that [Loc No 7]—which lacked lights in the cells and where he and other detainees experienced EITs—"felt like a dungeon."[58][159]

---

We raise the issue to underscore his state of mind while undergoing EITs and apparent willingness to tell interrogators what they wanted to hear—and not necessarily the truth—to get them to stop using the measures.
[59] (TS/ ████████ HCS//NF/ /MR) ████ who debriefed Ammar only after he underwent EITs and became "compliant," described ██████████████ "very odd" in that she could be

~~TOP SECRET/~~ ████████ ~~HCS/~~ ██~~OFORN//MR~~

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000483

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ██████ HCS//NOFORN//MR

137. (TS/ ██████ HCS//NF) Ammar's assertion that an Agency officer—a man, ██████ (sic)—gave him "psychosomatic attacks" probably relates to interrogator [NX2] conduct toward him and may have some justification,[5] [160] [CW9] said she could see how [NX2] might violate the DCI Guidelines, because he had an "attitude." Two officers indicated that Ammar during debriefings appeared nervous when lead interrogator [VX7] appeared. Several other Agency officers said Ammar at different periods in his detention appeared fearful and anxious to them. Interrogator [N17] for example, assessed in 2005 that Ammar was "consumed with the uncertainty of his position" and what would happen to him once his intelligence value was exhausted. Ammar's [Late] 2006 transfer package to Guantanamo Bay indicated that he had trouble sleeping, relaxing, and avoiding obsessing over his inability to focus. The package also indicated that, historically, Ammar has "fought with anxiety problems that simply took time and continual reinforcement by HVDIs (High Value Detainee Interrogators) that he was safe[161]."

sitting across from a terrorist who was responding to her as though he could be a graduate school student in the United States. [AT] tried to help OIG interviewers understand the juxtaposition of the bad and the good a[ ███ ] by relating what was to her an upsetting incident. She said she had taken Ammar outside into the yard of the [ ███ ] facility for a debriefing because an interrogator was applying EITs to another detainee inside[ CW1 ] stated [ ] had no soundproofing, and she did not want Ammar to hear what was going on with the EITs. According to [ ███ ] she and Ammar were sitting outside in a relatively lax security environment—[ ] guards wee present but no Agency security officers—and "having a nice, long conversation." She said a hedgehog showed up, and she and Ammar spent time together silently watching the hedgehog's antics while she waited for a signal that the EITs were over and she could bring Ammar back inside[ ].

"(U/ ██████ HCS//NF//MR) OIG, without talking with Ammar, cannot define precisely what Ammar might mean by the term "psychosomatic attacks." The United States Department of Veterans Affairs describes Posttraumatic Stress Disorder (PTSD) as an anxiety disorder than can occur after one has been through a traumatic event. "A traumatic event is something horrible and scary that you see or that happens to you. During this event, you think that your life or others' lives are in danger. You may feel afraid or feel that you have no control over what is happening." Symptoms of PTSD may include nightmares, flashbacks, avoidance of situations or people that trigger memories of the traumatic event, difficulty expressing feelings, anger or irritability, difficulty sleeping and [ ███████████████ ] fear for one's safety.

TOP SECRET/ ██████ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000484

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ▓▓▓▓▓ HCS//NOFORN//MR

138. (TS/ ▓▓▓▓ HCS//NF) Nonetheless, OIG could find no substantiation for the following allegations Ammar has made:

- That he was hit in the head with a pipe or bar.[52][p162]

- That he was given a vaccination that made him crazy.

- That he was hit on his nose, causing it to bleed.

- That he was kept in a freezing cell.

- That he was forced to eat.

- That he was threatened sexually.[53]

In order to pursue the allegations more thoroughly, OIG would need clarification from Ammar—in particular, what specifically happened, who was involved, and when and where the events occurred.

139. (TS/ ▓▓▓▓ HCS//NF) OIG found that Ammar's conditions improved once he became "compliant" and after Agency officers moved him from [Loc 2] in [late] 2003. As far as OIG could determine, Agency officers, after ending EITs [in mid] 2003, only debriefed Ammar and never returned him to "interrogation mode." [r163]

(TS/ ▓▓▓▓ HCS//NF) *Did Agency Officers Exceed Their Authorities?*

a foreign country

[52] (TS/ ▓▓▓▓ HCS//NF) The original transcript indicated Ammar said he was hit in the head with a bar when he was captured in ▓▓▓▓ OIG asked for a review of the recording, which revealed that ▓▓▓▓ was a garble. Ammar was captured in ▓▓▓▓
[53] (TS/ ▓▓▓▓ HCS//NF) Although OIG found no information to substantiate Ammar's allegation he was threatened sexually, women were present during Ammar's interrogations when he was naked, which would have been a cultural/religious affront. Moreover, prior to at least some of his renditions, the medical officers performed cavity searches, including of his rectum, which Ammar probably ▓▓▓▓▓▓▓▓▓

TOP SECRET ▓▓▓▓ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000485

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ~~███~~ /HCS//NOFORN//MR

140. (TS/ ~~███~~ /HCS//NF) Headquarters' justification for rendering Ammar and using enhanced measures on him was weak. The [ late ] 2001 MON says the CIA may "undertake operations designed to capture and detain persons who pose a *continuing, serious threat of violence or death to U.S. persons and interests or who are planning terrorist activities."* The MON also recognized that detainees may be held in US Government custody indefinitely *if appropriate law enforcement jurisdiction is not asserted.* (Italics added)

- [ A foreign country ] captured Ammar and had him in custody—clearly asserting its jurisdiction—so, in custody, he no longer posed "a continuing, serious threat of violence or death to US persons or interests," nor was he able to continue his terrorist activities. Then ~~███~~ ALEC Station [ W87 ], [ in mid ] 2003 told an OIG investigator that since operatives involved in many terrorist plots had been arrested, CTC had, in effect, thwarted the operations. As an example, she commented that *Ammar had planned, before the* [    ] *apprehended him,* to attack the US Consulate in [    ] (italics added) Headquarters also knew that it was rendering Ammar extra-legally; according to a cable from Headquarters [ in early ] 2005, "Headquarters understands there are real political consequences for [   ] in holding [    ] citizens *extra-legally[Loc3].*" (Italics added)

- Headquarters' logic justifying Ammar's detention was fuzzy and circular. Interrogators at [ Loc No 2 ] [ in mid ] 2003 told Headquarters that Ammar provided "*tidbits* of threat information," *they believed* he was "withholding threat information regarding his planned operations in [    ] and elsewhere," and that Ammar "*likely* had prior knowledge of the recent attacks in [    ] and recent location information on UBL." (Italics added) Neither the interrogators nor Headquarters presented specific evidence to indicate why Ammar met the threshold for the MON, particularly how rendering him from [    ] egal custody to [ Loc 2 ] was a

TOP SECRET/ ~~███~~ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000486

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/ ▓▓▓▓ HCS//NOFORN//MR

*a foreign city*

"legitimate act of self-defense." In fact, Ammar lacked knowledge of imminent threats, but Agency interrogators and analysts were convinced he was withholding information based upon their analysis of Ammar's connections to Khalid Shaykh Muhammad and what they assumed Ammar could have known.[54] For example, ▓ In mid ▓ 2003, ▓ Base noted that it continued *"to strongly believe* that subject is well aware of significant al-Qa'ida activity being directed against US interests." (Italics added) Agency officers also failed to offer justifications for why they believed Ammar—a▓ citizen—could not be charged and tried effectively in a     *a foreign country* ▓ court, particularly given that he was making "admissions by accident."

• If the Agency did not adhere to the standards set forth in the MON for detaining Ammar, then Agency officers could not have adhered to the DCI Guidelines on his interrogations. The Guidelines specifically state that they "address the conduct of interrogations of persons who are detained *pursuant to the authorities set forth in the Memorandum of Notification o* ▓ late 2001." (Italics added) The Guidelines say they do not address interrogations of persons detained pursuant to authorities other than those set forth in the ▓ late 2001 MON. *a foreign country* he ▓ ervice apprehended Ammar for a violation of ▓ law and had substantial evidence against him.[55]

*a foreign city*

[54] (TS/ ▓ HCS//NF) ▓ In mid ▓ 2003 ▓ Station submitted a report providing responses to questions the FBI had passed to the Agency for Ammar. The FBI asked whether Ammar was aware of plans for attacks against US persons or interests in the United States, and the Station indicated that the subject "has been covered in prior ▓ traffic before subject was rendered." The Station also stated that "Since his arrival at ▓ subject has reported no plans for attacks against US persons or interests other than the operation he was planning himself to simultaneously attack the US Consulate in ▓ residence suspected of housing US persons in ▓ Subject has denied any knowledge of current plans for attacks inside the United States."

[55] (TS/ ▓ HCS//NF) The ▓ Government quite likely will reassert its authority and raise questions about Ammar's status as ▓ President Pervez Musharraf's power continues to wane. ▓ judges, especially Supreme Court Justice Iftikar Muhammad Chaudhry, have said they want to revisit the cases of ▓ who have disappeared into secret detention facilities under the ▓ ▓
*a foreign country*

TOP SECRET/ ▓▓▓▓ HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY   MEA-2C-00000487

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET//██████████HCS//NOFORN//MR

141. (TS/██████████HCS//NF) Agency officers at [Loc No 2]
received cables from Headquarters giving senior Agency officers'
approval for the use of multiple EITs on Ammar, but, at the time,
Headquarters had no written opinion from DOJ/OLC indicating that
measures could be used in combination on detainees. Headquarters
interpreted previous OLC guidance as allowing Agency officers to
use the measures in combination and on Ammar.

142. (TS/██████████HCS//NF) Lead interrogator, [NX2] and his
interrogator trainees almost certainly applied some of the measures
exuberantly. The new interrogators, who had only two weeks of
classroom instruction and exercises, needed on-the-job practice for
certification, and Ammar provided them an opportunity to
demonstrate their knowledge of techniques. For its part,
Headquarters failed to provide guidance on how long and/or how
many repetitions of measures interrogators could apply to Ammar.

- In the case of the walling, in particular, OIG had difficulty
determining whether the session was designed to elicit
information from Ammar or to ensure that all interrogator
trainees received their certification. The interrogators lined up
to wall Ammar, suggesting that certification was key.
Moreover, a session in which several interrogators had to take
turns walling the much smaller detainee because they became
fatigued suggests to IOG that Ammar might reasonably feel
that he was beaten.[56]

143. (TS/██████████HCS//NF) [NX2] led his interrogator
trainees in two violations of Agency guidelines on EITs—using
refrigerated or iced water on Ammar during the water dousing and
placing a stick behind Ammar's knee-joints while he was in a
kneeling stress position.

---

[56] (TS/██████████HCS//NF) In addition to being smaller than some of the interrogators,
Ammar almost certainly was in a weakened condition because of lack of sleep and food and
prolonged standing.

TOP SECRET/██████████HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MEA-2C-00000488

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/███████████HCS//NOFORN//MR

♦ In the case of the water dousing, OIG could not determine precisely what happened to Ammar, but, at a minimum, the water the interrogators used was excessively cold and some of it had ice in it. Interrogator [X7Q] admitted to OIG that the "bath" probably was "outside the bounds of what we were supposed to be doing," and interrogator [QY7] stated he was so uncomfortable with the technique he sat outside the dousing room. Moreover, although Headquarters approved the use of water dousing as a technique for Ammar, neither the DCI Guidelines nor the DOJ/OLC opinions formally addressed the technique.

♦ OIG could not determine the extent of pain Ammar suffered from [NX2]'s use of a broomstick behind his knee joints. [NX2] claimed in a Lotus Note to senior Headquarters-based CTC officers [Y47] [C12] [KM4] and [QU4] that he used a broomstick handle to keep the detainee from rolling from his knees to the floor rather than to cause him pain or harm.[56][r165][r166]

144. (TS/███████████HCS//NF) Headquarters was aware, at least after the fact, that [NX2] and his interrogator trainees were using techniques that fell outside of the "permissible interrogation techniques," and CTC acted against [NX2]. [Y47] on [mid] 2003 spoke to [NX2] about his incorrect use of a stress position—a technique which [Y47] described to the COS/████████ as an "UNAUTHORIZED measure"—recalled [NX2] from ████████ to Headquarters, and removed him from the interrogation program.[57][r167] [NX2] subsequently retired. [Y47] explained in a Lotus Note to

---

[56] (TS/███████HCS//NF//MR) Debriefer [██] who was in the first running of the interrogation class that [██] taught, said he mentioned to students that the stress position could be enhanced with the use of a stick behind the detainee's legs. Interrogator [██] reported that [██] was irritated with him when he told [██] he could not use gravel on the floor to hurt the detainees' knees when they were in the kneeling stress position.
[57] (TS/███████HCS//NF//MR) [██] disputed that his technique was unauthorized, pointing out in a Lotus Note to CTC Legal officer [██] [16 ██] 2003 that the DCI interrogation guidelines do not specifically mention the stress position and that he was "the

TOP SECRET/███████████HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET//　　　　//HCS//NOFORN//MR

the COS/　　　　　　　　that, "This infraction, coupled with a
previous unauthorized variation of measures by [ NX2 ] and during a
period of intense scrutiny by Headquarters and policymakers,
mandated [ NX2 ] be recalled and removed from the program." [ 747 ]
also indicated that, "we are reaching out to our certified interrogators
to clarify events, so as to ensure there is no misunderstanding of
authorized procedures—regardless of the level of interrogation being
used on a detainee." [58] [749]

one who introduced this position into the program and taught the position." He stated he
wanted to see "the written guidelines that I violated."
[59] (TS// 　　HCS//NF//MR) OIG could not interview 　　　about the incident; he died
soon after he retired in late 2003.

TOP SECRET//　　　　　//HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SECRET//ORCON/NOFORN

TOP SECRET/~~████~~HCS//NOFORN//MR

**Annex A**

**Interrogation Course**

145. (TS/████HCS//NF) In late 2002, CTC/Renditions and Detainees Group (RDG) initiated a pilot running of a two-week Interrogator Training Course designed to train, qualify, and certify individuals as Agency interrogators.[60][r169] Several CTC officers were involved in developing the course, including NX2 and MA2 . According to NX2 he started with materials and experiences from the previous Agency program ████, which ended in 1986] and built upon it, adding elements from resistance training and dealing with cultural considerations. NX2 and other course development team members traveled to foreign countries to obtain information about their respective interrogation programs for use in designing the Agency's program. NX2 explained that his philosophy was to strip the detainee of everything and then provide small things (blankets, clothes, etc.) as rewards when the detainee provided information. According to MA2 , NX2 instructed him to put the course together and told him the deputy of RDG, ████, would review it. MA2 explained that he designed the course based upon the military model of Survival, Evasion, Resistance, and Escape (SERE) training and with considerable cutting and pasting from the SERE school syllabus and materials. He stated that contractors No. 2 and No. 1 who knew the SERE program well, also may have reviewed the curriculum. NX2 MA2 said, appreciated his technical expertise and knowledge of SERE training, but NX2 also believed he was more experienced in interrogating "real people[r170]."

60 (TS//HCS//NF) In late 2002 officials from foreign liason service briefed CTC officers on interrogation techniques and facilities. ████ officials reported that it takes four years to become a proficient interrogator. ████ Interrogators undergo nine months of intensive ████ language training, six months of interrogation training, and four months of advanced interrogation training. Foreign

TOP SECRET/~~████~~HCS//NOFORN//MR

SECRET//ORCON/NOFORN

UNCLASSIFIED//FOR OFFICIAL USE ONLY