DECLARATION OF STEPHEN N. XENAKIS

Pursuant to 28 U.S.C. 1746, I certify that the following is true and correct to the best of my knowledge:

1. I am a retired Brigadier General and Army Medical Corps officer with 28 years of active service.

2. I am board certified by the American Board of Psychiatry and Neurology in General Psychiatry and Child and Adolescent psychiatry. I have been a senior adviser to the Department of Defense on neurobehavioral conditions and medical management.

3. I have a Department of Defense-issued Top Secret (TS-SCI) security clearance, and have carried out independent assessments of at least 11 detainees, including Ammar al Baluchi, held at the U.S. Naval Base at Guantanamo Bay, Cuba. My assessments have been relied upon by the Guantanamo Bay military commissions, the District of Columbia Federal District Court, and federal appeals courts.

4. On instruction from detainee counsel and waiver of confidentiality from detainee-patients, I have examined the medical records, client affidavits, attorney-client notes, and legal declarations of other medical experts relating to at least ten Guantanamo detainees who were confirmed and allegedly tortured during their detention, including Mr. al Baluchi.

5. I am currently an Adjunct Clinical Professor at the Uniformed Services University of Health Sciences, and also maintain a private psychiatry practice.

6. All opinions in this declaration are to a reasonable degree of medical certainty. This declaration does not state all information available to me.

Assessment of Ammar al Baluchi

7. In May 2013, the Convening Authority authorized funding for me to conduct a psychiatric assessment of Mr. al Baluchi. I learned during my assessment that Mr. al Baluchi has a history of significant head trauma. He complains of problems in cognition, including short-term memory, attention, and concentration, and displays symptoms of such problems. On 7 August 2015, I prepared the attached Formulation of Medical Condition, which is accurate to a reasonable degree of medical certainty. He has additional symptoms of sleep disturbance, and I believe that his symptoms are consistent

with a traumatic brain injury, which he claims to have suffered while in CIA custody in 2003.

8. Mr. al Baluchi also complains of recurrent back pain that is not relieved with standard medications and supportive interventions. He has a documented history of injury to the back and extremities that correspond with his complaints.

9. Consistent with the standard of care for his complaints, I asked the Senior Medical Officer at the Joint Medical Group to conduct MRI scans of Mr. al Baluchi's head and spine. On 10 August 2015, based on my examination of Mr. al Baluchi, I prepared the attached statement of the Neuroimaging Requirements for ISN 10018, which is accurate to a reasonable degree of medical certainty. To my knowledge, those scans have not yet been performed.

## Needed follow-up

10. Although I possess substantial information, I do not have complete information regarding Mr. al Baluchi. Because the Convening Authority has not renewed my appointment, I have not reviewed medical records from 1 January 2014 to the present in a comprehensive manner.

11. Mr. al Baluchi has a complex medical situation. His legal team does not possess the medical expertise to understand his symptoms, diagnosis, and needs without medical advice. If the Convening Authority were to renew my appointment, I could provide medical consulting which would help Mr. al Baluchi's legal team understand and properly respond to his medical situation.

## Facility inspection

12. In August 2013, I accompanied James Connell, learned counsel for Mr. al Baluchi, and investigator SFC Brandon Johnson, on a court-mandated inspection of Camp 7 to observe conditions of confinement. Mr. Connell, SFC Johnson, and I all exercised professional judgment in our respective fields in determining what elements of the conditions of confinement to inspect and document. During this inspection, I learned a great deal of information about Mr. al Baluchi's environment and his reaction to it which I could not have obtained from photographs and diagrams alone.

13. Facility inspections such as the one I conducted of Camp 7 provide valuable information to inform the medical diagnosis of a prisoner. They are not required, but are suggested by the medical standard of practice. My observations at Camp 7 were important to my expert

conclusion that at best, Mr. al Baluchi's medical conditions may not have been properly addressed by the Joint Medical Group; and at worst, his conditions have been exacerbated by his confinement at Camp 7.

14. Based on my expertise, my experience at Camp 7 and with Mr. al Baluchi, and my knowledge of open-source information, it is my opinion that forensic examination of Mr. al Baluchi's conditions of conditions of confinement prior to 2006 would provide information valuable to his medical diagnosis.

Executed on this 26th day of May, 2016

_____
Stephen N. Xenakis, M.D.
Brigadier General (Ret), U.S. Army

*BG (Ret) Stephen N. Xenakis, M.D.*

**Memorandum reference to Client ISN 10018**
**To: James G. Connell, III and Jon Sands**
**From: BG (Ret) Stephen N. Xenakis, M.D.**
**Subject:  Formulation of Medical Condition**
**Date: 7 August 2015**

1. The medical and neuropsychiatric conditions manifested by ISN 10018 require extensive evaluation. He manifests chronic symptoms and persistent impairment that have not responded to usual treatment and therapies. Comprehensive evaluation and treatment are complex and require the services of multiple specialists.

2. The most significant facts of his medical history derive from his experiences in detention and being subjected to Enhanced Interrogation Techniques (EITs). The report of the Senate Select Committee on Interrogation of December 2014 summarizes the range of techniques used on detainees in CIA custody. The EITs include:

   a. Waterboarding
   b. Walling
   c. Cramped confinement
   d. Stress positions
   e. Sleep deprivation
   f. Shaving
   g. Diapering
   h. Hooding
   i. Isolation
   j. White noise
   k. Uncomfortably cool environment
   l. Restricted diet
   m. Water dousing
   n. Attention grasp.

3. The symptoms, impairments, disabilities, and concerns demonstrated and expressed by the patient are most likely the product of the cumulative and synergistic effects of the array of EITs.  The range of stressful conditions, suffering, and injuries contribute to overlapping symptoms and clinical presentations.  He requires evaluation for an array of illnesses and injuries including:

   1. Postconcussion syndrome (PCS) and likely moderate traumatic brain injury.
   2. Posttraumatic stress disorder and comorbid psychiatric conditions including major depression and chronic generalized anxiety.
   3. Sleep disturbances.
   4. Chronic pain and associated osteoarthritic conditions.

*BG (Ret) Stephen N. Xenakis, M.D.*

- 5. Thyroid dysfunction including "sick thyroid syndrome," associated with PCS.
- 6. Adrenocortical hormonal dysfunctions secondary to PCS.
- 7. Undetected chronic systemic infections.
- 8. Nutritional deficiencies.
- 9. Metabolic dysfunction including methylfolate metabolism.
- 10. Visual and auditory impairments secondary to PCS.

4. The description of "walling" and other EITs as published in the SSCI Reports supports chronic PCS as the predominant injury and illness. The most serious and debilitating condition affecting the detainees' state of health subjected to EITs is most likely unremitting PCS.

5. The symptoms, impairments, and disabilities clustered with chronic and unremitting PCS include:

   a. Cognitive deficits including diminished short-term memory and impairments in attention, focus, and concentration.
   b. Sleep disturbance.
   c. Posttraumatic stress disorder and comorbid emotional conditions.
   d. Problems in balance.
   e. Headaches.
   f. Tinnitus and loss of hearing because of damage to the eighth nerve.
   g. Deficiencies in smell.
   h. Nystagmus and other problems with visual tracking.
   i. Deficits in fine motor coordination.

6. The standard of care stipulates a comprehensive evaluation for PCS in light of the history of injuries and exposure to stress. The usual tests for evaluating postconcussion syndrome recommended by the Defense Center of Excellence (DCoE) include MRI with volumetric analysis and PET scanning. Comprehensive evaluation includes thorough neuropsychological testing for cognitive deficits commonly manifested by these patients. A comprehensive sleep study for chronic disturbance secondary to PCS is indicated.

7. The comorbid likelihood of musculoskeletal injury, consistent with EITs described in the SSCI Report, support conducting a comprehensive musculoskeletal assessment for fractures and injuries to tendons and ligaments. Comprehensive musculoskeletal evaluation includes imaging of the skeletal system and joints and bone scans, including magnetic resonance imaging, computerized tomography, and bone scans.

6. The symptoms and concerns associated with postconcussion syndrome and comorbid conditions include evaluation of abnormalities and deficiencies in thyroid function, adrenal function, and testosterone including other sex-related hormones.

2

*BG (Ret) Stephen N. Xenakis, M.D.*

7. Comprehensive assessment is the first step in formulating an understanding of the detainees' health condition and diagnoses. A preliminary formulation changes over time because of the complex nature of the illnesses and injuries, involvement of suitable specialists, and findings of further testing. Further analysis and review include:

    a. Description of the physiologic processes and mechanisms of action of the related illnesses and disorders.
    b. Analysis, comparison, and correlation of symptoms across disease states.
    c. Hypotheses regarding the contribution of the related disorders and illnesses to treatment-resistance and failure to improve.
    d. Proposals for improved assessment and diagnosis.
    e. Proposals for integrating treatment and therapies across multiple interrelated conditions.

8. Thank you for your attention to this matter.

*[signature]*

Stephen N. Xenakis, M.D.

*BG (Ret) Stephen N. Xenakis, M.D.*

**Memorandum reference to Client ISN 10018**
**To: James G. Connell III and Jon Sands**
**From: BG (Ret) Stephen N. Xenakis, M.D.**
**Subject:  Neuroimaging requirements for ISN 10018**
**Date: 10 August 2015**

1. ISN 10018 has a history of significant head trauma.  He complains of problems in cognition, including short-term memory, attention, and concentration.  He has additional symptoms of sleep disturbance.  He reports that his symptoms have progressed over the past several years.

2. Standards of care require further evaluation for post-concussion syndrome including neuroimaging.  The DCoE Clinical Recommendation, Neuroimaging following Mild Traumatic Brain Injury in the Non-Deployed Setting establishes a Preferred protocol of five standard MRI sequences, plus two optional MRI sequences.  In light of ISN 10018's clinical history, the standard of care requires the following procedures for assessment of post-concussion syndrome:

    - MRI, with contrast, of head, including the optional DTI sequence.

    Following digital quantitative analysis, the results should be correlated with detailed neuropsychological testing.

3. ISN 10018 complains of recurrent back pain that is not relieved with standard medications and supportive interventions.  He has a documented history of injury to the back and extremities that correspond with his complaints.  Standards of care require neuroimaging to assess the degree and type of injuries that contribute to his symptoms:

    - MRI, with contrast, of spine, with focus on points of injury.
    - MRI of shoulders, elbows, knees, ankles, and pelvis.

Stephen N. Xenakis, M.D.
Brigadier General (Ret), U.S. Army