UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

AMMAR AL-BALUCHI<br>
a/k/a Ali Abdul Aziz Ali,

Petitioner,

v.

LLOYD AUSTIN,<br>
Secretary of Defense, <u>et</u> <u>al.</u>,

Respondents.

</td>
<td>

)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)

</td>
<td>

Civil Action. No. 08-2083 (PLF)

</td></tr>
</table>

<u>OPINION AND ORDER</u>

Pending before the Court are petitioner Ammar al-Baluchi's Motion to Lift Stay on Habeas Proceedings and Compel Examination by a Mixed Medical Commission [Dkt. No. 225] and related Motion for Evidentiary Hearing in Support of Motion to Lift Stay on Habeas Proceedings and Compel Examination by a Mixed Medical Commission [Dkt. No. 237].[1] Mr. al-Baluchi is a detainee at Guantanamo Bay Naval Base whom the United States is prosecuting before a military commission for his alleged role in the terrorist attacks of September 11, 2001. Upon careful consideration of the parties' written submissions, the relevant authorities, and the record in this case, the Court will deny both of Mr. al-Baluchi's motions.[2]

---

[1]    Mr. al-Baluchi filed suit against the Secretary of Defense in his official capacity. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the current holder of that office, Lloyd Austin, is substituted for his predecessor as party to this litigation.

[2]    The Court has reviewed the following documents and accompanying exhibits in connection with the pending motions: Mr. al-Baluchi's Motion to Lift Stay on Habeas Proceedings and Compel Examination by a Mixed Medical Commission ("MMC Mot.") [Dkt. No. 225]; Respondents' Opposition to Motion to Lift Stay on Habeas Proceedings and Compel

I. BACKGROUND

Ammar al-Baluchi is a Pakistani national detained at the United States Naval Base in Guantanamo Bay, Cuba ("Guantanamo"). The United States is prosecuting Mr. al-Baluchi before a military commission for his alleged role in financing the terrorist attacks of September 11, 2001.

In the late 1990s, Mr. al-Baluchi worked as a computer technician and systems manager in Dubai. The government alleges that, in January of 2000, Mr. al-Baluchi purchased flight training videos and simulation software in order to provide information about commercial airline operations to Marwan Al-Shehhi, who flew American Airlines Flight 175 into the South Tower of the World Trade Center on September 11. See Exhibit Narrative to Respondents' Public Filing of Factual Return ("Factual Return") [Dkt. No. 96-1] at 11-17. In April 2000, the

---

Examination by a Mixed Medical Commission ("MMC Opp.") [Dkt. No. 228]; Mr. al-Baluchi's Reply to Respondents' Memorandum in Opposition to Motion to Lift Stay on Habeas Proceedings and Compel Examination by a Mixed Medical Commission ("MMC Reply") [Dkt. No. 236]; Mr. al-Baluchi's Motion for Evidentiary Hearing in Support of Motion to Lift Stay on Habeas Proceedings and Compel Examination by a Mixed Medical Commission ("Evidentiary Hr'g Mot.") [Dkt. No. 237]; Respondents' Opposition to Motion for Evidentiary Hearing in Support of Petitioner's Motion to Life Stay on Habeas Proceedings and Compel Examination by a Mixed Medical Commission [Dkt. No. 240]; Respondents' Notice of Classified Filings and Notice of Filing of Redacted Public Version of Exhibit in Support of Respondents' Opposition to Petitioner's Motion to Lift Stay on Habeas Proceedings and Compel Examination by a Mixed Medical Commission [Dkt. No. 243]; Mr. al-Baluchi's Reply to Respondents' Memorandum in Opposition to Petitioner's Motion for Evidentiary Hearing in Support of Motion to Lift Stay on Habeas Proceedings and Compel Examination by a Mixed Medical Commission [Dkt. No. 244]; Mr. al-Baluchi's Status Report Regarding Petitioner's Motion for Evidentiary Hearing in Support of Motion to Lift Stay on Habeas Proceedings and Compel Examination by a Mixed Medical Commission [Dkt. No. 245]; Respondents' Notice of Supplemental Authority [Dkt. No. 246]; Mr. al-Baluchi's Second Status Report Regarding Petitioner's Motion for Evidentiary Hearing in Support of Motion to Lift Stay on Habeas Proceedings and Compel Examination by a Mixed Medical Commission [Dkt. No. 247]; and Mr. al-Baluchi's Notice of Supplemental Authority Regarding Petitioner's Motion to Lift Stay on Habeas Proceedings and Compel Examination by a Mixed Medical Commission [Dkt. No. 248].

government asserts, Mr. al-Baluchi began sending bank-to-bank transfers of funds from Dubai to the 9/11 hijackers in the United States.  In all, the government alleges that Mr. al-Baluchi made six transfers totaling more than $100,000 to the 9/11 hijackers and pilots in the months during which they were planning the attacks.  See id. at 18-24.  Mr. al-Baluchi fled Dubai for Pakistan the day before the 9/11 attacks.  See id. at 25.  The government has alleged that he continued to manage al-Qaeda funds for investment and safekeeping, executing in-person exchanges of currency in excess of $500,000.  See id. at 25-29.

The United States apprehended Mr. al-Baluchi during or after March 2003.  See Factual Return at 29.  In approximately September 2006, Mr. al-Baluchi was taken to the United States Naval Base in Guantanamo Bay, where he remains to this day.  See Mr. al-Baluchi's December 2, 2008 Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 ("Habeas Pet.") [Dkt. No. 1] at 4 (page number citations refer to electronic case filing numbers). Mr. al-Baluchi asserts that the United States subjected him to a pattern of torture while detaining him overseas prior to his transfer to Guantanamo Bay.  See MMC Mot. at 3-7.

The government asserts that Mr. al-Baluchi is subject to detention pursuant to the 2001 Authorization for Use of Military Force ("AUMF"), which authorizes the President to use military force against those who "planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001."  Pub. L. 107-40, 115 Stat. 224.  The United States is prosecuting Mr. al-Baluchi as an enemy combatant before a capital military commission at Guantanamo Bay that has been empaneled pursuant to the Military Commissions Act of 2009, Pub. L. 111-84, §§ 1801-07, 123 Stat. 2190, 2574-614.  A Combatant Status Review Tribunal convened by the Department of Defense has designated Mr. al-Baluchi an "enemy combatant," a determination that Mr. al-Baluchi unsuccessfully challenged with a petition to the United States

Court of Appeals for the District of Columbia Circuit.  See Respondents' Status Report [Dkt. No. 7] at 1.

Mr. al-Baluchi was originally charged before a military commission on May 9, 2008.  See Respondents' Status Report [Dkt. No. 7] at 1.  In 2009, however, the government decided to bring Mr. al-Baluchi and four other 9/11 co-conspirators to trial in federal court in New York.  When that trial did not proceed, the Office of Military Commissions swore new "charges and specifications" against Mr. al-Baluchi on May 31, 2011 and January 25, 2012.  The charging document accused Mr. al-Baluchi of nine crimes triable by military commission pursuant to 10 U.S.C. § 950t.  See Exhibit A to Respondents' Unclassified Updated Memorandum in Opposition to Petitioner's Motion for Permanent Injunction or Mandamus with Respect to His Unlawful Capital Military Commission and Cross Motion to Hold Petition in Abeyance Pending Completion of Military Commission Proceedings, ("2012 Charge Sheet") [Dkt. No. 203-1] at 13-15, 17-36, 117-19.  On April 4, 2012, Convening Authority Bruce MacDonald ordered that Mr. al-Baluchi be tried on these charges by capital military commission.  In the intervening years, the government and Mr. al-Baluchi have been engaged in extensive pre-trial litigation before the capital military commission, as well as years of plea negotiations.[3]

On December 2, 2008, Mr. al-Baluchi filed with this Court his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.  See Habeas Pet. at 1.  The petition alleges that Mr. al-Baluchi was held by the CIA before arriving at Guantanamo Bay, that he is innocent of the charged offenses, and that his ongoing detention violates the United States Constitution and other U.S. laws.  Id. at 3-4.  The petition seeks a determination from this Court that his detention

---

[3]     The commission's docket currently exceeds eleven thousand entries.  See Office of Military Comm'ns, 9/11: Khalid Shaikh Mohammad et al. (2), https://www.mc.mil/CASES.aspx (last visited Sept. 8, 2023).

is unlawful.  Id.  The parties spent years litigating procedural matters associated with the habeas

petition, including discovery, access to classified information, and preservation of evidence.

In 2018, Mr. al-Baluchi filed a motion for a permanent injunction or mandamus to

enjoin the capital military commission proceedings, and respondents filed a cross-motion to hold

in abeyance Mr. al-Baluchi's habeas corpus petition pending completion of the military

commission proceedings.  On July 29, 2019, this Court denied Mr. al-Baluchi's motion, granted

respondents' cross-motion, and stayed the habeas corpus proceedings pending completion of the

military commission trial and appeal.  See Al-Baluchi v. Esper, 392 F. Supp. 3d 46, 52-53

(D.D.C. 2019).  On March 10, 2022, Mr. al-Baluchi filed an unclassified motion to lift the stay

on the habeas proceedings and compel the government to convene a Mixed Medical

Commission, citing Mr. al-Baluchi's physical and psychological medical conditions.  See MMC

Mot.  On July 29, 2022, Mr. al-Baluchi filed a related motion for an evidentiary hearing on his

earlier motion.  See Evidentiary Hr'g Mot.  Both of these motions are now ripe for decision.

## II.  LEGAL STANDARD

The legal authority to detain Mr. al-Baluchi derives from the AUMF, Pub. L.

No. 107-40, 115 Stat. 224.  See Paracha v. Trump, 453 F. Supp. 3d 168, 176 (D.D.C. 2020).

Enacted within a week of the terrorist attacks of September 11, 2001, the AUMF authorizes the

President

> to use all necessary and appropriate force against those nations,
> organizations, or persons he determines planned, authorized,
> committed, or aided the terrorist attacks that occurred on
> September 11, 2001, or harbored such organizations or persons, in
> order to prevent any future acts of international terrorism against the
> United States by such nations, organizations or persons.

Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224.  The "detention of individuals . . . , for the duration of the particular conflict in which they were captured, is so fundamental and accepted an incident to war as to be an exercise of the 'necessary and appropriate force' Congress has authorized the President to use."  Hamdi v. Rumsfeld, 542 U.S. 507, 518 (2004) (plurality opinion).

The "most current and precise statement of the government's detention authority" under the AUMF is found in the National Defense Authorization Act of 2012 ("NDAA"), Pub. L. No. 112-81, § 1021, 125 Stat. 1298, 1562.  Paracha v. Trump, 453 F. Supp. 3d at 178.  That statute affirms that the President's authority pursuant to the AUMF "to use all necessary and appropriate force" includes the authority "to detain covered persons . . . pending disposition under the law of war."  Pub. L. No. 112-81, § 1021(a), 125 Stat. 1298, 1562.  The 2012 NDAA defines a "covered person" to include "any person . . . who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners."  Id. § 1021(b), 125 Stat. at 1562; see Ali v. Obama, 736 F.3d 542, 544 n.1 (D.C. Cir. 2013).  And "[d]etention under the law of war" is permitted "until the end of the hostilities authorized by the [AUMF]."  Al-Alwi v. Trump, 901 F.3d 294, 297 (D.C. Cir. 2018) (quoting Pub. L. No. 112-81, § 1021(c)(1), 125 Stat. at 1562)); see Uthman v. Obama, 637 F.3d 400, 402 (D.C. Cir. 2011); see also Hamdi v. Rumsfeld, 542 U.S. at 520 (plurality opinion) ("It is a clearly established principle of the law of war that detention may last no longer than active hostilities." (citing Geneva Convention (III) Relative to the Treatment of Prisoners of War art. 118, Aug. 12, 1949, 6 U.S.T. 3316, 3406 ("Third Geneva Convention"))).

A Guantanamo detainee may challenge the United States' authority to detain him pursuant to the AUMF by filing a petition for habeas corpus, over which courts in this district

have jurisdiction.  See Paracha v. Trump, 453 F. Supp. 3d at 177 (first citing Boumediene v.

Bush, 553 U.S. 723 (2008); then citing Rasul v. Bush, 542 U.S. 466 (2004)); see also Ahjam v.

Obama, 37 F. Supp. 3d 273, 278 (D.D.C. 2014) ("The writ of habeas corpus remains the sole

means by which Guantanamo detainees may challenge the legality of their detention.").  "In

exercising its habeas jurisdiction over detainees at Guantanamo Bay, the Judicial Branch

'serv[es] as an important . . . check on the Executive's discretion in the realm of detentions.'"

Al-Qahtani v. Trump, 443 F. Supp. 3d 116, 121-22 (D.D.C. 2020) (alteration in original)

(quoting Hamdi v. Rumsfeld, 542 U.S. at 536 (plurality opinion)).

      The Third Geneva Convention is a multilateral treaty to which the United States is

a party, and it sets forth standards governing the detention, treatment, and release of prisoners of

war.  Article 4 of the Third Geneva Convention defines prisoners of war as follows:

> 1) Members of the armed forces of a [p]arty to the conflict, as well as members of militias or volunteer corps forming part of such armed forces.
>
> 2) Members of other militias and members of other volunteer corps, including those of organized resistance movements, belonging to a [p]arty to the conflict and operating in or outside their own territory, even if this territory is occupied, provided that such militias or volunteer corps, including such organized resistance movements, fulfil[l] the following conditions:
>
> > a)  that of being commanded by a person responsible for his subordinates;
> >
> > b)  that of having a fixed distinctive sign recognizable at a distance;
> >
> > c)  that of carrying arms openly;
> >
> > d)  that of conducting their operations in accordance with the laws and customs of war.

3) Members of regular armed forces who profess allegiance to a government or an authority not recognized by the [d]etaining [p]ower.

4) Persons who accompany the armed forces without actually being members thereof . . . provided that they have received authorization from the armed forces which they accompany, who shall provide them for that purpose with an identity card . . . .

5) Members of crews . . . who do not benefit by more favourable treatment under any other provisions of international law.

6) Inhabitants of a non-occupied territory, who on the approach of the enemy, spontaneously take up arms to resist the invading forces, without having had time to form themselves into regular armed units, provided they carry arms openly and respect the laws and customs of war.

Third Geneva Convention art. 4.

Article 112 of the Third Geneva Convention describes Mixed Medical Commissions and states that "[u]pon the outbreak of hostilities, Mixed Medical Commissions shall be appointed to examine sick and wounded prisoners of war, and to make all appropriate decisions regarding them." Third Geneva Convention art. 112. Army Regulation 190-8 ("AR 190-8") is the implementing regulation for the Third Geneva Convention, and "provides policy, procedures, and responsibilities for the administration, treatment, employment, and compensation of enemy prisoners of war (EPW), retained personnel (RP), civilian internees (CI) and other detainees (OD) in the custody of U.S. Armed Forces." U.S. Dep'ts of the Army, Navy, Air Force, & Marine Corps, Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, Army Regulation 190-8 § 1-1 (1997), https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/r190_8.pdf. Section 3-12 of the regulation provides for the repatriation of sick and wounded "enemy prisoners of war" and "retained personnel." Id. § 3-12. Subsection 3-12(h) states that certain qualifying enemy

8

prisoners of war and retained personnel "will be examined by the Mixed Medical Commission."
Id. § 3-12(h).

### III.  DISCUSSION

The Court agrees with Mr. al-Baluchi that it has subject matter jurisdiction to resolve the merits of his request for a Mixed Medical Commission.  On the merits, however, the Court concludes that Mr. al-Baluchi is not entitled to a Mixed Medical Commission under the relevant authorities.  The Court discusses subject matter jurisdiction first before turning to the merits of Mr. al-Baluchi's request.

#### A.  Subject Matter Jurisdiction

Mr. al-Baluchi requests that the Court lift the stay on his habeas petition so that this Court may decide his request for a Mixed Medical Commission.  See MMC Mot. at 10.  This request raises two separate questions:  (1) whether a motion for a Mixed Medical Commission sounds in habeas; and (2) even if the motion does sound in habeas, whether the Court should lift the stay on Mr. al-Baluchi's habeas proceedings because the request merits an exception to the Court's jurisdictional abstention in this case.  See Al-Baluchi v. Esper, 392 F. Supp. 3d at 58-66.  For the reasons that follow, the Court finds that Mr. al-Baluchi's motion sounds in habeas and that the Court is not required to abstain from considering this motion.

First, "[f]ederal courts have jurisdiction over actions filed by Guantanamo detainees only if they 'sound in habeas corpus.'"  Bin Lep v. Biden ("Bin Lep II"), Civil Action No. 20-3344, 2023 WL 2707493, at *4 (D.D.C. Mar. 30, 2023) (quoting Aamer v. Obama ("Aamer I"), 742 F.3d 1023, 1030 (D.C. Cir. 2014)).  Respondents argue that a claim that would only potentially result in release from custody, such as Mr. al-Baluchi's request for a Mixed

Medical Commission, does not sound in habeas.  See MMC Opp. at 13.  Respondents contend

that instead Mr. al-Baluchi's motion is properly understood as a motion for a permanent

injunction.  See id. at 11-12.  Respondents cite to Department of Homeland Security v.

Thuraissigiam, in which the Supreme Court concluded that a habeas petitioner's request for a

new opportunity to apply for asylum and other relief from removal from the United States "falls

outside the scope of the common-law habeas writ."  See Dep't of Homeland Sec. v.

Thuraissigiam, 140 S. Ct. 1959, 1970-71 (2020).

       The Court finds respondents' argument unpersuasive.  The Court concludes that a

motion for a Mixed Medical Commission sounds in habeas even if the motion only leads to the

potential release of the detainee.  Thuraissigiam is inapposite here.  In that case, the petitioner

was an asylum-seeker rather than a prisoner.  See Dep't of Homeland Sec. v. Thuraissigiam, 140

S. Ct. at 1963.  The Supreme Court rejected the petitioner's arguments because he had not

"shown that the writ of habeas corpus was understood at the time of the adoption of the

Constitution to permit a petitioner to claim the right to enter or remain in a country or to obtain

administrative review potentially leading to that result."  Id. at 1969 (emphasis added).  The

Supreme Court's conclusion that the petitioner's request "falls outside the scope of the

common-law habeas writ" depended on the fact that the request was for a new opportunity to

apply for asylum, and not – as respondents assert – because the petition involved a claim that

would only potentially result in petitioner's release from custody.  Id. at 1971.  Indeed, as

Judge Bates and Judge Collyer both concluded, a Mixed Medical Commission is "at the core of

habeas."  Al-Qahtani v. Trump, 443 F. Supp. 3d at 127.

       In Al-Qahtani v. Trump, Judge Collyer distinguished between a Mixed Medical

Commission and the Guantanamo Periodic Review Board at issue in Salahi v. Obama.  See id.

at 126-27.  In Salahi, Judge Lamberth held that a Guantanamo detainee's request to compel a

Periodic Review Board's consideration of his detention status did not sound in habeas because

both the Board's recommendation to grant release and the Secretary of Defense's decision to

accept the recommendation are discretionary.  See Salahi v. Obama, Civil Action

No. 05-0569, 2015 WL 9216557, at *1-3 (D.D.C. Dec. 17, 2015).  Distinguishing Salahi,

Judge Collyer pointed out that, in contrast, a Mixed Medical Commission's review is "quite

distinct from a Periodic Review Board:  if certain criteria are met, the detained individual must

be released.  A mixed medical commission is designed to make findings about the health of an

individual; those findings lead to a result certain, not an exercise of discretion."  Al-Qahtani v.

Trump, 443 F. Supp. 3d at 127.

        The other cases that respondents cite in support of their argument are not

analogous to this situation.  See MMC Opp. at 14.  Judge Bates considered the same cases in Bin

Lep v. Biden and concluded that Skinner v. Switzer, 562 U.S. 521 (2011), Wilkinson v.

Dotson, 544 U.S. 74 (2005), and Muhammad v. Close, 540 U.S. 749 (2004) (per curiam), "all

concern whether a 'claim that may be brought under § 1983 need . . . be brought first in

habeas.'"  Bin Lep II, 2023 WL 2707493, at *5 (quoting Al-Qahtani v. Trump, 443 F. Supp. 3d

at 127).  Clearly such claims do not have to be brought first in habeas.  Similarly, Davis v. U.S.

Sentencing Commission is also not instructive here.  In Davis, the D.C. Circuit concluded that an

equal protection challenge to amendments to the U.S. Sentencing Guidelines is not a core habeas

claim because a successful challenge "would do no more than allow [the prisoner] to seek a

sentence reduction, which the district court retains the discretion to deny."  Davis v. U.S.

Sentencing Commission, 716 F.3d 660, 666 (D.C. Cir. 2013) (emphasis added).  In contrast, Mr.

al-Baluchi's request "involves much less discretion relevant to achieving release from custody

than the relief at issue in <u>Davis</u>." <u>Bin Lep II</u>, 2023 WL 2707493, at *6.  The Court agrees with

Judge Bates' conclusion that "[t]he ultimate outcome of the [request for a Mixed Medical

Commission] – no matter how tenuous or uncertain – is 'simple release' from custody as

contemplated by <u>Thuraissigiam</u>." <u>Id</u>. at *4.

      Respondents contend that "even assuming that an MMC convened in <u>Al-Qahtani</u>

could have functioned as a 'nondiscretionary release mechanism' . . . the same would <u>not</u> be true

as to Petitioner during the pendency of his military commission proceedings and any resulting

sentence." MMC. Opp. at 17.  Again, the Court disagrees.  "Habeas corpus relief is not limited

to <u>immediate release</u> from . . . custody . . . the writ is available as well to <u>attack future</u>

<u>confinement and obtain future releases</u>." <u>Bin Lep II</u>, 2023 WL 2707493, at *4 (quoting <u>Preiser</u>

<u>v. Rodriguez</u>, 411 U.S. 475, 487 (1973)); <u>see also</u> <u>Chatman-Bey v. Thornburgh</u>, 864

F.2d 804, 807 (D.C. Cir. 1988).  The fact that Mr. al-Baluchi seeks review by a Mixed Medical

Commission that <u>may</u> result in his future release does not deprive this Court of habeas

jurisdiction.  The Court concludes that Mr. al-Baluchi's request for a Mixed Medical

Commission sounds in habeas; contrary to respondents' suggestion, it is not properly understood

as a request for a permanent injunction.

      Second, Mr. al-Baluchi argues that this Court's stay of the habeas proceedings

does not prevent the Court from temporarily lifting the stay for the purpose of considering his

motion for a Mixed Medical Commission.  He points out that in the Court's 2019 opinion staying

the habeas proceedings in this case, the Court expressly stated that the stay "will not prevent this

Court from exercising its jurisdiction over a subsequent habeas petition that merits an exception

to abstention:  for example, one that raises a claim that cannot be raised before the military

commission." <u>Al-Baluchi v. Esper</u>, 392 F. Supp. 3d at 67.  He also points out that in connection

with respondents' prior motion for a stay of the habeas proceedings, respondents conceded that if Mr. al-Baluchi challenged the conditions of his confinement following the stay, "the Court may evaluate whether adjudicating that motion could potentially interfere with his military commission and, if appropriate, lift the stay for the limited purpose of considering the underlying merits of the motion."  Respondents' Reply in Further Support of Their Cross-Motion to Hold Petition in Abeyance Pending Completion of Military Commission Proceedings [Dkt. No. 208] at 21.  But in connection with the present motions, respondents now argue that for the Court even to consider the merits of Mr. al-Baluchi's request would disrupt the military commission proceedings and trial.  See MMC Opp. at 20.

       The Court agrees with Mr. al-Baluchi.  As Judge Bates noted in Bin Lep v. Biden, while it is possible that in pursuit of his argument for a Mixed Military Commission, Mr. al-Baluchi may advance a claim before this Court that "overlaps with claims that could be raised before the military commission such as whether [he] is entitled to an affirmative defense for lack of mental responsibility," Bin Lep v. Biden ("Bin Lep I"), Civil Action No. 20-3344, 2022 WL 123957, at *16 (D.D.C. Jan. 13, 2022), his current request for a Mixed Medical Commission does not require the Court to make a finding regarding his mental state or any other factual finding or legal conclusion that would interfere with the military commission. In addition, in Abdulrazzaq v. Trump, even though the petitioner was awaiting trial before a military commission, Judge Sullivan decided a habeas claim related to the petitioner's medical care and the Eighth Amendment.  See Abdulrazzaq v. Trump, 422 F. Supp. 3d 281, 285-91 (D.D.C. 2019).  Thus, because there is no support for the argument that the Court's adjudication of Mr. al-Baluchi's motion for a Mixed Medical Commission would interfere with the military

13

commission proceedings, the Court's abstention on this issue is not warranted and

Mr. al-Baluchi's motion may proceed before this Court.

Finally, respondents argue that separate from consideration of the military

commission proceedings, other prudential concerns caution against this Court's exercising

habeas jurisdiction. See MMC Opp. at 18. Respondents argue that "courts should be wary of

'unwarranted judicial intrusion into the Executive's ability to conduct military operations' and to

manage its 'international relations.'" Id. at 18 (quoting Munaf v. Geren, 553 U.S. 674, 689, 700

(2008)). Respondents assert that "the courts cannot command the United States to take action

assertedly necessary to performance of a treaty," id. (quoting Holmes v. Laird, 459

F.2d 1211, 1220 (D.C. Cir. 1972)), and contend that Mr. al-Baluchi's motion conflicts with the

executive branch's interpretation of the Third Geneva Convention. Id. at 19. These arguments

about treaty interpretation, however, relate to the merits of Mr. al-Baluchi's request, and they do

not persuade the Court to decline to consider the request in the first place. There therefore is no

reason for the Court to refrain from exercising jurisdiction.

### B. Entitlement to a Mixed Medical Commission

#### 1. Mr. al-Baluchi Is Not an "Other Detainee" Under AR 190-8

Having determined that the Court has habeas jurisdiction to consider

Mr. al-Baluchi's motion to compel a Mixed Medical Commission – and that it may temporarily

lift the stay on these habeas proceedings for the limited purpose of considering the motion – the

question is whether on the merits Mr. al-Baluchi is entitled to a Mixed Medical Commission.

Mr. al-Baluchi argues that he is entitled to a Mixed Medical Commission under

Army Regulation 190-8 ("AR 190-8"). See MMC Mot. at 12. As discussed, AR 190-8

implements the protections afforded to prisoners of war under the Third Geneva Convention.

AR 190-8 applies to "enemy prisoners of war" and "other detainees," as well as to other classifications not relevant here. See AR 190-8, § 1.1(a). Under AR 190-8, an "enemy prisoner of war" is a "detained person as defined in Articles 4 and 5 of the [Third Geneva Convention]." AR 190-8 at 33. AR 190-8 defines "other detainees" as "[p]ersons in the custody of the U.S. Armed Forces who have not been classified as an [enemy prisoners of war], [retained personnel], or [civilian internee]" and states that "other detainees" "shall be treated as [enemy prisoners of war] until a legal status is ascertained by competent authority." Id. (emphasis added). Section 3-12(h) of AR 190-8 provides that certain qualifying enemy prisoners of war "will be examined by the Mixed Medical Commission." Id. § 3-12(h).

Mr. al-Baluchi was designated as an "enemy combatant" by a Combatant Status Review Tribunal. See supra at 3-4. He argues that the term "enemy combatant" is not defined in AR 190-8 and that he therefore can be classified as an "other detainee" under the regulation. MMC Mot. at 12-13.[4] According to Mr. al-Baluchi, as an "other detainee" he must be treated as

---

[4]     Mr. al-Baluchi has never been designated as an "enemy prisoner of war." As discussed, Mr. al-Baluchi was designated as an "enemy combatant" by a Combatant Status Review Tribunal in 2007. See Unclassified Action Memo for Designated Civilian Official from Convening Authority, Combatant Status Review Tribunal [Dkt. No. 228-3]; Unclassified Summary of Basis for Tribunal Decision [Dkt. No. 228-4]. In his motion, Mr. al-Baluchi states that he is an "alien unprivileged enemy belligerent." See MMC Mot. at 13. Mr. al-Baluchi cites a 2017 filing by the United States in his military commission trial, in which the government states: "the [a]ccused is, and was, an alien unprivileged enemy belligerent (AUEB), as that term is defined in 10 U.S.C. § 948(a)(7), and [ ] he was engaged in hostilities against the United States as a member of al Qaeda during all relevant time periods." Id. at 13 n.53 (citing AE02O (GOV), Government Consolidated Response to AE502J (AAA) Mr. al-Baluchi's List of Potential Witnesses for Personal Jurisdiction Hearing, at 10, https://www.mc.mil/Portals/0/pdfs/KSM2/KSM%20II%20(AE502O(Gov)).pdf).

A January 11, 2021 memorandum issued by the Secretary of the Army clarifying AR 190-8 notes that the term "unprivileged belligerents" is synonymous with the term "unlawful enemy combatants." See Army Regulation (AR) 190-8 Clarification/Exception Memorandum (Jan. 11, 2021) [Dkt. No. 225-8] at 1; see also DoD Directive 2310.01E at 16-17 (noting that the term "unprivileged enemy belligerent" is synonymous with the term "enemy combatant").

an enemy prisoner of war and as such, he is entitled to a Mixed Medical Commission.  See id.

He contends that pursuant to his written request to the government and given his deteriorating

health, the government must convene a Mixed Medical Commission to examine him.  See id.

at 13-16.  Mr. al-Baluchi cites in support of his position Judge Collyer's decision in Al-Qahtani,

in which she concluded that Mr. al-Qahtani, who was found to be an "enemy combatant" by the

government – a classification not defined in AR 190-8 – could also be classified as an "other

detainee" under the regulation.  See Al-Qahtani v. Trump, 443 F. Supp. 3d at 130.  She noted

that in Al Warafi v. Obama, the D.C. Circuit "found that mere designation as an 'enemy

combatant' did not render Army Regulation 190-8 inapplicable," and she concluded that in light

of Al Warafi, Mr. al-Qahtani met the criteria for an "other detainee" in AR 190-8.  See id. (citing

Al Warafi v. Obama, 716 F.3d 627 (D.C. Cir. 2013)).  As a consequence, Judge Collyer

concluded that Mr. al-Qahtani should be treated as an enemy prisoner of war and that he was

entitled to a Mixed Medical Commission.  See id. at 131.

        The Court disagrees with Mr. al-Baluchi and with Judge Collyer and concludes

that Mr. al-Baluchi is not entitled to a Mixed Medical Commission under AR 190-8.  As

Judge Bates pointed out in Bin Lep II, Judge Collyer's "relatively brief consideration" of the

issue – without the benefit of briefing from the parties on this topic – did not address the

important distinction between international and non-international armed conflicts in the Third

Geneva Convention.  See Bin Lep II, 2023 WL 2707493, at *10.  Most of the Third Geneva

Convention's protections are afforded to persons captured during international armed conflicts,

defined in the convention as "all cases of declared war or of any other armed conflict which may

arise between two or more of the High Contracting Parties."  Third Geneva Convention art. 2.

Fewer protections are afforded to persons captured during "armed conflict not of an international character," commonly known as "non-international armed conflicts." Id. art. 3.

For example, prisoner-of-war status under the Third Geneva Convention only applies to persons detained during international armed conflicts. See Third Geneva Convention art. 4. In addition, under Article 5, which applies only to persons detained during international armed conflicts as well, if there is doubt "as to whether persons having committed a belligerent act and having fallen into the hands of the enemy belong to any of the categories enumerated in Article 4," such persons continue to enjoy the protection of the Third Geneva Convention until their status is "determined by a competent tribunal." Id. art. 5.

As discussed, under AR 190-8, certain qualifying enemy prisoners of war are entitled to be examined by a Mixed Medical Commission. See AR 190-8 § 3-12(h). As an initial matter, Mr. al-Baluchi is not an enemy prisoner of war because he was detained pursuant to the 2001 AUMF, which authorized the President to detain any person who was a part of or substantially supported al-Qaeda. See Pub. L. No. 112-81, § 1021(a), (b)(2), 125 Stat. at 1562. The United States' conflict with al-Qaeda and other terrorist organization is considered a non-international armed conflict. See Hamdan v. Rumsfeld, 548 U.S. 557, 628-29 (2006). Persons like Mr. al-Baluchi captured during non-international armed conflicts are not afforded prisoner-of-war status. See Third Geneva Convention art. 3.

The thrust of Mr. al-Baluchi's argument is that as an "other detainee," under AR 190-8, he should be treated as an enemy prisoner of war and receive the same right to be examined by a Mixed Medical Commission. See MMC Mot. at 12-13. Under AR 190-8, however, the process for determining a detainee's provisional prisoner-of-war status – such as whether he qualifies as an "other detainee" – is "in accordance with Article 5" of the Third

17

Geneva Convention, which applies solely to persons captured during international armed

conflicts.  See AR 190-8 § 1-6(a) ("In accordance with Article 5 [of the Third Geneva

Convention], if any doubt arises as to whether a person, having committed a belligerent act and

been taken into custody by the US Armed Forces, belongs to any of the [prisoner-of-war]

categories enumerated in Article 4 . . . such persons shall enjoy the protection of the present

Convention until such time as their status has been determined by a competent tribunal.").  In

other words, the "other detainee" classification under AR 190-8 applies only to persons captured

during international armed conflicts, but not to Mr. al-Baluchi, who was captured during a

non-international armed conflict.  As Judge Bates explained:

> Because Guantanamo detainees were not captured in the context of
> an international armed conflict under the Third Geneva
> Convention's definition of that term, but rather during a
> non-international one, they are not prisoners of war and cannot be
> "other detainees" because those classifications are only available to
> those detained during international armed conflicts.  As the Court
> sees it, that context removes Guantanamo detainees from the broad
> protections of the Third Geneva Convention, granting them only the
> narrower set of protections in Article 3.  An MMC is only available
> to prisoners of war captured during an international armed conflict
> under the Third Geneva Convention, and it is not part of the baseline
> protections outlined in Article 3 that attach for non-prisoners of war
> captured during a non-international conflict.  Moreover, AR 190-8
> § 3-12, the implementing provision, makes clear that an MMC is
> only available to enemy prisoners of war and retained
> personnel . . . .  The Court accordingly concludes that Bin Lep is not
> entitled to an MMC under the relevant governing treaty and
> implementing regulation . . . .

See Bin Lep II, 2023 WL 2707493, at *10.

A Department of Defense ("DoD") directive confirms that "Article 5 provisional

prisoner-of-war protection" – such as whether someone qualifies as an "other detainee" – "only

applies in the context of international armed conflicts."  MMC Opp. at 22.  The directive states:

> During international armed conflict, should any doubt arise as to
> whether a detainee belongs to any of the categories enumerated in
> Article 4 of the [Third Geneva Convention] and as such is entitled
> to the protections and privileges afforded [enemy prisoners of war],
> such detainees will be treated as [enemy prisoners of war] until a
> tribunal convened in accordance with Article 5 of the [Third Geneva
> Convention] determines the detainee's status under the law of war.

DoD Directive 2310.01E § 3.8 (emphasis added).  Thus, for the foregoing reasons, the Court

concludes that Mr. al-Baluchi, who was detained during a non-international armed conflict, is not

an "other detainee" under AR 190-8 and is not entitled to a Mixed Medical Commission.

### 2.   The Clarification/Exception Memorandum was Properly Issued

On January 11, 2021, following the decision in Al-Qahtani, the Secretary of the

Army issued a memorandum (the "Clarification/Exception Memorandum") that clarified that

"[u]nder AR 190-8, [Guantanamo] detainees are not 'Enemy Prisoners of War' or 'Other

Detainees' who are to be treated as Enemy Prisoners of War."  See Clarification/Exception

Memorandum [Dkt. No. 225-8] at 1.  The Clarification/Exception Memorandum confirmed that

Mr. al-Baluchi is not entitled to a Mixed Medical Commission because AR 190-8 does not apply

to him.  Mr. al-Baluchi argues, however, that this memorandum is procedurally invalid because it

was improperly issued.  As discussed in Section III.B.1, supra, the Court has already concluded

that Mr. al-Baluchi is not entitled to a Mixed Medical Commission without relying on the

Clarification/Exception Memorandum.  The Court therefore only briefly addresses its

disagreements with Mr. al-Baluchi's arguments regarding the validity of the

Clarification/Exception Memorandum.

First, Mr. al-Baluchi argues that Secretary of the Army does not have authority to

issue exceptions – like the Clarification/Exception Memorandum – to army regulations.  See

MMC Mot. at 19.  Under DoD Directive 2310.01E ("DoDD 2310.01E"), on the "DoD Detainee

19

Program," the Secretary of the Army is designated as the "DoD Executive Agent [ ] for the [a]dministration of the DoD Detainee Program in accordance with" DoD Directive 5101.1. DoDD 2310.01E at 1.  In DoD Directive 5101.1 ("DoDD 5101.1"), a "DoD Executive Agent" is defined as "[t]he Head of a DoD Component to whom the Secretary of Defense or the Deputy Secretary of Defense has assigned specific responsibilities, functions, and authorities to provide defined levels of support for operational missions, or administrative or other designated activities that involve two or more of the DoD Components.  The nature and scope of the DoD Executive Agent[']s responsibilities, functions, and authorities shall . . . [b]e prescribed at the time of assignment." DoD Directive 5101.1 at 2.  Mr. al-Baluchi argues that an Executive Agent's role, as defined in DoDD 5101.1, is "inherently an implementation and support function" and that none of the Secretary of the Army's responsibilities as Executive Agent of the Detainee Program, as described in DoDD 2310.01E, permit him to issue exceptions to army regulations like the Clarification/Exception Memorandum.  MMC Mot. at 19-20.

As respondents point out, however, this is too narrow a reading of the Secretary of the Army's authority.  See MMC Opp. at 34.  Under DoDD 2310.01E, the Secretary of the Army is the Executive Agent for the administration of the Detainee Program.  See DoDD 2310.01E at 1.  This is a more expansive role than Mr. al-Baluchi attempts to paint it, and it includes the authority for the Secretary of the Army to "[d]evelop[] and publish[] guidance necessary for the DoD-wide implementation of detainee operations." Id. at 7.  The Court is unpersuaded by Mr. al-Baluchi's argument that the Secretary of the Army did not have authority to issue the Clarification/Exception Memorandum.

Second, Mr. al-Baluchi argues that the person with sole authority to issue exceptions to AR 190-8 is not the Secretary of the Army, but another official in the Department

of the Army.  See MMC Mot. at 21.  Mr. al-Baluchi cites a separate regulation, Army

Regulation 25-30 ("AR 25-30"), in support of this argument.  See Army Regulation 25-30.

Under AR 25-30, a "proponent" is defined as "[t]he agency or command responsible for

initiating, developing, coordinating, approving content, and issuing a publication, as well as

identifying a publication for removal."  See AR 25-30 at 44.  AR 25-30 specifies that "[e]ach

publication has only one proponent" and "[o]nly [Headquarters Department of the Army

("HQDA")] principal officials can be proponents for [Department of the Army] policy

publications."  Id.  Section 1-7(c) of AR 25-30 also specifies that "HQDA principal officials may

grant exceptions to policy (also known as waivers) contained within the publications for which

they are the proponent and exception authority, consistent with controlling law and regulations."

AR 25-30 § 1-7(c).

   AR 190-8 states that the Deputy Chief of Staff for Operations and Plans ("DCS")

is the "proponent" of the regulation and has the authority to approve exceptions to the regulation.

See AR 190-8 at i.  Mr. al-Baluchi argues that only a HQDA principal official, as the proponent

of AR 190-8, had the authority to issue the Clarification/Exception Memorandum.  See MMC

Mot. at 21-22.  As respondents point out, however, nothing in AR 190-8 specifies that as the

proponent of the regulation, the DCS is the only authority who may issue exceptions to Army

regulations.  See MMC Opp. at 37.  Moreover, the source that Mr. al-Baluchi relies upon,

AR 25-30, is a regulation entitled "Information Management:  Publishing" and issued by the

Army Publishing Program.  See AR 25-30.  The Court agrees with respondents that

Mr. al-Baluchi's attempt to "transmute the provision of [a] publishing regulation into a radical

constraint on the [Secretary of the Army's] substantive authority to issue" the

Clarification/Exception Memorandum is not persuasive.  MMC Opp. at 36.  And, as discussed,

supra at 19-20, the Secretary of the Army has the authority to issue the Clarification/Exception Memorandum under DoDD 2310.01E.

Finally, Mr. al-Baluchi argues that the Secretary of the Army's issuance of the Clarification/Exception Memorandum usurped authority delegated to a subordinate officer, the Provost Marshal General.  See MMC Mot. at 24-25.  According to Mr. al-Baluchi, the Provost Marshal General had the exclusive authority under AR 190-8 to issue exceptions to the regulation, a power that was delegated by the Secretary to the Army to the DCS and then to the Provost Marshal General.  Mr. al-Baluchi argues that "authority once delegated may not be exercised ad hoc by the superior, delegating authority."  Id.

The Court agrees with respondents that Mr. al-Baluchi misconstrues the language of the directives at issue.  Respondents correctly point out that "[a]lthough AR 190-8's text in 1997 indicated that a DCS has [the] authority to approve certain exceptions, the [Secretary of the Army] retains that authority as well."  MMC Opp. at 30.  Under DoDD 5101.1, the Secretary of the Army – as the Executive Agent for the administration of the Detainee Program – exercises authority that "takes precedence over the authority of other DoD Component officials [including the DCS] performing related or collateral . . . responsibilities and functions."  DoDD 5101.1 § 4.4; see also Heggestad v. U.S. Dept. of Justice, 182 F. Supp. 2d 1, 9 (D.D.C. 2000) ("[I]t is well established that the head of an agency retains the authority to make final decisions for the agency even if he or she delegates the authority to make these decisions to his or her subordinates.").  There is therefore no reason to believe that the Secretary of the Army's issuance of the Clarification/Exception Memorandum improperly usurped authority delegated to a subordinate officer.

*C.  An Evidentiary Hearing is Unnecessary*

Having resolved Mr. al-Baluchi's motion for a Mixed Medical Commission, the Court sees no need to convene an evidentiary hearing.  Mr. al-Baluchi's request for a Mixed Medical Commission is a legal question that does not depend on any factual development.  As Judge Bates noted, "[t]he parties' disagreements about certain aspects of the medical care at Guantanamo, for example, are not <u>material</u> disputes because the nature of the medical care at Guantanamo has nothing to do with whether the relevant authorities afford . . . entitlement to an MMC."  <u>Bin Lep II</u>, 2023 WL 2707493, at *8.

For the foregoing reasons, it is hereby

ORDERED that Mr. al-Baluchi's Motion to Lift Stay on Habeas Proceedings and Compel Examination by a Mixed Medical Commission [Dkt. No. 225] and related Motion for Evidentiary Hearing in Support of Motion to Lift Stay on Habeas Proceedings and Compel Examination by a Mixed Medical Commission [Dkt. No. 237] are DENIED.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 9|8|23